No. 23-30033

# In the United States
# Court of Appeals for the Fifth Circuit

CALEB REESE; FIREARMS POLICY COALITION, INCORPORATED; SECOND AMENDMENT FOUNDATION; LOUISIANA SHOOTING ASSOCIATION; EMILY NAQUIN,

*Plaintiffs-Appellants,*

V.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN DETTELBACH, DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; MERRICK GARLAND, U.S. ATTORNEY GENERAL,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, No. 6:20-cv-01438

## BRIEF OF PLAINTIFFS-APPELLANTS

George J. Armbruster, III
ARMBRUSTER & ASSOCIATES, APLC
332 E. Farrel Road, Suite D
Lafayette, LA 70508
(337) 889-5511
george@arm-assoc.com

David H. Thompson
*Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

Joseph Greenlee
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149
(916) 517-1665
jgr@fpclaw.org

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

*Reese v. BATFE*, No. 23-30033

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| *Plaintiffs-Appellants* | *Counsel for Plaintiffs-Appellants* |
|---|---|
| Caleb Reese<br>Louisiana Shooting Association<br>Emily Naquin<br>Second Amendment Foundation<br>Firearms Policy Coalition, Inc. | David H. Thompson<br>Peter A. Patterson<br>William V. Bergstrom<br>COOPER & KIRK, PLLC<br><br>George J. Armbruster, III<br>ARMBRUSTER & ASSOCIATES, APLC<br><br>Joseph Greenlee<br>FPC ACTION FOUNDATION<br><br>John W. Dillon*<br>DILLON LAW GROUP<br><br>Raymond M. DiGuiseppe*<br>DIGUISEPPE LAW FIRM<br><br>Adam Kraut*<br>SECOND AMENDMENT FOUNDATION |

i

| ***Defendants-Appellees*** | ***Counsel for Defendants-Appellees*** |
|---|---|
| Bureau of Alcohol, Tobacco, Firearms and Explosives<br><br>Steven Dettelbach, in his official capacity as ATF Director<br><br>Merrick Garland, in his official capacity as Attorney General of the United States | Abby C. Wright<br>Daniel M. Riess*<br>Steven H. Hazel<br>U.S. DEPARTMENT OF JUSTICE |

Attorneys whose names are denoted with an asterisk entered appearances in the district court but have not entered appearances in the Fifth Circuit.

Dated: March 13, 2023

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. This case satisfies the standards for allowing oral argument set forth in Fed. R. App. 34(a)(2). First, this appeal is not frivolous. As explained in our brief, the challenged ban on licensed handgun sales to law-abiding 18-to-20-year-old adults cannot be squared with the fundamental right to keep and bear arms protected by the Second Amendment to the United States Constitution. Second, although this Court has previously rejected a challenge to this same law, *see National Rifle Ass'n of Am., Inc. v. BATFE*, 700 F.3d 185 (5th Cir. 2012), *reh'g denied*, 714 F.3d 334 (2013) ("*NRA I*"), a ruling in Plaintiffs-Appellants' favor is compelled by the Supreme Court's decision in *New York State Rifle & Pistol, Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which, as discussed below, abrogated this Circuit's decision in *NRA I*. This issue has not been authoritatively decided following *Bruen*. Finally, Plaintiffs-Appellants respectfully submit that the decisional process on the important matters presented in this case would be significantly aided by oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ...............................................................................iv

JURISDICTIONAL STATEMENT ......................................................................1

ISSUE PRESENTED ............................................................................................1

INTRODUCTION .................................................................................................2

STATEMENT OF THE CASE ..............................................................................3

SUMMARY OF THE ARGUMENT ....................................................................7

ARGUMENT ........................................................................................................9

I.    The Second Amendment's Plain Text Cover Plaintiffs' Rights to Purchase Firearms..........................................................................................10

    A.    The Second Amendment Protects the Right to Purchase Firearms. ...10

    B.    The Second Amendment Applies to 18-to-20-Year-Old Adults. .......14

II.    The Handgun Ban Cannot Be Justified By Reference to Any Historical Firearms Regulations. ..................................................................................22

    A.    The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Older Americans. ...............................26

    B.    Later History Also Supports Plaintiffs. .............................................35

CONCLUSION ...................................................................................................43

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*Agostini v. Felton*, 521 U.S. 203 (1997) ............................................... 24

*Andrews v. State*, 50 Tenn. 165 (1871) ........................................... 11, 12

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) .......................... 15

*Aymette v. State*, 21 Tenn. 154 (1840) ................................................. 42

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ........ 13

*Crawford v. Washington*, 541 U.S. 36 (2004) ....................................... 24

*District of Columbia v. Heller*, 554 U.S. 570
    (2008) ........................................................................ *passim*

*Dred Scott v. Sandford*, 19 How. 393 (1857) ....................................... 32

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ........................................... 18

*Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011) ................................. 11

*Firearms Pol'y Coal., Inc. v. McCraw*, --- F. Supp. 3d. ----, 2022 WL 3656996
    (N.D. Tex. Aug. 25, 2022) .......................................... 26, 28, 30, 31

*Folajtar v. Attorney General of the United States,* 980 F.3d 897 (3d Cir. 2020) .... 33

*Gamble v. United States*, 139 S. Ct. 1960 (2019) .................................. 35

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ............. 13, 14, 15, 16, 21, 27, 37

*Ill. Ass'n of Firearm Retailers v. City of Chicago*, 961 F. Supp. 2d 928
    (N.D. Ill. 2014) ..................................................... 11, 12

*Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ........... 11

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) .......... 17, 19, 26, 27, 34, 37, 38, 41, 42

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...................................... 33

*Luis v. United States*, 578 U.S. 5 (2016) ........................................... 11

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ....................................... 12

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................ 2, 13, 24, 37

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &*
    *Explosives* ("*NRA I*"), 700 F.3d 185
    (5th Cir. 2012) .................................................... *passim*

*Nat'l Rifle Ass'n, Inc. v. BATFE* ("*NRA II*"), 714 F.3d 334
(5th Cir. 2013) ................................ 21, 26, 27, 28, 30, 31, 32, 34, 35, 36, 42, 43

*National Rifle Association v. Bondi*, --- F. 4th ----, 2023 WL 2416683
(11th Cir. March 9, 2023) .................................................. 23, 29, 39

*National Rifle Association, Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013)...... 25, 27

*Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117 (2011) ................24

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ........................................................16

*New York State Rifle & Pistol, Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111
(2022) ................................................................................................*passim*

*Nunn v. Georgia*, 1 Ga. 243 (1846) ................................................ 14, 15

*Page v. State*, 50 Tenn. 198 (1871) ........................................................42

*Parker v. Dist. of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ..................................18

*Perpich v. Dep't of Def.*, 496 U.S. 334 (1990) ....................................................17

*State v. Callicutt*, 69 Tenn. 714 (1878).................................................41

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ................................11

*Terry v. Ohio*, 392 U.S. 1 (1968).................................................................13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)............... 15, 16

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ....................................11

*United States v. Miller*, 307 U.S. 174 (1939).........................................................27

*United States v. Rahimi*, --- F.4th ----, 2023 WL 2317796
(5th Cir. Mar. 2, 2023) ........................................................ 22, 23, 40

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .................................16

*Virginia v. Moore*, 553 U.S. 164 (2008)................................................................24

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ................................16

## Constitutions, Statutes and Rules

U.S. CONST.
art. I, § 2, cl. 2.........................................................................................15
art. I, § 8, cl. 16.......................................................................................17
amend. II.....................................................................................................9
amend. XXVI ...........................................................................................15

18 U.S.C.

§ 922(a)(1)(A)................................................................4
§ 922(b)(1)...............................................................3, 4
§ 922(c)(1) ...............................................................4

28 U.S.C.
§ 1291 ....................................................................1
§ 1331 ....................................................................1

1 BLACKSTONE COMMENTARIES *441...............................39

16 Del. Laws 716 (1881)...............................................38

156 Ala. Acts 17 .........................................................37

1856 Tenn. Pub. Acts 92...............................................37

1860 Ky. Acts 245 ......................................................38

1875 Ind. Acts 86........................................................38

1876 Ga. Laws 112 ......................................................38

1878 Miss. Laws 175–76................................................38

1881 Ill. Laws 73 ........................................................38

1882 Md. Laws 656 ......................................................38

1882 W. Va. Acts 421–22..............................................38

1883 Kan. Sess. Laws 159 .............................................37

1883 Wis. Sess. Laws 290 .............................................38

1884 Iowa Acts 86.......................................................38

1885 Nev. Stat. 51 ......................................................37

1890 La. Acts 39....................................................38, 39

1890 Wyo. Sess. Laws 1253 ...........................................37

1893 N.C. Sess. Laws 468–69.........................................38

1897 Tex. Gen. Laws 221–22..........................................38

27 Stat. 116–17 (1892) (District of Columbia)......................38

Mo. Rev. Stat. § 1274 (1879)..........................................38

Omnibus Crime Control and Safe Streets Act of 1968,
Pub. L. No. 90-351, 82 Stat. 197.................................3

The Militia Act, subd. ch. 33 § 1, 1 Stat. 271 ......................17

27 C.F.R.
§ 478.96(b) ...................................................................4
§ 478.99(b)(1) ..............................................................4
§ 478.124(a).................................................................4
§ 478.124(f) .................................................................4

## Other

2 ANNALS OF CONGRESS (Joseph Gales ed., 1834) ..........................18, 19

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 116
    (2011) ................................................................................32

*Banking With Interest: Former FHFA Chief: The Next Collapse of Fannie,
    Freddie "May Well Be an Inevitability"* INTRAFI NETWORK (May 17, 2022),
    https://apple.co/3NQX0lN ...........................................................1

JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) ................................39

Brief for *Amicus Curiae* National African American Gun Association, Inc.
    in Support of Petitioners, July 16, 2021,
    *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 ................32, 33

Thomas M. Cooley, THE GENERAL PRINCIPLES OF CONSTITUTIONAL
    LAW IN THE UNITED STATES OF AMERICA (1880)..................................16, 21, 41

Thomas M. Cooley, TREATISE ON CONSTITUTIONAL LIMITATIONS (5th ed. 1883)..41

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second
    Amendment*, 82 MICH. L. REV. 204 (1983) ........................................19

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young
    Adults*, 43 S. ILL. U. L.J. 495 (2019)..........................................20, 28

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit
    Cases on the Second Amendment Rights of Young People*,
    43 S. ILL. UNIV. L.J. 119 (2018) ..................................................38, 41

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in
    1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022),
    *available at* https://bit.ly/41OFQND.............................................23

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
    11 TEX. REV. OF L. AND POLITICS 191 (2006) .....................................37, 38

*Sentiments on a Peace Establishment* (May 2, 1783),
    *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON
    (John C. Fitzpatrick, ed. 1938)....................................................19

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiffs brought claims arising under federal law. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, because this appeal is from a final judgment that disposed of all parties' claims. The district court entered judgment on December 21, 2022, and Plaintiffs timely noticed this appeal on January 10, 2023.

## ISSUE PRESENTED

1. Whether a federal law that bans licensed sales of handguns and handgun ammunition to law-abiding 18-to-20-year-old adults violates the Second Amendment to the United States Constitution.

## INTRODUCTION

The Second Amendment right to "possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 581, 592 (2008). On their eighteenth birthdays, the Individual Plaintiffs in this case became legal adults for almost all purposes and certainly for the purpose of exercising their other constitutional rights. They are entitled to vote, enter contracts, and get married. They can join the military to fight and die for their country. And as adults, there are no parents or other legal guardians generally responsible for their care and protection. Yet the laws and regulations challenged in this case ("the Handgun Ban") categorically bar them from accessing the commercial market for handguns, "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 628–29), as other adult Americans have the undisputed right to do.

The district court dismissed Plaintiffs' claims, holding that the Handgun Ban was constitutional because there existed a historical tradition of similar firearms regulation that satisfied the requirements of the test laid out in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The district court was wrong to reach that conclusion because at the Founding—the most relevant time

period for understanding the scope of the Second Amendment—there were *no* restrictions on the rights of 18-to-20-year-olds to keep and bear arms on account of their age. Indeed, people in that group were, by dint of being in the militia, actually *required* to acquire firearms. And as for the later laws on which the district court relied, they are unable to bear the weight the district court places on them. They come too late in time, they did not restrict the rights of legal adults, and many of them were the sorts of laws that *Bruen* disregarded entirely. There is simply no historical regulation from any relevant time period that is anything like the Handgun Ban. The decision below should be reversed, and this Court should direct that judgment be entered in Plaintiffs' favor.

## STATEMENT OF THE CASE

Plaintiffs challenge the constitutionality of statutes that were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968 ("Act"), Pub. L. No. 90-351, 82 Stat. 197, along with regulations promulgated to enforce those statutory provisions, that together bar 18-to-20-year-olds from purchasing handguns from federal firearms licensees ("FFLs"). In particular, the Act makes it unlawful for an FFL:

> to sell or deliver . . . any firearm or ammunition . . . if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

3

18 U.S.C. § 922(b)(1). Likewise, the Act prohibits FFLs from selling a firearm to a person "who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer)" unless the person submits a sworn statement that "in the case of any firearm other than a shotgun or a rifle, [he or she is] twenty-one years or more of age." *Id.* § 922(c)(1). These statutes are implemented by regulations that similarly restrict handgun sales to individuals over 21. *See* 27 C.F.R. §§ 478.99(b)(1), 478.96(b), & 478.124(a), (f).

As a result of these statutes and regulations, "18-to-20-year-olds may not purchase handguns from FFLs." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*NRA I*"), 700 F.3d 185, 190 (5th Cir. 2012), *abrogated by Bruen*, 142 S. Ct. at 2127. And FFLs effectively *are* the commercial market for handguns—all who "engage in the business of importing, manufacturing, or dealing in firearms" must become FFLs. *See* 18 U.S.C. § 922(a)(1)(A). The Handgun Ban therefore shuts 18-to-20-year-olds out of the entire commercial market for handguns.

Plaintiffs Caleb Reese and Emily Naquin (collectively, "Individual Plaintiffs") are residents of Louisiana who are older than 18 but younger than 21 years old. ROA.317; ROA.641; ROA.724. Neither of the Individual Plaintiffs has ever "been charged with nor convicted of any misdemeanor or felony offense, and [both are] otherwise eligible to purchase and possess firearms, including handguns,

under all applicable laws." ROA.321–24; ROA.641; ROA.724. Neither owns a handgun but both intend and desire to purchase one, along with handgun ammunition, for lawful purposes, including self-defense. ROA.321–243; ROA.641; ROA.724–25. Both are "acquainted with the proper and safe handling, use, and storage of handguns and handgun ammunition." ROA.321, 323, 324; ROA.641; ROA.724. And both "would purchase [one or more handguns] and handgun ammunition from a lawful retailer," given that, if not for the Handgun Ban, the handguns would be "otherwise available for [their] purchase from multiple firearms retailers within [their] local area[s]." ROA.322–24; ROA.641; *see, e.g.,* ROA.727. However, the Handgun Ban prevents each of them "from purchasing handguns of the makes and models of [their] choice . . . from lawful retailers." ROA.322–24; ROA.641; ROA724–25.

Plaintiffs Firearms Policy Coalition ("FPC"), Second Amendment Foundation ("SAF"), and Louisiana Shooting Association ("LSA") (collectively, "Organizational Plaintiffs") are nonprofit organizations dedicated to promoting the right to keep and bear arms. ROA.318–20; ROA.642; ROA.726; ROA.728; ROA.731. All three Organizational Plaintiffs have members between the ages of eighteen and twenty-one, ROA.318–20; ROA.642; ROA.726; ROA.728; ROA.731, including the Individual Plaintiffs, ROA.317–18; ROA.642; ROA.727; ROA.729; ROA.731, and they all brought this action "on behalf of [their] individual members

who would purchase handguns and handgun ammunition from lawful retailers, and [their] member FFL handgun retailers who would sell handguns and handgun ammunition to adults under the age of twenty-one, but are prohibited from doing so by the Handgun Ban," ROA.318–20; ROA.642; ROA.727; ROA.729; ROA.731.

Plaintiffs initiated this action on November 6, 2020, seeking declaratory and injunctive relief from the federal agency—the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE")—and federal officials—the director of the BATFE and the attorney general—responsible for enforcing the Handgun Ban. Plaintiffs alleged that the Handgun Ban was unconstitutional for all adults over the age of eighteen.

On April 15, 2021, the Defendants filed a motion to dismiss or for summary judgment. *See* ROA.94. On May 5, 2021, Plaintiffs filed their First Amended Complaint, *see* ROA.315, which added Plaintiff Naquin as a party and added a claim that the Handgun Ban is unconstitutional as-applied to women over the age of eighteen.[1] Defendants filed a motion to dismiss or for summary judgment and Plaintiffs' cross-moved for summary judgment. On December 21, 2022, the district court entered judgment in Defendants' favor, and on January 10, 2023, Plaintiffs

---

[1] Given that this claim only differed from the facial challenge to the Handgun Ban at the "interest balancing" step of the analysis, and *Bruen* did away with interest balancing, there is no meaningful difference between Plaintiffs' facial and as-applied claims.

appealed to this Court.

## SUMMARY OF THE ARGUMENT

Under *Bruen*, this Court must review this Second Amendment challenge first by asking whether the plain text of the Amendment covers the conduct prohibited by the Handgun Ban. If so, then the Ban is presumptively unconstitutional and can only be saved only if the government demonstrates a tradition of "distinctly similar" historical regulations with roots at the Founding. The district court erred in finding that the Handgun Ban survives this analysis.

The district court did not closely analyze the plain text of the Amendment, but there can be no doubt that it protects the rights of 18-to-20-year-olds to purchase firearms. Although the Amendment explicitly protects "keep[ing]" and "bear[ing]" firearms, it is well established that Constitutional rights extend to cover conduct necessary to their exercise, and here the right to "keep" a firearm necessarily entails the right to acquire one, including through the regulated marketplace. And Plaintiffs are among "the people" to whom the right applies. The Supreme Court has repeatedly said that this language in the Second Amendment (as well as the First and the Fourth) refers to *all Americans*. Furthermore, the Amendment explicitly references "the militia" and was included in the constitution to protect that entity from destruction at the hands of the federal government. At the Founding or shortly thereafter, 18-to-20-year-olds were part of "the militia" everywhere in the country.

Although those early militia statutes did not *confer* a right to keep and bear arms, they demonstrate a background understanding that 18-year-olds were among the people to whom the pre-existing right to keep and bear arms applied.

Turning to history, the district court incorrectly found that history supported the Handgun Ban. In doing so, it relied heavily on this Court's earlier decision in *NRA I*. But *NRA I* itself reached no final conclusions about the history of the Amendment and answered the same question presented here on grounds that have now been entirely abrogated by *Bruen*. In any event, the *NRA I* decision and the district court here fundamentally erred in finding any Founding Era support for the Handgun Ban. There is none. At the Founding, 18-to-20-year-olds were required to own firearms as part of their militia duties and there were *zero* laws restricting them from using those firearms when not on duty. *NRA I* and the district court found support in several places: laws that disarmed *other* groups on a categorical basis but which would be obviously unconstitutional today, laws that disarmed *individuals* for specific demonstrations of dangerousness, a thoroughly debunked theory of "civic virtue" that supposedly reigned at the Founding, and the fact that 20-year-olds were, at the founding, considered legal minors. Not *one* of these laws or theories satisfies *Bruen*'s requirement that proposed historical analogues burden the right for the same reasons and in the same way as the modern law at issue.

In fact, the first laws that could arguably be considered analogues do not appear until just before the Civil War. This is too late, in the face of the unanimous practice at the Founding, to overcome the clear text of the Amendment and that earlier history. The Court need look no further. But even if these later laws are analyzed, once those that were enacted without reference to *any* constitutional provision protecting the right to bear arms and other historical outliers are removed, all are distinguishable as focused exclusively on the practices of minors, who were dependent upon their parents for care and protection. Plaintiffs in this case are legal adults; earlier restrictions on the rights of minors are irrelevant to the Handgun Ban. As such, the district court's judgment should be reversed, and judgment should be entered in Plaintiffs' favor.

## ARGUMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The right presumptively "belongs to all Americans," not "an unspecified subset." *Heller*, 554 U.S. at 580, 581, 592. The Amendment enshrines " 'the right of law-abiding, responsible citizens to use arms' for self-defense . . . [and] demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). For that reason, no important governmental interest can justify legislation that conflicts with the protections of the Second

Amendment. Following the Supreme Court's decision in *Bruen*, the following standard governs cases challenging the constitutionality of laws under the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 2129–30 (quotation marks omitted). Here, the text of the amendment encompasses 18-to-20-year-olds' right to acquire handguns and the government has not demonstrated a historical tradition of firearm regulation at all comparable to the Handgun Ban. As a result, the district court erred in granting the government's motion to dismiss and should have entered summary judgment in Plaintiffs' favor. This Court reviews this decision *de novo*.

## I.   The Second Amendment's Plain Text Covers Plaintiffs' Rights to Purchase Firearms.

The district court did not resolve this issue but rather "assume[d] that the statute and regulations at issue proscribe conduct covered by the plain text of the Second Amendment," noting that this Court in *NRA I* "appear[ed] to assume that the restrictions at issue implicate this age group's Second Amendment rights." ROA.1147-48. The district court's assumption was correct.

### A. The Second Amendment Protects the Right to Purchase Firearms.

The laws at issue in this case prevent Plaintiffs from purchasing handguns and

handgun ammunition from licensed firearms dealers. That is activity covered by the Second Amendment. The Second Amendment explicitly enshrines a right to "keep" arms and a right to "bear" them. The Supreme Court has explained that "keep" in this context means that Americans have a right to "to retain in one's power or possession"; *i.e.*, to "have weapons." *Heller*, 554 U.S. at 582 (analyzing Founding era dictionaries) (cleaned up). Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). Here, the right to "have" arms implies the right to acquire them, as courts around the country have repeatedly held (and, as the district court noted, this Court implicitly concluded in *NRA I*). *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011)); *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms for protection implies a corresponding right to obtain bullets necessary to use them." (quoting *Ezell*, 651 F.3d at 704)), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127; *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (The conclusion that "there would be no constitutional defect in prohibiting the commercial sale of firearms . . . would be untenable under *Heller*."), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127; *Ill. Ass'n of*

*Firearm Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014)

("This right must also include the right to acquire a firearm."); *Andrews v. State*, 50

Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to

purchase them."); *see also Heller*, 554 U.S. at 583 n.7 (2008). Any reading of the

Amendment that finds *possession* protected and *acquisition* not would eviscerate its

protections with an unduly literal construction of the "plain text." As the Supreme

Court cautioned in *McCulloch v. Maryland*:

> A constitution, to contain an accurate detail of all the subdivisions of
> which its great powers will admit, and of all the means by which they
> may be carried into execution, would partake of the prolixity of a legal
> code, and could scarcely be embraced by the human mind. . . Its nature,
> therefore, requires, that only its great outlines should be marked, its
> important objects designated, and the minor ingredients which compose
> those objects, be deduced from the nature of the objects themselves.

17 U.S. 316, 407 (1819).

The district court raised the concern, however, that because the "statute and

regulations here . . . do not impose a total ban on the sale of firearms" it was possible

that they fell outside of the text and so did not implicate the Second Amendment.

ROA.1147. But nothing in *Heller*, *Bruen*, or any other Supreme Court case

interpreting the Second Amendment suggests that only *total bans* implicate the

Second Amendment right. Such reasoning is inappropriate under *Bruen*. Indeed,

*Bruen* itself did not concern a total ban but rather a licensing regime that restricted

public carry to those with atypical self-defense needs. And *Bruen*'s analysis refutes

the district court's suggestion. The Second Amendment's "plain text covers [the Plaintiffs'] conduct"—that is, purchasing handguns. If the government seeks to justify its regulation by showing that other avenues remain open to 18-to-20-year-olds and that closing off the right to purchase firearms from licensed dealers is acceptable despite the Second Amendment's text, it must do so through reference to historical tradition. Reading the text so narrowly would treat the Second Amendment as "a second class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780 (plurality op.)). For instance, it would clearly *implicate* the First Amendment, for instance to pass a law that burdens a small minority religious practice even as it leaves other avenues for religious observance open, *see, e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993), just as it *implicates* the Fourth Amendment for a police officer to conduct a "carefully limited search of the outer clothing . . . in an attempt to discover weapons," *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Whether this infringement upon the right described in the Second Amendment's text is a justifiable one is an issue for the historical analysis mandated by *Bruen*.

Furthermore, the restrictions at issue do more than close off *one* way for Plaintiffs to acquire handguns. They close off *the most important* way to do so.

> [O]ther options are not always readily available to many individuals. Not all young adults have friends or family members who are able or

> willing to gift them a gun. And secondary markets are not always available to everyone or easy to navigate safely. On the other hand, licensed dealers come with assurances of quality, safety, legality, and more.

*Hirschfeld v. BATFE*, 5 F.4th 407, 417 (4th Cir. 2021), *vacated as moot* 14 F.4th

322 (4th Cir. 2021). By precluding individuals from the principal way by which they

can acquire a firearm and thereby exercise their Second Amendment right to keep

and bear arms, the Handgun Ban regulates conduct falling within the plain text of

the Second Amendment.

### B. The Second Amendment Applies to 18-to-20-Year-Old Adults.

The district court did not explicitly address whether Plaintiffs, as 18-to-20-

year-old adults, fall within the "people" protected by the Second Amendment, but

rather appears to have assumed that they do. ROA.1147 Again, that assumption was

correct. Two key elements of the Amendment's text, as conclusively interpreted by

the Supreme Court, remove any doubt that 18-to-20-year-olds have full Second

Amendment rights.

*First*, the Amendment refers to a right of "the people" to keep and bear arms

without mentioning age. The " 'normal and ordinary' meaning" of "the people"

includes *all* the people. *Bruen*, 142 S. Ct. at 2127. As the Supreme Court held in

*Heller*, "the Second Amendment right is exercised individually and belongs to *all*

Americans." 554 U.S. at 581 (emphasis added); *Nunn v. Georgia*, 1 Ga. 243, 250

(1846) ("The right of the whole people, old and young, men, women[,] and boys,

and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree.") (quoted approvingly, *Heller*, 554 U.S. at 612–13 and *Bruen*, 142 S. Ct. at 2147) (emphasis in original). Quoting *Heller*, *Bruen* reiterated that "the Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." 142 S. Ct. at 2156. The exceptions are shown by history; they are not a matter of plain text.

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). In context, the Constitution elsewhere explicitly considers and prescribes limits based on age. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives). "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld*, 5 F.4th at 421. And in the two other provisions in the Bill of Rights that explicitly describe a right of "the people" generally—the First and the Fourth Amendments—the rights extend to 18-year-olds and in fact extend to *the whole people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students . . . are 'persons' under our Constitution [who] are possessed of fundamental rights which the State must

respect"); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) ("Equally indisputable is the proposition that the Fourteenth Amendment protects the [incorporated Fourth Amendment] rights of students against [unreasonable searches and seizures] by public school officials."); *see also Hirschfeld*, 5 F.4th at 421. It would make no sense to interpret "the people" in the Second Amendment to have a different meaning than it does in the First and Fourth Amendments, particularly when it "seems to have been a term of art employed in select parts of the Constitution." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). And "[w]hen the term *the people* is made use of . . . in all the enumerations and guaranties of rights [in the Constitution] the whole people are intended." Thomas M. Cooley, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880); *accord Heller*, 554 U.S. at 580–81. Even where "the people" does not appear, *every other constitutional right* applies *at least* to those 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that the right to jury trial, voting, marriage, and sex apply at least to those 18 years old).

*Second*, the Amendment includes a "prefatory clause" which begins: "[a] well regulated Militia, being necessary to the security of a free State . . . ." As *Heller* explained, this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. As such, although the right is

not limited to those who were in the militia or eligible for militia service at the Founding (it is unquestionably broader and includes, for example, women like Plaintiff Naquin), "[l]ogic demands that there be a link between the stated purpose and the command," *id.* at 577, meaning that if an individual would have been a member of the "militia," *at least* he must be part of "the people" protected by the Amendment.

At the Founding, the "militia" was widely understood to refer to "all able-bodied men," *id.* at 596, including in the unanimous judgment of the federal government and every state in the union, all men of at least 18 years of age, *Jones v. Bonta*, 34 F.4th 704, 718–19 & App'x 2 (9th Cir. 2022) (collecting post-ratification state militia laws), *vacated on reh'g and remanded in light of* Bruen, 47 F.4th 1124 (Mem.). This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. The Militia Act, subd. ch. 33 § 1, 1 Stat. 271, passed by the Second Congress just months after the Second Amendment was ratified, "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 719 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that the Second Amendment right vests by age 18.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment.

*Parker v. Dist. of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570; *see also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("[T]his Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given the Constitution's provisions." (cleaned up)).

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2145–46 (Joseph Gales ed., 1834). Although previously "military age ha[d] generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id.* at 2153. Representative Jackson explained "that

from eighteen to twenty-one was found to be *the best* age to make soldiers of." *Id.* at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President in 1792 signed the Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719 & App'x 2. There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms. This followed from the colonial practice: "From the earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 n.46 (1983). Plaintiffs are unaware of even a single state that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a

comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-year period in Virginia [between 1738 and 1757])." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533 (2019).

To be clear, Plaintiffs do not contend that these militia laws somehow *extended* Second Amendment rights to 18-year-olds. Indeed, *Heller* made clear that the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated Militia" referred to in the Amendment's prefatory clause, which the Constitution understood to be an entity "already in existence" made up of "all able-bodied men," is the "pool" from which

> Congress has plenary power to organize the units that will make up an
> effective fighting force. That is what Congress did in the first Militia
> Act, which specified that each and every free able-bodied white male
> citizen . . . who is or shall be of the age of eighteen years . . . shall
> severally and respectively be enrolled in the militia.

*Id.* (quoting Act of May 8, 1792) (quotation marks omitted). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless *must* draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after

the passage of the Second Amendment establishes that they *must* have been within the militia referenced by the Second Amendment. *Id.*; *see also Hirschfeld*, 5 F.4th 407, 429–30 ("Because the individual right is broader than the Second Amendment's civic purpose, those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right."). As a result, "any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms" is "inconceivable." *Nat'l Rifle Ass'n, Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental) ("*NRA II*").

Finally, it is worth noting that this understanding of the scope of the right, and the importance of the "militia" in the prefatory clause, persisted well beyond the time of the Founding. It was still the view in the 19th century following the ratification of the Fourteenth Amendment. As Thomas Cooley wrote in his 1880 treatise, when interpreting the Second Amendment's text,

> [i]t might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. . . . The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose.

COOLEY, *supra*, GENERAL PRINCIPLES, at 271. The Court in *Heller* noted: "All other post-Civil War 19th-century sources we have found concurred with Cooley." 554 U.S. at 618. The text of the Amendment cannot be read in any way to exclude 18-to-20-year-olds from its coverage.

## II.    The Handgun Ban Cannot Be Justified By Reference to Any Historical Firearms Regulations.

The text of the Amendment covers purchasing handguns and applies to Plaintiffs, so the Handgun Ban is unconstitutional under *Bruen* unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. The Supreme Court was clear: the burden is on the government to *prove* that the Handgun Ban is constitutional, and the only acceptable standard against which to judge its constitutionality is the history of traditional firearm regulation in this country. *Id.*; *see also id.* at 2131 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference." (quoting *Heller*, 554 U.S. at 635)).

When applying this test, the Supreme Court has provided significant guidance to this Court. For instance, it has cautioned that historical regulations cannot justify a modern law unless they are "relevantly similar," meaning that the historical regulations "imposed 'a comparable burden on the right of armed self-defense' [and] were also 'comparably justified.' " *United States v. Rahimi*, --- F.4th ----, 2023 WL 2317796, at *8 (5th Cir. Mar. 2, 2023) (quoting *Bruen*, 142 S. Ct. at 2132–33). In cases where, as here, the "problem" sought to be addressed (the availability of firearms to 18-to-20-year-olds like Plaintiffs) "has persisted since the 18th century,

the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. And when analyzing historical analogues, the greatest attention must be placed on the practices of the founding generation because, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' " *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35 (emphasis in *Bruen*); *see Rahimi*, 2023 WL 2317796, at *8 ("We thus afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification."); Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022), *available at* https://bit.ly/41OFQND. The Eleventh Circuit recently reached the opposite conclusion, giving precedence to history from around the time of the ratification of the Fourteenth Amendment. *See National Rifle Association v. Bondi*, --- F. 4th ----, 2023 WL 2416683, at *5 (11th Cir. March 9, 2023). But in that case the question was the constitutionality of a *state* law. Here, where the right in question is the Second Amendment operating directly on the federal government, not indirectly through incorporation by the Fourteenth Amendment against the states, there can be no dispute that the people adopted the right in 1791. And in any event, the *Bondi* decision got this point wrong. In addition to conflicting with this

Circuit's precedent in *Rahimi*, the *Bondi* decision fails to account for two interrelated principles that *require* 1791 to be the focus of this Court's analysis.

First, with respect to the federal government, the Supreme Court has *always* treated 1791as the key date for determining the meaning of the Bill of Rights. *Bruen*, 142 S. Ct. at 2137; *see also Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011). Second, the Supreme Court has made clear that the Bill of Rights, including the Second Amendment, means the same thing applied against the federal government directly as it does applied against the states. *McDonald*, 561 U.S. at 765–66 (collecting cases). Putting these two principles together, binding Supreme Court precedent mandates treating 1791 as the key date for determining the meaning of the Bill of Rights, and even if *Bruen* cast doubt on this practice (it did not, it also treated evidence from the Founding as generally dispositive of the scope of the right, *see id.* at 2136–37), this Court would remain bound to follow these decisions until the Supreme Court clearly overruled them, *see Agostini v. Felton*, 521 U.S. 203, 237 (1997); *see also Bruen*, 142 S. Ct. at 2136 (Barrett, J., concurring).

While the district court appropriately noted that precedence should be given to Founding era history in its analysis, it otherwise failed to properly apply *Bruen*'s exacting historical standard when it found the Handgun Ban justified. A proper

analysis of Founding era history demonstrates that there were *no* comparable bans on 18-to-20-year-olds' exercise of Second Amendment rights at the Founding. The scant potential analogues from later in our country's history are insufficient both because they were inconsistent with that Founding era history and because they were based on a rationale (that 18-to-20-year-olds could be restricted in their exercise of their rights because they were minors) that does not apply today.

In reaching the wrong conclusion, the district court relied heavily on this Court's pre-*Bruen* decisions in *NRA I* and *National Rifle Association, Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013). To be sure, the district court did not consider itself bound by them—both decisions upheld restrictions on the rights of 18-to-20-year-olds based on the now-defunct "step two" analysis that applied in this Circuit before *Bruen* and have been abrogated—but it nevertheless placed dispositive weight on those panel's discussion of Second Amendment history, even though the panels were not willing to do the same. In *NRA I*, the panel declined to decide whether the same laws at issue here were permissible in light of our nation's history, stating that it "face[d] institutional challenges in conducting a definitive review of the relevant historical record" so that although it was "inclined to uphold the challenged federal laws" based on its assessment of history, the panel "ultimately conclude[d] that the challenged federal laws pass constitutional muster even if they implicate the Second Amendment guarantee." 700 F.3d at 204. And in *McCraw*, the

Court went no further, merely noting that, in light of *NRA I*, it was "likely" that Texas's ban on carriage of firearms by 18-to-20-year-olds fell outside the scope of the Second Amendment. 719 F.3d at 347. As a result, the Fifth Circuit's historical analysis in both cases was explicitly tentative and was merely dicta even before *Bruen* clarified the standard to be applied in Second Amendment cases and abrogated both cases. *See Firearms Pol'y Coal., Inc. v. McCraw*, --- F. Supp. 3d. ----, 2022 WL 3656996, at *7 (N.D. Tex. Aug. 25, 2022). Furthermore, as discussed below, the historical analysis in these cases was not conducted in the tailored, specific way that *Bruen* requires. In *NRA I*, the Court concluded that "*at a high level of generality*, the [Handgun Ban] is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *NRA I*, 700 F.3d at 203 (emphasis added); *but see Bruen*, 142 S. Ct. at 2133 ("Courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." (cleaned up)). As such, in deciding this historical issue, this Court is writing on a clean slate and its *NRA I* and *McCraw* can provide little guidance.

### A. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Older Americans.

Well before the Founding era, the tradition of 18-to-20-year-olds "keeping and bearing arms [was] deep-rooted in English law and custom" and "was brought

across the Atlantic by the American colonists." *Jones*, 34 F.4th at 717. As discussed above, in the period immediately following ratification "every state's militia law *obliged*" 18-to-20-year-olds "to acquire and possess firearms." *Jones*, 34 F.4th at 719 (emphasis added); *see also United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called for service these men were expected to appear bearing arms supplied by themselves."). And in dissenting from the denial of rehearing en banc in *NRA II*, Judge Jones reached the same conclusion, explaining that although sixteen was the minimum age before the Constitution was ratified, "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in *every state* became eighteen." 714 F.3d at 340 (Jones, J., dissental) (emphasis added). After exhaustively surveying historical gun regulations related to firearm purchasing by 18-to-20-year-olds, the Fourth Circuit in *Hirschfeld* concluded that it was not until 1856 that *any* state restricted the ability of 18-to-20-year-olds to "possess or purchase weapons." 5 F.4th at 437.

In addition to the "founding-era evidence of militia membership [which] undermines [the district court's] interpretation" of the Amendment, 18-to-20-year-olds were expected to bear arms as part of the *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Jones*, 34 F.4th at 718, 722 (cleaned up). Similarly, at common law

by age 18 all able-bodied men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." Kopel & Greenlee, *Second Amendment Rights*, *supra* at 534.

The *NRA I* panel opinion, which the district court relied almost exclusively on for its analysis of relevant history, did not analyze Founding era history in a way that comports with *Bruen*'s requirements. *See Firearms Pol'y Coal.*, 2022 WL 3656996, at *9 ("*NRA* failed to conduct a tailored historical analysis."). *Bruen* requires courts to take a close look at actual historical restrictions on the right to bear arms; the Supreme Court itself analyzed several statutes in great detail to determine whether New York's concealed carry law comported with historical practice. The *NRA I* decision undertook no similar efforts in its analysis of the state of the right at the Founding. Revealingly, it gave its section devoted to the period the more general title "Founding-Era *Attitudes*." 700 F.3d at 200 (emphasis added).

This focus on attitudes, rather than laws, is evident from the fact that the panel largely ignored the most relevant Founding era evidence for this case—the militia statutes just discussed. As Judge Jones noted, "[f]rom a historical perspective, it is more than odd that the [*NRA I*] panel relegate[d] militia service to a footnote." *NRA II*, 714 F.3d at 339 (Jones, J., dissental). And the footnote in which it discussed the militia statutes got both the importance of these laws, and their history, wrong. The panel in *NRA I* argued that such laws should not be given much weight since "the

28

right to arms is not co-extensive with the duty to serve in the militia." 700 F.3d at 204 n.17 (citing *Heller*, 554 U.S. at 589–94). The district court in this case echoed that sentiment. ROA.1149. Undoubtedly true, but that does not mean that courts can simply ignore who composed the militia when the Second Amendment was adopted. Although the Second Amendment's prefatory clause does not "limit or expand the scope of the operative clause," "[l]ogic demands that there be a link between the stated purpose and the command." *Heller*, 554 U.S. at 577, 578. The prefatory clause—"A well regulated Militia, being necessary to the security of a free State"— "announces the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 595, 599. Therefore, although the right is not limited to membership in the militia (it is unquestionably broader and includes, for example, women), logic demands that its protections extend *at least* to those the Framers understood to constitute the militia. Any other reading would sever the "link between the stated purpose and the command," contrary to the instruction of *Heller*. *Id.* at 577–78. This is also why the Eleventh Circuit was wrong, in *Bondi*, to suggest that emphasizing Founding era militia membership "mistakes a legal obligation for a right." *Bondi*, 2023 WL 2416683, at *12. The "militia" in the Second Amendment refers to the unorganized body of all able-bodied male citizens, not the subset of that body that the government chooses to require to participate in the organized militia. *See Heller*, 554 U.S. at 596. The fact that 18-year-olds all-but uniformly were in the

*organized* militias of the Founding era demonstrates conclusively were members of the *unorganized* militia referred to by the Second Amendment.

The panel in *NRA I* also stated that the militia laws "fluctuat[ed] the age of enrollment "depending on legislative need." 700 F.3d at 204 n.17. But as discussed above, that was not the case in any relevant sense. In the two states cited in *NRA I* as setting the age at 21, 18-year-olds were nevertheless allowed in the militia. *See NRA II*, 714 F.3d at 341–42 (Jones, J., dissental). The analysis just of these militia laws demonstrates that *NRA I*'s historical analysis is insufficient under *Bruen*.

The district court also noted that the *NRA I* panel had relied on "a variety of gun safety regulations were on the books" at the Founding. ROA.1148 (quoting *NRA*, 700 F.3d at 200). These included (1) " 'laws disarming certain groups and restricting sales to certain groups' for reasons of public safety" (2) "laws [that] confiscated weapons from law-abiding slaves and freemen," (3) " 'the classical republican notion that only those with adequate civic virtue could claim the right to arms,' " and (4) that the "age of majority from the founding era-until the 1970s was 21." ROA.1148 (quoting *NRA*, 700 F.3d at 200).

None of this listed evidence satisfies *Bruen*'s requirement that proposed analogues be "relevantly similar" to the modern law. Because, "everything is similar in infinite ways to everything else," *Bruen* provided two key metrics for courts "to assess which similarities are important and which are not": "how and why" earlier

"regulations burden[ed] a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. Taking the points from the district court in turn, the "laws disarming certain groups and restricting sales to certain groups" are not appropriate analogues. Neither the district court nor the *NRA I* panel cited a single law from the founding that included 18-to-20-year-olds within the "certain groups" that could be so disarmed. In fact, the laws that the *NRA* panel cited affirmatively support the right of ordinary 18-to-20-year-olds to keep and bear arms. For instance, the panel noted that "several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." 700 F.3d at 200. But those laws fail *Bruen*'s test—since they targeted *individuals* based on a showing of *individual* dangerousness (during a time of revolution), not an entire group based on their age. They were effectively administered "on a case-by-case basis" whereas the Handgun Ban acts as a flat ban on an entire group. *NRA II*, 714 F.3d at 343 (Jones, J., dissental); *cf. Firearms Policy Coal.*, 2022 WL 3656996, at *10 (The Supreme Court's "recognition of *specific* 'longstanding prohibitions' [on felons and the mentally ill] does not support a *general* prohibition on almost all 18-to-20-year-olds—just because of their age." (emphasis in original)). But more than that, "[a] brief survey reveals that [loyalty laws] were applicable to persons *above eighteen* and stated that those who did not swear allegiance would be *dis*armed— eighteen year olds were considered to have rights even if they were being restricted

31

equally with other suspect class members." *NRA II*, 714 F.3d at 343 (Jones, J., dissental) (emphasis in original).

The *NRA I* panel also noted that the Founders disarmed "law-abiding slaves [and] free blacks" because they were "deemed untrustworthy." 700 F.3d at 200 (citing Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 116 (2011)). These of course *were* class-based laws, though they are different from the present laws in that they targeted different classes of people than the Handgun Ban. That distinction matters because these laws targeted people who were viewed as wholly outside the protective scope of the Bill of Rights. As the Supreme Court noted in *Bruen*, Chief Justice Taney confirmed the early American view on the limitations of the Second Amendment when he "fretted" that "if blacks were citizens . . . they would be entitled to . . . the right to keep and carry arms wherever they went." *Bruen*, 142 S. Ct. at 2150–51 (quoting *Dred Scott v. Sandford*, 19 How. 393, 417 (1857)) (cleaned up). Eighteen-year-olds were *not* categorically excluded from "the people" protected by the Second Amendment, so these restrictions are not informative about modern laws targeting them. More importantly, these laws are repugnant, racist, and obviously unconstitutional today under the Fourteenth Amendment. The Court in *Bruen* simply ignored racist laws limiting the rights to public carry, and this Court should do the same. *See* Brief for *Amicus Curiae* National African American Gun Association, Inc. in Support of Petitioners at 4–11,

July 16, 2021, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843 (citing racist laws which *Bruen* ignored).

The *NRA I* panel's reference to the "classical republican notion that only those with adequate civic virtue could claim the right to arms," 700 F.3d at 201 (cleaned up); ROA.1148-49, is likewise insufficient to support the Handgun Ban under *Bruen*. The panel did not cite any Founding era laws actually disarming the "unvirtuous," but instead based its conclusion on this point on two different law review articles. 700 F.3d at 200. This lack of support is notable. The "virtue" theory of the Second Amendment has been roundly criticized by other judges in the years after *NRA I* was decided as an academic construction with no basis in the actual history of our nation. In his dissent in *Folajtar v. Attorney General of the United States*, a case about felon disarmament, Judge Bibas demonstrated that "the virtue theory is flimsy" at best, and that the academic sources endorsing it (including those referenced in *NRA*) "are like the layers of a matryoshka doll, each nested layer successively larger with little at the core." 980 F.3d 897, 915–16, 919 (3d Cir. 2020). At best, the "virtue" theory of rights applied to "exercise of civic rights," "like the rights to vote and serve on juries," but *Heller* "expressly rejects the argument that the Second Amendment protects a purely civic right." *Kanter v. Barr*, 919 F.3d 437, 462–63 (7th Cir. 2019) (Barrett, J., dissenting). Instead, "the Second Amendment confer[s] an *individual right* to keep and bear arms. *Id.* at 463 (quoting *Heller*, 554 U.S. 595) (emphasis in

*Kanter*). Then-Judge Barret noted that the parties had "introduced no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights. And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment." *Id.* No such evidence was cited by the district court here either, and none is to be found in *NRA I*. Without some such evidence, the "virtue" theory cannot support the Handgun Ban's constitutionality under *Bruen*.

Finally, the district court found persuasive the *NRA I* panel's point that 18-to-20-year-olds were minors at the Founding (and for a long time after). As the Court explained in that case: "If a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18-to-20-year-olds as 'minors,' then it stands to reason that the citizen would have supported restricting an 18-to-20-year-old's right to keep and bear arms." 700 F.3d at 202; *see also* ROA.1149 (quoting the same). This claim fails the *Bruen* test two different ways. First, as Judge Jones explained, at the Founding, minors who were at least 18 years old were not, contrary to the assumption in the first clause of the quoted sentence from the panel opinion, "conceived of . . . [as] unworthy of the Second Amendment guarantee." *Id.* Instead, while that status may have restricted *other* rights of those individuals, *see Jones*, 34 F.4th at 720, "those minors were in the militia *and, as such*, they were required to own their own weapons. What *is inconceivable* is any argument that 18- to 20-year-olds were not

considered, at the time of the founding, to have full rights regarding firearms." *NRA II*, 714 F.3d at 342 (Jones, J., dissental) (emphasis in original). Second, even if the State could show that being a minor in 1791 carried with it some disability with respect to firearms, *Bruen* also demands that modern restrictions be "comparably justified" to their historical analogues. And here, there would be no justification for extending any historical restrictions based on minority status to 18-to-20-year-olds today, since 18-to-20-year-olds today are legally adults, not minors. And that distinction is meaningful, since a minor whose Second Amendment rights are restricted is under the care and protection of a parent or guardian, while an adult whose Second Amendment rights are restricted is not.

**B. Later History Also Supports Plaintiffs.**

In view of the unanimous practice of the Founding era of treating 18-to-20-year-olds as having full Second Amendment rights, this Court need look no further. "*Heller*'s interest in mid- to late-19th century commentary was secondary. . . . In other words, [*Heller*'s] 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established,' " by earlier sources of information about the right. *Bruen*, 142 S. Ct. at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019)). Indeed, the district court, in construing the *NRA I* opinion, also noted that the Founding era history should control, since in *NRA I* "the panel confirmed its initial conclusions by looking to nineteenth century laws

restricting access to firearms by those under the age of 21." ROA.1152-53. But the panel in *NRA I* got the earlier history wrong, so to the extent the nineteenth century history does demonstrate restrictions on the rights of 18-to-20-year-olds to acquire handguns, that history conflicts with the Founding era and should be disregarded. *See NRA II*, 714 F.3d at 344 (Jones, J., dissental) ("With its merely general references to firearms regulations at the founding and its only support in regulations against 18-to 20-year olds late in the 19th century, the panel is unable to prove that banning commercial firearms sales to late teens has any analogue in the founding era."). There is simply not a shred of evidence from the Founding era of any "historical analogue" that attempted to constrain 18-to-20-year-olds' exercise of their Second Amendment rights in any way like the Handgun Ban does here. Because any later evidence in support of the Handgun Ban can only contradict this earlier evidence, this Court can end its analysis here with the unanimous practices of the Founding era. *Bruen*, 142 S. Ct. at 2137.

However, if post-Founding era history is considered, it demonstrates that restrictions equivalent to the Handgun Ban were rare even at later periods in our country's history. As Judge Jones explained, the *NRA I* panel's reference to putatively similar 19th century laws "is overstated." *NRA II*, 714 F.3d at 344. The panel asserted that by 1899, "nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use

particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at 21." 700 F.3d at 202. But under *Bruen*, these laws should be afforded little weight. All come too late in time. Only two of them predate the civil war: one from Alabama and one from Tennessee. *See* 156 Ala. Acts 17; 1856 Tenn. Pub. Acts 92. "It would . . . be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440; *see also McDonald*, 561 U.S. at 770–78; *Jones*, 34 F.4th at 722 (noting the "deeply offensive nature of many of" "the Reconstruction-era laws" restricting the Second Amendment rights of 18-to-20-year-olds). One law cited by the panel did not prevent purchase of handguns at all, it merely forbade them to be carried concealed, so it did not burden the exercise of the right to the same degree as the Handgun Ban. 1885 Nev. Stat. 51. One law comes from Kansas, 1883 Kan. Sess. Laws 159, which was singled out by *Bruen* as an example of a state that, around this time, "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*," 142 S. Ct. at 2155. *Bruen* was also dismissive of overly restrictive firearm laws in the Western Territories, which "were rarely subject to judicial scrutiny" and deserving of "little weight," *id.* at 2121. The panel's Wyoming law qualifies. 1890 Wyo. Sess. Laws 1253. Several other laws come from states with no Second Amendment analogue

and so were passed by legislatures that did not consider themselves bound to respect a right to bear arms of their citizens. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. OF L. AND POLITICS 191, 193–204 (2006); 16 Del. Laws 716 (1881); 1881 Ill. Laws 73; 1884 Iowa Acts 86; 1882 Md. Laws 656; 1890 La. Acts 39; 1882 W. Va. Acts 421–22; 1883 Wis. Sess. Laws 290.

That leaves just nine laws, all enacted over a century after the Second Amendment was ratified, in the last quarter of the nineteenth century (from 1875 in Indiana to 1897 in Texas). Of those, seven explicitly singled out this age group because they were "minors." 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112; 1860 Ky. Acts 245[2]; 1878 Miss. Laws 175–76; Mo. Rev. Stat. § 1274 (1879); 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22. And even the two laws that did not specifically say they applied to minors (but instead referenced only an age cutoff) *did* in fact, apply to minors. 1875 Ind. Acts 86; 1890 La. Acts

---

[2] The *NRA I* panel cited 1873 Ky. Acts 359 here, but that statute "has nothing to do with arms;" the citation appears to point either at a law incorporating a banking and warehousing company or at a law revising the charter for the city of Newport. *See* David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. UNIV. L.J. 119, 138 & n.100 (2018). It is entirely possible that the relevant law which Kopel & Greenlee found from Kentucky (and which is substituted above) would have been excluded by the *NRA I* panel in light of its obviously discriminatory nature. The law applied against sales or gifts to "any minor, or slave, or free negro." The *Jones* court remarked on the "deeply offensive nature" of firearms laws from around the time of the Reconstruction, 34 F.4th at 722, and as discussed above, laws like this one were given no weight in *Bruen*. They should be entirely excluded from the analysis of the Second Amendment right.

39. These laws are not appropriate analogues to the Handgun Ban for the simple reason that they are predicated on a status (legal minority) that does not apply to 18-to-20-year-olds today. This critical distinction was ignored by the Eleventh Circuit in *Bondi*, and as a result that case reached the wrong conclusion about the relevance of these laws. *See Bondi*, 2023 WL 2416683, at *7. *Bruen* requires asking *both* "how and why" past laws infringed on the Second Amendment right, and historical laws can only serve as useful analogues if their modern comparator is "comparably justified." *Bruen*, 142 S. Ct. at 2132–33. To the extent these laws restricting the rights of minors applied to 18-to-20-year-olds, they did so because 18-to-20-year-olds were minors under the legal protection of their parents or guardians. *See, e.g.*, 1 BLACKSTONE COMMENTARIES *441. That is no longer the case. Plaintiffs are legal adults. And we are not aware of any law from any potentially relevant time frame that singled out the firearm rights of legal *adults* for special restrictions based on their being younger than other legal adults. *See, e.g.*, JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) (explaining that upon reaching the age of majority, "every man is in the full enjoyment of his civil and political rights"). For the same reason, the district court was wrong to think its conclusion was also supported by "the patriarchal model of the family that dominated from colonial times through the end of the nineteenth century, in which children were viewed as the property of the patriarch subject to his absolute authority, and not as persons with full agency."

ROA.1152. Whatever the merits of this historical claim, (1) it says *nothing* about whether the government had power to disarm 18-to-20-year-olds at the Founding, and (2) it is based on a legal status that does not apply to Plaintiffs, who are fully responsible for their own protection.

The district court offered a different rationale for these laws. It stated that "[t]he 'why' of these historical restrictions was that the governing authorities deemed these categories of persons as dangerous to public safety. . . . Likewise, with regard to the laws challenged in this suit, Congress has deemed unfettered access to handguns by 18 to 20-year-olds to be a danger to public safety." ROA.1153. This is directly contradicted by the text of these laws, which referred to minors, and more than that, it looks at the laws at too high a level of generality. *See Rahimi*, 2023 WL 2317796, at *9 ("The purpose of laws disarming 'disloyal' or 'unacceptable' groups was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of domestic gun abuse posed by another individual. Thus, laws disarming 'dangerous' classes of people are not 'relevantly similar' to" the challenged laws. (cleaned up)). If the district court is right, and historical analogues give legislatures authority to "deem . . . categories of persons as dangerous to public safety" and then disarm them, then the legislature has carte blanche to declare individuals or groups outside the protective scope of the Amendment, no matter who they are. This is incompatible with *Bruen*'s rejection of interest

balancing on the grounds that, while "deference to legislative interest balancing is understandable . . . it is not deference that the Constitution demands here." 142 S. Ct. at 2131. Indeed, *Bruen* specifically cautioned against courts "engag[ing] in independent means-end scrutiny under the guise of an analogical inquiry" as the district court did below. *Id.* at 2133 n.7.

The additional support that both the district court and the *NRA I* panel relied on to buttress these proposed analogues was Thomas M. Cooley's TREATISE ON CONSTITUTIONAL LIMITATIONS, at 740 n.4 (5th ed. 1883), which stated in a footnote that "the State may prohibit the sale of arms to minors." *See NRA I*, 700 F.3d at 203; ROA.1149. But as discussed above, Cooley elsewhere was clear that it the Second Amendment applied to "the whole people," Cooley, *supra* GENERAL PRINCIPLES, at 268, and Cooley was not here endorsing the view that bans on sales to minors were constitutional (and again, Plaintiffs are not minors). The sentence appeared in the section of his treatise regarding the police power and Cooley was merely "identifying . . . a case related to his discussion, which is how he utilized footnotes to cite thousands of cases throughout his treatise." Kopel & Greenlee, *supra History and Tradition* at 143. What is more, in this case, Cooley's authority identified in the footnote was *State v. Callicutt*, 69 Tenn. 714 (1878), a case upholding a conviction for selling pistols to minors. To the extent *Callicutt* passed upon the constitutionality of the law at issue, it only "addressed concealed carry of dangerous weapons, not the

right to keep and bear arms more generally." *Jones*, 34 F.th at 720. The only legal reasoning in *Callicutt* on the scope of the right to bear arms is a pair of citations to *Aymette v. State*, 21 Tenn. 154 (1840) and *Page v. State*, 50 Tenn. 198 (1871). *Heller* singled out *Aymette* as demonstrating an "odd reading of the right" which was "not the one [the Court] adopt[ed]," and simultaneously permitted citizens "to carry arms openly, unconnected with any service in a formal militia, but . . . use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. *Page* asserted that the legislature could restrict carrying a revolver because it was not "an arm for war purposes." 50 Tenn. at 198. Again, *Heller* made clear that the Amendment is not limited to protecting arms for war purposes but "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. *Callicutt* is not good law and has nothing informative to say about the appropriate scope of the Second Amendment right.

Under *Bruen*, this case should be a relatively easy one. The only possible analogues for the Handgun Ban are from too late a date to overcome the text of the Second Amendment and the unanimous practice at the Founding. *See Bruen*, 142 S. Ct. at 2154 ("As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). As Judge Jones remarked in *NRA II*:

> Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging

> device violates the original public meaning of the Fourth Amendment
> is a hard question. In this case, however, the answer to the historical
> question is easy. The original public meaning of the Second
> Amendment include[s] individuals eighteen to twenty[.] . . . The
> members of the first Congress were ignorant of thermal heat imaging
> devices; with late teenage males, they were familiar.

714 F.3d at 342 (Jones, J., dissental) (internal citation omitted). The *Bruen* court

largely echoed this sentiment, noting that the inquiry it was prescribing "will be

fairly straightforward" in cases where "a challenged regulation addresses a general

societal problem that has persisted since the 18th century" and a "lack of a distinctly

similar historical regulation addressing that problem [provides] relevant evidence

that the challenged regulation is inconsistent with the Second Amendment." 142 S.

Ct. at 2131. The government has singled out 18-to-20-year-olds for differential

treatment from other adults, seemingly out of a concern that they are too young to

be trusted with the right to purchase and possess a firearm. Yet the Founders knew

all about 18-to-20-year-olds; they required them to possess firearms in good working

order and to know how to use them so that they could be ready to serve as members

of the militia if the need arose. They never enacted a *single* "distinctly similar" ban

on their acquiring firearms.

## CONCLUSION

For these reasons, the district court's order should be reversed and this case

should be remanded with instruction that judgment be entered in Plaintiffs' favor.

Dated: March 13, 2023                    Respectfully submitted,

George J. Armbruster, III                /s/ David H. Thompson
ARMBRUSTER & ASSOCIATES, APLC            David H. Thompson
332 E. Farrel Road, Suite D              *Counsel of Record*
Lafayette, LA 70508                      Peter A. Patterson
(337) 889-5511                           William V. Bergstrom
george@arm-assoc.com                     COOPER & KIRK, PLLC
                                         1523 New Hampshire Ave., NW
                                         Washington, D.C. 20036
                                         (202) 220-9600
                                         dthompson@cooperkirk.com

                                         Joseph Greenlee
                                         FPC ACTION FOUNDATION
                                         5550 Painted Mirage Road
                                         Suite 320
                                         Las Vegas, Nevada 89149
                                         (916) 517-1665
                                         jgr@fpclaw.org

                    *Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit on March 13, 2023 by using the appellate CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.

Dated: March 13, 2023                          <u>s/David H. Thompson</u>
                                                David H. Thompson

                                                *Counsel for Plaintiffs-Appellants*

**<u>CERTIFICATE OF COMPLIANCE</u>**

I certify that this Brief of Plaintiffs-Appellants complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 11,616 words, excluding the parts exempted by FED. R. APP. P. 32(f).

This brief also complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 (Version 2301) in Times New Roman 14-point font.

Dated: March 13, 2023                    <u>s/ David H. Thompson</u>
                                         David H. Thompson

                                         *Counsel for Plaintiffs-Appellants*