No. 23-30033

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

Caleb Reese; Firearms Policy Coalition, Incorporated; Second Amendment
Foundation; Louisiana Shooting Association; Emily Naquin,

Plaintiffs-Appellants,

v.

Bureau of Alcohol, Tobacco, Firearms, and Explosives; Steven Dettelbach, Director
of the Bureau of Alcohol, Tobacco, Firearms and Explosives; Merrick Garland, U.S.
Attorney General,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Western District of Louisiana

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

BRANDON BONAPARTE BROWN
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
STEVEN H. HAZEL
  *Attorneys, Appellate Staff
  Civil Division, Room 7217
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-2498*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs challenge the constitutionality of longstanding provisions of federal law.  The federal government believes that oral argument is therefore appropriate.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUE ...................................................................... 1

STATEMENT OF THE CASE ....................................................................... 1

    A.    Statutory and Regulatory Background ........................................... 1

    B.    Prior Proceedings ......................................................................... 5

SUMMARY OF ARGUMENT ...................................................................... 7

STANDARD OF REVIEW ........................................................................... 11

ARGUMENT ............................................................................................... 11

I.    The Commercial Sale Restrictions Challenged Here Regulate Individuals and Conduct Outside the Second Amendment's Historical Scope ................... 11

    A.    The Second Amendment Does Not Entitle Plaintiffs to Purchase Handguns from Federal Firearms Licensees ........................... 12

    B.    The Second Amendment Does Not Prevent Legislatures from Restricting Arms-Bearing by Eighteen-to-Twenty-Year-Olds ............... 13

II.    Historical Analogues Confirm that the Commercial Sale Restrictions Comport with the Second Amendment .............................................. 31

CONCLUSION ........................................................................................... 46

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Andrews v. State*,
  50 Tenn. 165 (1871) ................................................................ 33

*Brown v. Entertainment. Merchs. Ass'n*,
  564 U.S. 786 (2011) .............................................................. 21, 35

*Crawford v. Washington*,
  541 U.S. 36 (2004) ................................................................ 40

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .................................... 9, 10, 11, 12, 17, 18, 19, 20, 22, 25,
                          26, 29-30, 31, 32, 33, 38, 39, 40, 44

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ............................................................... 28

*Ezell v. City of Chicago*,
  846 F.3d 888 (7th Cir. 2017) ..................................................... 14

*Firearms Policy Coal. Inc. v. McCraw*,
  No. 21-cv-1348, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) ................ 13

*Gabree v. King*,
  614 F.2d 1 (1st Cir. 1980) ........................................................ 17

*KP Eng'g, L.P., In re*,
  63 F.4th 452 (5th Cir. 2023) ..................................................... 11

*Marsh v. Chambers*,
  463 U.S. 783 (1983) ............................................................... 40

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ......................................................... 9, 13, 20, 40, 43

*National Rifle Ass'n v. Bondi*,
  61 F.4th 1317 (11th Cir. 2023) ................... 10, 11, 13, 17, 26, 32, 34, 35, 36, 41, 45

*National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012) ................................. 7, 8, 9, 10, 12, 13, 15, 16, 18, 19, 20,
                                          23, 24, 25, 26, 29, 30, 31, 32, 35, 38, 45

*National Rifle Ass'n v. McCraw*,
   719 F.3d 338 (5th Cir. 2013) ............................................................. 15

*New Jersey v. T.L.O.*,
   469 U.S. 325 (1985) ....................................................................... 28

*New York State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) .................................... 6, 7, 11, 13, 15, 16, 19, 20, 21, 22,
                                          28, 30, 31, 34, 38, 39, 41, 42, 43

*Opinion of the Justices, In re*,
   39 Mass. (22 Pick) 571 (1838) ......................................................... 24

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ....................................................................... 40

*Ramos v. Louisiana*,
   140 S. Ct. 1390 (2020) ................................................................... 40

*Seoane v. Ortho Pharms., Inc.*,
   660 F.2d 146 (5th Cir. 1981) ........................................................... 14

*State v. Callicutt*,
   69 Tenn. 714 (1878) ............................................................... 33, 34, 44

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ........................................................... 14

*United States v. Alvarez*,
   567 U.S. 709 (2012) ....................................................................... 40

*United States v. Flores*,
   663 F.3d 1022 (8th Cir. 2011) ......................................................... 28

*United States v. Jimenez-Shilon*,
   34 F.4th 1042 (11th Cir. 2022) ........................................................ 15

*United States v. Kelly*,
   No. 3:22-cr-37, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ............ 42

*United States v. Portillo-Munoz,*
 643 F.3d 437 (5th Cir. 2011) ............................................................... 12, 28

*United States v. Rahimi,*
 61 F.4th 443 (5th Cir. 2023) .............................................................. 11, 12

*United States v. Rene E.,*
 583 F.3d 8 (1st Cir. 2009) .................................................................. 16, 26

*United States v. Sitladeen,*
 64 F.4th 978 (8th Cir. 2023) ..................................................................... 28

*United States v. Stevens,*
 559 U.S. 460 (2010) ................................................................................... 40

*Worth v. Harrington,*
 No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) ................... 13

## Constitutions:

U.S. Const. art. I, § 2 ............................................................................... 27

U.S. Const. amend. II .............................................................7, 8-9, 11, 14, 25

U.S. Const. pmbl. ..................................................................................... 27

N.C. Const. of 1868, art. XII, § 1 ............................................................ 24

## Federal Statutes:

Act of Mar. 26, 1790, 1 Stat. 104 ............................................................ 16

Act of Jan. 29, 1795, ch. 20, 1 Stat. 415 ................................................. 16

Bipartisan Safer Communities Act,
 Pub. L. No. 117-159, tit. II, 136 Stat. 1313 (2022)
 (codified at 18 U.S.C. § 922(t)(1)(C) ...................................................... 6

Gun Control Act of 1968,
    Pub. L. No. 90-618, tit. I, 82 Stat. 1213 ........................................................... 3

National Militia Act of 1792, 1 Stat. 271:
    § 1, 1 Stat. at 271 ............................................................................................ 23
    § 2, 1 Stat. at 272 ............................................................................................ 23

Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, tit. IV, 82 Stat. 197 ................................................... 1-2
        § 901(a)(3), 82 Stat. at 225 ........................................................... 3, 30
        § 901(a)(6), 82 Stat. at 225-26 ................................................. 2, 3, 20

Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, tit. XI, subtit. B, 108 Stat. 1796 ................................. 5

18 U.S.C. § 921(a)(21) ......................................................................................... 4

18 U.S.C. § 921(a)(21)(C) ..................................................................................... 4

18 U.S.C. § 922(a)(1) ............................................................................................ 4

18 U.S.C. § 922(b)(1) ............................................................................ 1, 4, 8, 12, 22

18 U.S.C. § 922(c)(1) ............................................................................ 1, 4, 8, 12, 22

18 U.S.C. § 922(x) ................................................................................................. 5

18 U.S.C. § 926 ..................................................................................................... 5

28 U.S.C. § 1291 .................................................................................................. 1

28 U.S.C. § 1331 .................................................................................................. 1


**State Statutes:**

Act of Mar. 20, 1797, ch. LXXXI, No. 1, § 15,
    *reprinted in The Laws of the State of Vermont, Digested and Compiled* (1808) ...................... 37

Act of Mar. 6, 1810, ch. CVII, § 28, 1810 Mass Laws 151 ............................... 37

Act of Dec. 22, 1820, ch. XXXVI, § 46, 1820 N.H. Laws 287 ..................................... 37

An Act for raising levies and recruits to serve in the present expedition
  against the French, on the Ohio, ch. II, §§ I-III, *reprinted in* 6 Hening (1819) ......... 24

An Act for the better regulating and training the Militia, ch. II, §§ II- III,
  *reprinted in* 6 Hening (1819) ............................................................................... 24

An Act for the settling and better Regulation of the Militia, ch. II, § II,
  *reprinted in* 4 *The Statutes at Large; Being a Collection of All the Laws of*
  *Virginia, from the First Session of the Legislature, in the Year 1619*
  (William Waller Hening ed., 1820)................................................................... 24

An Act to exempt minors from Militia Duty in time of peace (1829),
  *reprinted in* A *Compilation of the Public Laws of the State of New-Jersey,*
  *Passed Since the Revision in the Year 1820* (Josiah Harrison ed., 1833)........................... 24

An act to oblige the free male inhabitants of this state above a certain
  age to give assurance of Allegiance to the same, and for other purposes,
  ch. III (1777), *reprinted in* 9 Hening (1821) .................................................... 26

Ariz. Rev. Stat. Ann. § 13-3112(E)(2) ............................................................... 21

Colo. Rev. Stat. § 18-12-203(1)(b) .................................................................. 21

Fla. Stat. § 790.06(2)(b) ........................................................................... 22

Ga. Code. Ann. § 16-11-129(b)(2)(A) ................................................................. 22

Idaho Code § 18-3302K(4)(a) ......................................................................... 22

430 Ill. Comp. Stat. 66/25(1) ...................................................................... 22

1859 Ky. Acts 241, 245 ............................................................................. 32

Tenn. Code § 4864 (1858) ........................................................................ 32, 44

**Regulation:**

27 C.F.R. § 478.99(b) ............................................................................... 5

## Legislative Materials:

2 *Annals of Cong.* 1805 (1790) ..................................................................... 25

114 Cong. Rec. 12,279 (1968) ........................................................................ 2

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 89th Cong. 67 (1965) .................................... 3

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. (1967) ......................................... 2

S. Rep. No. 88-1340 (1964) ........................................................................... 1

S. Rep. No. 89-1866 (1966) ...................................................................... 2, 34

S. Rep. No. 90-1097 (1968) ..................................................................... 3, 4, 5

## State Legislative Materials:

Act of July 4, 1825, ch. I, § 24, 1825 Mo. Laws 533 ....................................... 37

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17 ...................................... 32

ch. CLXIV, § 34, 1821 Me. Laws 687 ............................................................. 37

4 Statutes at Large of Pennsylvania 153 (J. Mitchell & H. Flanders eds. 1897) ........... 16

2 *The Code of North Carolina* ch. 35, § 3168 (William T. Dortch, John Manning, & John S. Henderson eds., 1883) ..................... 37

*The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027 (Richard H. Clark et al. eds., 1861) ................................................................ 24

## Other Authorities:

Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867 (1994) .......................................... 17

Akhil Reed Amar, *The Bill of Rights* (1998) ............................................... 27, 31

42 Am. Jur. 2d Infants § 6 (WestLaw 2023 update) .......................................................... 30

William Blackstone, 1 *Commentaries on the Laws of England* (1765) .................................. 16

Jacob Charles, *Armed in America: A History of Gun Rights from*
*Colonial Militias to Concealed Carry* (2019) .................................................. 33, 45

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ........................ 33

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment:*
*Making Sense of the Historical Record*, 40 YALE L. & POL. REV. INTER ALIA 1
(2021)........................................................................................................................ 16, 17

Robert J. Cottrol & Raymond T. Diamond,
*The Second Amendment: Toward an Afro-Americanist Reconsideration*,
80 GEO. L.J. 309 (1991)........................................................................................ 26

John Faucheraud Grimké, *The South Carolina Justice of Peace*
(R. Aitken & Son eds., 1788)................................................................................ 37

*Fraser v. ATF*,
No. 3:22-cv-410, slip op. (E.D. Va. May 10, 2023) ........................................ 35

Vivian E. Hamilton, *Adulthood in Law and Culture*,
91 Tul. L. Rev. 55 (2016)............................................................................. 15-16, 17

Brian Jackson, *The Lingering Legacy of in Loco Parentis: An Historical Survey*
*and Proposal for Reform*, 44 Vand. L. Rev. 1135 (1991) .................................. 36

*James Madison's Notes of the Constitutional Convention, August 7, 1787*,
YALE LAW SCHOOL AVALON PROJECT, https://perma.cc/QJ7B-D4J4 .................. 18

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*,
71 U. CIN. L. REV. 1345 (2003) ........................................................................ 18, 27

James Kent, 2 *Commentaries on American Law* 101 (1827) ...................................16, 17, 21

Kurt Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*
(Jan. 15, 2021), https://ssrn.com/sol3/papers/cfm?abstract_id3766917 ............... 39

*Letter from John Adams to James Sullivan* (26 May 1776)
(on file with the National Archives) https://perma.cc/CE79-RA8K ...................... 18

*Letter from Thomas Jefferson to Samuel Smith* (3 May 1823)
(on file with the National Archives) https://perma.cc/2CJB-N7RS .................18-19

John Locke, *Two Treatises of Government* (Peter Laslett ed., Cambridge 1960)............... 19

*Militia Act, [25 November 1755]*, National Archives
(Nov. 25, 1755), https://perma.cc/2DFN-Z2GN ..................................................... 37

Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of
the Constitution* (1997)......................................................................................... 18

Kara E. Rudolph *et al.*, *Association Between Connecticut's Permit-to-Purchase
Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49 (2015),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4504296/
pdf/AJPH.2015.302703.pdf........................................................................2-3

Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category*,
85 Fordham L. Rev. 641 (2016) ....................................................................... 19

Zephaniah Swift, 1 *A System of the Laws of the State of Connecticut* 213
(Windham & John Bryne eds., 1795) ............................................................. 17

The Federalist No. 62 (Alexander Hamilton or James Madison),
https://perma.cc/GH3N-F968................................................................... 29

Univ. of Ga. Libraries, *The Minutes of the Senatus Academicus 1799-1842*,
(Nov. 4, 1976), https://perma.cc/VVT2-KFDB ..................................... 36

Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes*,
Encyclopedia Va. 6-7 (Oct. 5, 1824), https://perma.cc/HNY3-PXDZ ................. 36

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
11 Tex. Rev. L. & Pol. 191 (2006) ................................................................ 43

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.321, ¶ 15 (Amended Complaint).  The district court entered final judgment on December 21, 2022.  ROA.1155.  Plaintiffs filed a timely notice of appeal on January 10, 2023.  ROA.1156.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Federal law has long prohibited federal firearms licensees from selling handguns to individuals under the age of 21.  *See* 18 U.S.C. § 922(b)(1), (c)(1).  The question presented is whether the district court correctly concluded that these commercial sale restrictions are consistent with the Second Amendment.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

This case concerns legislatures' authority to set age qualifications on the commercial sale of firearms.

Following a multi-year inquiry into violent crime that included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964), Congress found "that the ease with which" handguns could be acquired by "juveniles without the knowledge or consent of their parents or guardians[] . . . and others whose possession of such weapons is similarly contrary to the public interest[] is a significant factor in the prevalence of lawlessness and violent crime in the United States," Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat.

197, 225.  The legislative record established that "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence, including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder.  114 Cong. Rec. 12,279, 12,309 (1968) (statement of Sen. Dodd).

Based on its investigations, Congress identified "a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior."  Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225-26. Federal law enforcement officials testified that "[t]he greatest growth of crime today is in the area of young people, juveniles[,] and young adults" and that "[t]he easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly."  *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57 (1967) (statement of Sheldon S. Cohen).   Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors," which "take on added significance when one considers the fact that in each of the jurisdictions referred to the lawful acquisition of concealable firearms by these persons was prohibited by statute."   S. Rep. No. 89-1866, at 59 (1966); *see also id.* at 58, 60.  These legislative findings accord with more recent empirical evidence identifying a relationship between setting the minimum age to purchase firearms at 21 and a decrease in violent crime.  *See, e.g.*, Kara E. Rudolph *et al.*, *Association Between*

2

*Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49, 49-50 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC4504296/pdf/AJPH.2015.302703.pdf.

Congress's investigations revealed that "almost all of these firearms[] are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 89th Cong. 67 (1965) (statement of Sheldon S. Cohen). Congress thus concluded that concealable firearms (such as handguns) "have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior," Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 226, and "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible," *id.* § 901(a)(3), 82 Stat. at 225.

To that end, Congress included statutory provisions designed to address "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79 (1968), in both the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-14. Section 922(b)(1) prohibits federal firearms licensees from selling "any firearm or

ammunition to any individual" under the age of 18, and limits federal firearms licensee sales of firearms to individuals between the ages of 18 and 20 to "a shotgun or rifle, or ammunition for a shotgun or rifle." 18 U.S.C. § 922(b)(1).[1]  Under Section 922(c)(1), a federal firearms licensee may not "sell a firearm to a[n unlicensed] person who does not appear in person at the licensee's business premises" unless the purchaser submits a sworn statement attesting that "in the case of any firearm other than a shotgun or a rifle, [the purchaser is] twenty-one years or more of age, or that, in the case of a shotgun or a rifle, [the purchaser is] eighteen years or more of age."  *Id.* § 922(c)(1).

Sections 922(b)(1) and (c)(1) are restrictions on the commercial sale of handguns and do not prohibit the possession of handguns by 18-to-20-year-olds. Congress recognized that, under these commercial sale restrictions, "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian."  S. Rep. No. 90-1097, at 79.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), which is authorized to promulgate "such rules and regulations as are necessary to carry out"

---

[1] A federal firearms license is required to "engage in the business of importing, manufacturing, or dealing in firearms" or "ammunition." 18 U.S.C. § 922(a)(1).  A person is "engaged in the business" of dealing in firearms, *id.* § 921(a)(21), if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C).

Title 18's provisions relating to firearms, 18 U.S.C. § 926, has issued implementing

regulations that closely track the statute. The regulation at 27 C.F.R. § 478.99(b)

provides that a federal firearms licensee "shall not sell or deliver (1) any firearm or

ammunition to any individual who the [licensee] knows or has reasonable cause to

believe is less than 18 years of age" or (2) any firearms "other than a shotgun or rifle,

or ammunition for a shotgun or rifle, to any individual who the [licensee] knows or

has reasonable cause to believe is less than 21 years of age." ATF applies these

implementing regulations consistent with Congress's understanding that "a minor or

juvenile would not be restricted from owning, or learning the proper usage of [a]

firearm, since any firearm which his parent or guardian desired him to have could be

obtained for the minor or juvenile by the parent or guardian." S. Rep. No. 90-1097, at

79.

    In addition to enacting the commercial sale restrictions at issue here, Congress

has also implemented a variety of other age-based firearms regulations. For example,

Congress has limited the circumstances under which individuals under 18 years old

may possess handguns but has not placed any similar age-related limits on the

possession of handguns by individuals between 18 and 20 years old. *See* Violent

Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XI,

subtit. B, § 110201, 108 Stat. 1796, 2010-11 (adding 18 U.S.C. § 922(x)). And in 2022,

Congress implemented enhanced background checks for individuals under the age of

21. *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, tit. II, § 12001, 136

Stat. 1313, 1322-25 (2022) (codified at 18 U.S.C. § 922(t)(1)(C)).

### B.    Prior Proceedings

**1.** Plaintiffs are two 18-to-20-year-olds and three advocacy organizations with

18-to-20-year-old members.  ROA.317-20, ¶¶ 6, 8-11 (Amended Complaint).

Plaintiffs allege that they wish to purchase handguns from federal firearms licensees

but that the commercial sale restrictions prevent them from doing so.  ROA.321-24,

¶¶ 20, 25 (Amended Complaint).  Plaintiffs do not allege that they are unable to

acquire handguns from their parents, guardians, or private sellers.

Plaintiffs request declaratory and injunctive relief directing that they be

permitted to purchase handguns from federal firearms licensees.  ROA.335, ¶¶ 82,

337-38 (Amended Complaint).  Plaintiffs acknowledge that the commercial sale

restrictions preclude that result but assert that the restrictions are unconstitutional.[2]

ROA.332, ¶¶ 73, 74 (Amended Complaint).

**2.** The district court granted the government's motion to dismiss.  ROA.1154.

The court explained that under the test the Supreme Court articulated in *New York*

*State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), the challenged commercial

sale restrictions pass constitutional muster so long as they either: (1) leave undisturbed

---

[2] Although the operative complaint also claimed that the federal restrictions are
unconstitutional "as applied to 18-to-20-year-old women," ROA.335, ¶¶ 82-83
(Amended Complaint), plaintiffs abandon that claim on appeal, Br. 6 n.1.

"the Second Amendment's plain text" or (2) comport "with the Nation's historical tradition of firearm regulation." ROA.1153 & n.117 (citing *Bruen*, 142 S. Ct. at 2126).

At the outset, the district court expressed doubt about whether "the Second Amendment's plain text protects the ability of 18 to 20-year-olds to directly purchase handguns from [federal firearms licensees (FFLs)]." ROA.1146. The court observed that "the statute and regulations at issue here" do not "explicitly restrict the rights of 18 to 20-year-olds to 'keep and bear Arms.'" ROA.1147 (quoting U.S. Const. amend. II). And the court recognized that while "a complete restriction on the sale of firearms" might "gut the right to own or possess firearms," the commercial sale restrictions come nowhere near a "total ban." ROA.1147. The court emphasized that the restrictions do not prohibit 18-to-20-year-olds from "receiving handguns as gifts from parents or guardians," "purchasing handguns in 'private sales' from non-FFL sellers," or "purchasing long-guns from FFLs." ROA.1147.

The district court ultimately did not resolve the question whether the conduct in which plaintiffs seek to engage implicates the Second Amendment's text, however, because it determined that "the challenged laws are consistent with the Nation's historical tradition of firearm regulation." ROA.1153. The court explained that in *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives (NRA)*, 700 F.3d 185 (5th Cir. 2012), this Court "considered and analyzed the historical backdrop" of "the same laws at issue in this case." ROA.1148. Although "the panel opinion in *NRA* issued pre-*Bruen*," the district court recognized that *NRA*'s "discussion of the

7

historical record . . . satisfies the *Bruen* test." ROA.1152. For example, *NRA* collected "historical evidence that the Founders likely would not have been of the opinion that minors enjoy the full scope of rights encompassed in the Second Amendment." ROA.1152; *see NRA*, 700 F.3d at 200-02. And *NRA* confirmed that conclusion "by looking to nineteenth century laws restricting access to firearms by those under the age of 21." ROA.1152-53; *see NRA*, 700 F.3d at 202-04. Based on this historical evidence, the district court concluded that "to the extent the Second Amendment protects the challenged conduct," the government "has adequately demonstrated that the challenged laws are consistent with the Nation's historical tradition." ROA.1153.

## SUMMARY OF ARGUMENT

For over half a century, federal law has prohibited federal firearms licensees from selling handguns to individuals under the age of 21. *See* 18 U.S.C. § 922(b)(1), (c)(1). These commercial sale restrictions do not prevent 18-to-20-year-olds from possessing or carrying handguns or from obtaining handguns from their parents or guardians or through private sales. Despite the availability of handguns from those sources, plaintiffs insist that 18-to-20-year-olds have a constitutional right to purchase such weapons from federal firearms licensees.

The district court correctly recognized that the commercial sale restrictions challenged here are consistent with the Second Amendment. As an initial matter, the Second Amendment secures the right to "keep and bear Arms," U.S. Const. amend.

8

II—not the right to purchase handguns from a particular type of seller when those

weapons remain available elsewhere.  Because the challenged restrictions regulate only

the sale of handguns by federal firearms licensees, they fall within the class of

"commercial sale" regulations that the Supreme Court has taken pains not to call into

question. *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *McDonald v. City of*

*Chicago*, 561 U.S. 742, 786 (2010).

The commercial sale restrictions are limited not just in the conduct they target,

but in their focus on underage individuals.  It is undisputed that legislatures may

implement some age qualifications on access to arms.  And the age qualifications at

issue here fall within historical bounds.  This Court has explained that by far the most

common age qualification established by Founding Era legislatures was 21, the age of

majority at common law.  *See NRA*, 700 F.3d 185, 201 (5th Cir. 2012).  Legislatures

therefore excluded 18-to-20-year-olds from a variety of important rights, including

rights closely associated with the right to bear arms.  There is no historical basis for

concluding that the founders precluded legislatures from adopting the same age

qualification in regulating access to firearms.

In attempting to identify historical support for their position, plaintiffs rely on

the twin assumptions that at the founding all persons were eligible to join the militia

and that all persons eligible to be in a militia at the founding share identical Second

Amendment protections.  Plaintiffs' factual premise is incorrect:  Founding Era

legislatures frequently imposed age limits on militia membership.  And in any event,

9

the Supreme Court has explained that the right to bear arms, as understood by the founders, is "unconnected with militia service." *Heller*, 554 U.S. at 582. Indeed, state militias often enrolled individuals who were viewed as lacking Second Amendment rights, as was notably the case for those who refused to swear loyalty oaths and for members of certain minority groups.

Historical analogues confirm that the commercial sale restrictions at issue in this case comport with the Second Amendment. This Court has previously canvassed the historical record and concluded that "[m]odern restrictions on the ability of persons under 21 to purchase handguns . . . seem, to us, to be firmly historically rooted." *NRA*, 700 F.3d at 204. In the nineteenth century, for example, at least 19 jurisdictions enacted laws that—like the commercial sale restrictions at issue here— restricted 18-to-20-year-olds' ability to obtain handguns over their parents' objections. Those restrictions trace their origins to Founding Era measures calculated to prevent underage individuals from accessing arms without adult supervision. That tradition endures today, as in recent times "all fifty States (and the District of Columbia)" have "imposed minimum-age qualifications on the use or purchase of particular firearms." *Id.* at 190 n.4. Modern restrictions on the sale of firearms to 18-to-20-year-olds thus continue a historical tradition stretching back to the founding, as the Eleventh Circuit recently recognized. *See National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1327 (11th Cir. 2023).

## STANDARD OF REVIEW

The Court reviews the district court's grant of a motion to dismiss de novo. *See In re KP Eng'g, L.P.*, 63 F.4th 452, 455 (5th Cir. 2023).

## ARGUMENT

The Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen* establishes a test for resolving Second Amendment challenges that is "rooted in the Second Amendment's text, as informed by history." 142 S. Ct. 2111, 2127 (2022). That test can be divided into "two analytical steps." *United States v. Rahimi*, 61 F.4th 443, 453-55 (5th Cir. 2023) (citing *Bruen*, 142 S. Ct. 2111, 2126-27 (2022)); *see also National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321 (11th Cir. 2023) (same). First, a challenger must show that its conduct falls within "the Second Amendment's plain text." *Rahimi*, 61 F.4th at 453. Second, if the challenger clears that hurdle, the relevant law must be upheld so long as it accords with a "historical analogue." *Id.* at 454. *Bruen* thus "brings historical sources to bear on both inquiries." *Bondi*, 61 F.4th at 1321. Plaintiffs' Second Amendment challenge fails at both steps.

## I. The Commercial Sale Restrictions Challenged Here Regulate Individuals and Conduct Outside the Second Amendment's Historical Scope

The Constitution protects the right "to keep and bear Arms," U.S. Const. amend. II, but "[l]ike most rights, the right secured by the Second Amendment is not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Because the Second Amendment "codif[ied] a pre-existing right," courts discern that right's limits by

11

"examin[ing] a variety of legal and other sources" from our Nation's history.  *Id.* at

603-05.  As this Court has recognized, that history shows that the right to bear arms

extended to some "groups of people," *United States v. Portillo-Munoz,* 643 F.3d 437, 440

(5th Cir. 2011), and some types of "conduct," *Rahimi,* 61 F.4th at 450, but not others.

The commercial sale restrictions at issue here do not implicate the Second

Amendment's text for two independent reasons: they target conduct the right does

not protect and they regulate an age group historically subject to exclusion from the

right.

### A.    The Second Amendment Does Not Entitle Plaintiffs to Purchase Handguns from Federal Firearms Licensees

**1.** The commercial sale restrictions at issue here bar 18-to-20-year-olds from

purchasing handguns from federal firearms licensees.  *See* 18 U.S.C. § 922(b)(1), (c)(1).

The restrictions do not prevent those individuals from "possess[ing] and us[ing]

handguns." *NRA,* 700 F.3d 185, 189 (5th Cir. 2012).  The restrictions also leave

undisturbed 18-to-20-year-olds' ability to obtain handguns "from parents or

guardians" or "though unlicensed, private sales." *Id.* at 190-91.

In *Heller*, the Supreme Court emphasized that nothing in its opinion "should be

taken to cast doubt" on "laws imposing conditions and qualifications on the

commercial sale of arms."  554 U.S. at 626-27 & n.26.  And in *McDonald v. City of

Chicago*, the Court "repeat[ed]" its "assurances" that *Heller* did not "cast doubt on such

longstanding regulatory measures" as "laws imposing conditions and qualifications on

the commercial sale of arms." 561 U.S. 742, 786 (2010); *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that nothing in *Bruen* "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms").

The challenged restrictions, which limit only the sale of handguns by a particular type of seller (federal firearms licensees) to a particular class of buyers (under-21-year-olds), thus raise no Second Amendment concerns. As this Court emphasized in *NRA*, the restrictions allow 18-to-20-year-olds to obtain handguns from "[p]arents or guardians" or "through unlicensed, private sales." 700 F.3d at 189-90. In *Bondi*, the Eleventh Circuit similarly observed that modern laws limiting "18-to-20-year-olds' rights to *buy* firearms" rest on a strong historical foundation. 61 F.4th at 1331 (emphasis added). And even in *Firearms Policy Coalition Inc. v. McCraw*, a district court decision that invalidated a state law prohibiting 18-to-20-year-olds from carrying handguns in public, the court observed that a challenge to a law restricting the sale of handguns to the same age group would present a "wholly different" case. No. 4:21-cv-1245, 2022 WL 3656996, at *7 (N.D. Tex. Aug. 25, 2022); *see also Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) (similar).

**2.** Plaintiffs err in suggesting (Br. 12-13) that the challenged restrictions' particular focus on the commercial sale of handguns has no bearing on the Second Amendment analysis. The Second Amendment's text protects only "keep[ing] and

13

bear[ing] arms," U.S. Const. amend. II, and does not establish a right to buy any weapon at any time from any source. And although plaintiffs assert (Br. 11-12) that every restriction on the sale of firearms necessarily impairs the ability to keep and bear arms, the cases on which they rely support the opposite conclusion. Those cases reflect that while an extraordinarily "severe[]" restriction on purchasing or practicing with firearms may implicate the Amendment's text, *see Ezell v. City of Chicago*, 846 F.3d 888, 894 (7th Cir. 2017), less extensive restrictions do not, *see Teixeira v. County of Alameda*, 873 F.3d 670, 679-80 (9th Cir. 2017) (en banc). Despite their reliance on these authorities, plaintiffs present no allegations addressing any effect the commercial sale restrictions may have on conduct protected by the Amendment's text.

The district court correctly recognized (ROA.1142) that plaintiffs cannot salvage their case by urging that "the burden is on the government to *prove* that the Handgun Ban is constitutional," Br. 22, thus inverting the customary burden and the general presumption of constitutionality that attaches to federal statutes, *see Seoane v. Ortho Pharms., Inc.*, 660 F.2d 146, 151 (5th Cir. 1981) (noting "the presumption of constitutionality of legislative acts"). Plaintiffs' failure to demonstrate that the commercial sale restrictions impair their ability to keep and bear handguns thus forecloses their Second Amendment challenge.

14

**B.    The Second Amendment Does Not Prevent Legislatures from Restricting Arms-Bearing by Eighteen-to-Twenty-Year-Olds**

The commercial sale restrictions do not implicate the Second Amendment for the additional reason that they regulate only underage individuals.  The "particular history" of the Second Amendment right shows that it "extended (and thus extends) to some categories of individuals, but not others."  *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022).  This Court explained in *NRA*, based on an extensive analysis of Founding and Reconstruction Era materials, *see* 700 F.3d at 199-204, that "[m]odern restrictions on the ability of persons under 21 to purchase handguns . . . seem, to us, to be firmly historically rooted," *id.* at 204; *see National Rifle Ass'n v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (reiterating that "age-based restrictions on access to and use of firearms" are "likely outside the scope of the Second Amendment").  Although *NRA* proceeded, "in an abundance of caution," 700 F.3d at 204, to hold that the commercial sale restrictions are constitutional under the means-end test that *Bruen* later disapproved, *see* 142 S. Ct. at 2127, *NRA*'s detailed review of the historical record shows that the commercial sale restrictions satisfy *Bruen*'s historical standard.

**1.** As *NRA* recognized, *see* 700 F.3d at 204 & n.17, legislatures have long held authority to set age qualifications for various rights.  Today, legislatures establish age requirements for working, driving, drinking alcohol, and consenting to sex, among many other examples.  *See* Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L.

Rev. 55, 66-79 (2016). At the founding, legislatures also enforced age qualifications for a range of important activities, from getting married, *see, e.g.*, 4 Statutes at Large of Pennsylvania 153 (J. Mitchell & H. Flanders eds. 1897), to becoming a naturalized citizen, *see* Act of Mar. 26, 1790, 1 Stat. 104; Act of Jan. 29, 1795, ch. 20, 1 Stat. 415, to forming enforceable contracts, *see* James Kent, 2 *Commentaries on American Law* 101 (1827); *see also* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 YALE L. & POL. REV. INTER ALIA 1, 9-10 (2021) (collecting other examples).

It is common ground that legislatures can establish age limits on access to arms. Plaintiffs do not challenge (Br. 16-17) laws prohibiting the purchase and use of firearms by individuals under the age of 18, and those laws have been upheld as consistent with the Second Amendment, *see, e.g.*, *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (upholding, based on a review of Founding and Reconstruction Era evidence, the federal prohibition on the possession of handguns by individuals under the age of 18); *see also Bruen*, 142 S. Ct. at 2134 (indicating that the Second Amendment right does not extend beyond "ordinary, law-abiding, adult citizens").

For the Second Amendment's ratifiers, a natural point at which to draw the line between underage individuals and responsible adults was age 21. As this Court observed in *NRA*, "[t]he age of majority at common law was 21" and individuals under that age were classified as "minor[s]" or "infant[s]." 700 F.3d at 201-02; *see* William Blackstone, 1 *Commentaries on the Laws of England* 463 (1765) ("So that full age

in male or female, is twenty one years[] . . . who till that time is an infant, and so styled in law."). Following the common law approach, the "American colonies, then the United States, adopted age twenty-one as the near universal age of majority." Vivian Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55, 64 (2016); *see* Kent, *supra*, at 101 (confirming that "the inability of infants to take care of themselves . . . continues, in contemplation of law, until the infant has attained the age of twenty-one years").

Eighteen-to-twenty-year-olds therefore "did not enjoy the full range of civil and political rights." *Bondi*, 61 F.4th at 1324. Among other examples, underage individuals generally could not "claim the right of petition," Cornell, *supra*, at 8; enter many kinds of contracts, *see* Zephaniah Swift, 1 *A System of the Laws of the State of Connecticut* 213-16 (Windham & John Bryne eds., 1795); and serve on juries, *see* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 877 n.52 (1994) (finding no evidence that historical legislatures authorized individuals under the age of 21 to serve on juries); *see also Gabree v. King*, 614 F.2d 1, 2 (1st Cir. 1980) (recognizing that "eighteen to twenty-one year olds have historically been denied full rights of adulthood").

In addition to adopting these limits, the founders also prevented individuals under the age of 21 from voting. The Supreme Court has described the class entitled to bear arms as limited to those who belonged to "the political community," *Heller*, 554 U.S. at 580, and at the founding, a hallmark of "membership in the polity" was

17

the right to vote, Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 301 (1997).  Legislatures allowed individuals to vote only after they turned 21, a practice that persisted from the founding through the Twenty-Sixth Amendment's passage in 1971.  *See* Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. CIN. L. REV. 1345, 1345, 1358-59 (2003).  The modern age qualification for purchasing handguns from commercial sellers is thus congruent with Founding Era legislatures' practice of excluding 18-to-20-year-olds from the "political community."  *Heller*, 554 U.S. at 580.

**2.** These historical age restrictions reflect the founders' view that reason and judgment are not fully developed before the age of 21.  For example, John Adams explained that individuals under that age could not vote because they lack "[j]udgment" and "[w]ill" and are not "fit to be trusted by the [p]ublic."  *Letter from John Adams to James Sullivan* (26 May 1776) (on file with the National Archives) https://perma.cc/CE79-RA8K.  Gouverneur Morris, a signer of the Constitution and drafter of its Preamble, likewise warned that under-21-year-olds "want prudence" and "have no will of their own."  *James Madison's Notes of the Constitutional Convention, August 7, 1787*, YALE LAW SCHOOL AVALON PROJECT, https://perma.cc/QJ7B-D4J4.  And Thomas Jefferson similarly placed "infants"—again, a term that encompassed all "persons under the age of 21," *NRA*, 700 F.3d at 201—in the same category as "maniacs," "drunkards," and others who "cannot take care of themselves," *Letter from Thomas Jefferson to Samuel Smith,* (3 May 1823) (on file with the National Archives)

https://perma.cc/2CJB-N7RS [Jefferson Letter]; *see also* John Locke, *Two Treatises of Government* 324-28 (Peter Laslett ed., Cambridge 1960) (observing that the rights of "lunatics," "idiots," and "children" could be restricted because those groups had not achieved a "state of reason").

The founders' determination that age 21 represents a meaningful milestone in the development of reason and judgment comports not only with historical theory, but also with "modern scientific research." *NRA*, 700 F.3d at 210 n.21. Empirical evidence shows that "eighteen-to-twenty-one-year-olds . . . engage in risk-taking behavior (including involvement in criminal activity) at a higher rate than older adults." Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category*, 85 Fordham L. Rev. 641, 645 (2016). In *NRA*, for example, this Court collected evidence showing that 18-to-20-year-olds are disproportionately likely to be arrested, to commit various violent offenses, and to commit gun homicides. *See* 700 F.3d at 210. *NRA* explained that the heightened risk associated with 18-to-20-year-olds stems from their comparatively poor "response inhibition," "emotional regulation," and "impulse control." *Id.* at 210 n.21 (quotation marks omitted).

Age-based firearms regulations thus accord with legislatures' more general authority to disarm groups historically deemed irresponsible. The Supreme Court has repeatedly described the class of individuals to which the right extends as "law-abiding, responsible citizens." *See, e.g.*, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156. Consistent with that understanding of the right's scope, the Court cautioned in

19

*Heller* that "nothing in [its] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms," including regulations disarming "felons and the mentally ill." 554 U.S. at 626. *Heller* provided these "only as examples" and left the identification of additional categories of lawful regulations "to future evaluation." *Id.* at 627 n.26, 635. A plurality of the Court "repeat[ed]" *Heller*'s "assurances" in *McDonald*, 561 U.S. at 786, and in *Bruen*, six Justices reiterated those assurances yet again.[3]

Like the groups whose disarmament the Supreme Court has approved, *see Heller*, 554 U.S. at 626, 18-to-20-year-olds were historically viewed as presenting a heightened risk to "public safety," *NRA*, 700 F.3d at 204, *see id.* at 205-06. The same deficiencies in judgment and reason that led the founders to designate 18-to-20-year-olds as "infants" also inhibit safe firearms ownership. *Id.* at 201; *see also id.* at 206 (noting that "Congress found that persons under 21 tend to be relatively irresponsible and can be prone to violent crime") (citing 82 Stat. at 197, 225-26). It is therefore

---

[3] *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing that "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms" are constitutional under *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626)); *id.* at 2157 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (agreeing that "the Court's opinion" should be understood as "cast[ing] no doubt on [the] aspect of *Heller*'s holding" permitting such firearms regulations).

inconceivable that the Second Amendment's ratifiers—who deemed 18-to-20-year-olds unable to "take care of themselves," Kent, *supra*, at 101—nonetheless regarded them as entitled to acquire lethal weapons over their parents' objections.

That conclusion finds further support in historical norms concerning parental authority to oversee 18-to-20-year-olds. As *Bruen*'s author has elsewhere observed, Founding Era parents generally retained substantial authority to supervise children under the age of 21. *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 821-31 (2011) (Thomas, J., dissenting). Nothing in the historical record suggests that when the founders codified the Second Amendment, they intended to alter that paradigm.

*Bruen* reinforces that conclusion. Although *Bruen* invalidated New York's "may issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check."[4]  142 S. Ct. at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[] . . . ."). Those licensing regimes typically preclude individuals under the age of 21 from carrying firearms in public.[5]  Because these types

---

[4] A "shall issue" regime is one in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 142 S. Ct. at 2123. By contrast, a "may issue" regime vests "authorities [with] discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria." *Id.* at 2124.

[5] *See, e.g.*, Ariz. Rev. Stat. Ann. § 13-3112(E)(2) (permit available only to those "twenty-one years of age or older," with limited exception for those who serve in the armed forces); Colo. Rev. Stat. § 18-12-203(1)(b) (permit only available to someone

*Continued on next page.*

of prerequisites are "designed to ensure only that those bearing arms in [a] jurisdiction are, in fact, 'law-abiding, responsible citizens,'" the Supreme Court indicated that they generally pass constitutional muster. *Id.* at 2138 n.9 (majority op.) (quoting *Heller*, 554 U.S. at 635). As Justice Alito emphasized in concurrence, *Bruen* therefore "does not expand the categories of people who may lawfully possess a gun" and federal law thus continues to "bar[] the sale of a handgun to anyone under the age of 21." *Id.* at 2157-58 (citing 18 U.S.C. §§ 922(b)(1), (c)(1)).

**3.** In arguing otherwise, plaintiffs commit three significant errors and depart from the decisions of the Supreme Court and this Court. First, although plaintiffs insist (Br. 17-20) that Founding Era militia laws establish that Second Amendment rights vest at age 18, *Heller* makes clear that the Amendment's scope is "unconnected with militia service," 554 U.S. at 582, and in any event historical legislatures had latitude to exclude those under the age of 21 from militias and many did. Second, although plaintiffs advance various arguments (Br. 14-15) suggesting that the Constitution precludes age qualifications of any kind, that suggestion is both incompatible with plaintiffs' acceptance of restrictions on arms-bearing by those under the age of 18 and unsupported by the provisions on which plaintiffs rely.

---

who "[i]s twenty-one years of age or older"); Fla. Stat. § 790.06(2)(b) (license only available to someone "21 years of age or older"); Ga. Code. Ann. § 16-11-129(b)(2)(A) (license only available to those over "21 years of age," with a limited exception for those who serve in the armed forces); Idaho Code § 18-3302K(4)(a) (license only available to those "over the age of twenty-one (21) years"); 430 Ill. Comp. Stat. 66/25(1) (license only available to those "at least 21 years of age").

Finally, although plaintiffs invoke modern attitudes about who qualifies as an adult (Br. 14), *Bruen* ties the Second Amendment's scope to historical practices, which support the provisions challenged here.

**a.** Plaintiffs' primary contention is that militia laws of the Founding Era compel the conclusion that restrictions on the sale of handguns to those under age 21 are unconstitutional. Plaintiffs urge (Br. 7-8) that 18-to-20-year-olds "were part of 'the militia'" at the founding, and that they therefore fell "among the people to whom the pre-existing right to keep and bear arms applied." But plaintiffs' premise and conclusion both fail.

As an initial matter, plaintiffs err in suggesting (Br. 17-20) that Founding Era legislatures lacked authority to exclude 18-to-20-year-olds from militia service. Plaintiffs focus (Br. 20) on the National Militia Act of 1792 (Militia Act), which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (*except as is herein after excepted*) shall severally and respectively be enrolled in the militia." Militia Act § 1, 1 Stat. 271, 271 (1792) (emphasis added). As this Court has explained, however, the very next section of the Act "gave States discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17; *see* Militia Act § 2, 1 Stat. at 272 (excluding from the militia "all persons who now are or may hereafter be exempted by the laws of the respective states"). Indeed, when the governor of Massachusetts requested legal advice on this issue, the Massachusetts

Supreme Judicial Court concluded: "[I]t is competent for the State legislature by law to exempt from enrol[l]ment in the militia, all persons under twenty-one and over thirty years of age." *In re Opinion of the Justices*, 39 Mass. (22 Pick) 571, 576 (1838).

Consistent with that authority, "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need." *NRA*, 700 F.3d at 204 n.17. Virginia set a minimum age of 21, which it lowered in times of exceptional need, for example, in 1755 prior to the Seven Years War.[6] Other states—including Georgia, New Jersey, and North Carolina— enrolled only individuals over 21 in their respective militias at various points between the late eighteenth century and the mid-nineteenth century.[7] "Such fluctuation undermines [any] militia-based claim that the right to purchase arms must fully vest precisely at age 18." *Id.*

---

[6] *See* An Act for the settling and better Regulation of the Militia, ch. II, § II, *reprinted in* 4 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 118 (William Waller Hening ed., 1820) (originally promulgated in 1723); An Act for raising levies and recruits to serve in the present expedition against the French, on the Ohio, ch. II, §§ I-III, *reprinted in* 6 Hening, *supra*, at 438, 438-39 (1819) (originally promulgated in 1754); An Act for the better regulating and training the Militia, ch. II, §§ II- III, *reprinted in* 6 Hening, *supra*, at 530, 530-31 (1819) (originally promulgated in 1755).

[7] *See, e.g., The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027, at 189, 189, 199 (Richard H. Clark et al. eds., 1861); An Act to exempt minors from Militia Duty in time of peace (1829), *reprinted in A Compilation of the Public Laws of the State of New-Jersey, Passed Since the Revision in the Year 1820*, at 266, 266 (Josiah Harrison ed., 1833); N.C. Const. of 1868, art. XII, § 1.

Plaintiffs also fail to derive support from the Militia Act's legislative history. *Contra* Br. 20. Although some lawmakers proposed 18 as the universal age for militia service, Congress rejected those proposals and left state legislatures with "discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17. And other parts of the legislative record reflect that Congress did not expect that 18-to-20-year-olds in states that enrolled them in the militia would supply their own firearms. When Congress considered whether the United States should furnish firearms to persons unable to equip themselves, Representative John Vining asked "by what means minors were to provide themselves with the requisite articles?" 2 *Annals of Cong.* 1805 (1790) (ROA.357-360). The remedy, according to Representative Jeremiah Wadsworth, was that "as to minors, their parents or guardians would prefer furnishing them with arms themselves." *Id.* at 1808. At the founding, then, individuals under 21 did not enjoy unregulated access to arms. Rather, as with the present-day age qualification, the presumption was that parents and guardians would be better entrusted with the furnishing of arms to underage individuals.

In any event, as the Supreme Court has warned, the founders understood the right to bear arms as "an individual right unconnected to militia service." *Heller*, 554 U.S. at 582. The wisdom of that warning is illustrated by the circumstances of this case. Whatever historical legislatures may have determined about the age at which citizens were required to carry arms as part of a "well-regulated" military body, U.S. Const. Amend. II, those determinations do not answer the separate question whether

citizens of the same age were entitled to obtain a certain subset of arms (handguns) outside the supervised context of militia service, *see Heller*, 554 U.S. at 597 ("[W]ell-regulated" implies "proper discipline and training") (quotation marks omitted).

Plaintiffs' contention that militia participation defined the scope of the Second Amendment cannot be squared with the historical record. For example, Black people served in some state militias and fought in the Revolutionary War yet were barred from possessing arms outside the context of militia service in other states and at other times. *See* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 331-32 (1991). Likewise, Virginia disarmed individuals who refused to swear a loyalty oath but required them to enroll in the militia and even participate in musters, albeit without weapons.[8]

"[M]erely being part of the militia" thus did not establish an entitlement to Second Amendment rights. *Bondi*, 61 F.4th at 1331. And were it otherwise, the presence of 16-year-olds in some Founding Era militias could be viewed as dictating that today's high school sophomores have full rights to keep and bear arms. *See NRA*, 700 F.3d at 204 n.17 (citing examples of militia laws enrolling 16-year-olds); *see also Rene E.*, 583 F.3d at 13-16 (collecting historical evidence supporting the federal prohibition on handgun possession by under-18-year-olds).

---

[8] An act to oblige the free male inhabitants of this state above a certain age to give assurance of Allegiance to the same, and for other purposes, ch. III (1777), *reprinted in* 9 Hening, *supra*, at 281, 281-82 (1821).

**b.** Plaintiffs fare no better in mining the Constitution (Br. 14-17) for provisions they claim indicate that the Second Amendment extends in full measure to those between the ages of 18 and 21.

In urging this Court to interpret "the people" covered by the Second Amendment in light of the Constitution's other uses of that term, Br. 14-15, plaintiffs only underscore their error. The Constitution often deploys the term "the people" to refer to groups from which 18-to-20-year-olds were historically excluded. For instance, the Preamble describes "the People" as those who "ordain[ed] and establish[ed]" the Constitution by participating in the ratifying conventions. U.S. Const. pmbl.; *see* Akhil Reed Amar, *The Bill of Rights* 27 (1998) (equating "the People" referenced in the Preamble with those who approved the Constitution "by majority vote in special conventions"). And Article I likewise defines "the people" as those who state legislatures authorized to vote in elections for the House of Representatives. U.S. Const. art. I, § 2. In both provisions, "the people" thus denotes a class of individuals that in the Founding Era did not include 18-to-20-year-olds. *See* Karlan, *supra*, at 1358-59.

Instead of acknowledging these provisions, plaintiffs attempt (Br. 14-15) to tether the Second Amendment's scope to that of the First and Fourth Amendments, which also refer to "the people." But both the Supreme Court and this Court have recognized that the Second, First, and Fourth Amendments do not share the same contours. The Supreme Court, for example, has described the Second Amendment

right, unlike the First and Fourth Amendment rights, as belonging to "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. This Court has likewise admonished that the Second and Fourth Amendments do not "cover exactly the same groups of people." *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011). The Court explained that as "an affirmative right," the right to bear arms "would be extended to fewer groups" than "would a protective right" like the right to be free from unreasonable searches and seizures. *Id.* at 441. That holding is consistent with the Second Amendment methodology set forth by the Supreme Court, including in *Bruen*. *See United States v. Sitladeen*, 64 F.4th 978, 983-87 (8th Cir. 2023) (holding that *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011), an Eighth Circuit case that adopted *Portillo-Munoz*'s reasoning and result, remains binding precedent after *Bruen*).

Regardless, even on its own terms First and Fourth Amendment precedent lends no support to plaintiffs' position. In the First Amendment context, "[i]t is well settled" that the government "can adopt more stringent controls on communicative materials available to youths than on those available to adults." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975). And in Fourth Amendment cases, the Supreme Court has permitted the government to prohibit some conduct by underage individuals "that would be perfectly permissible if undertaken by an adult." *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985). Thus, to the extent First and Fourth Amendment cases shed light on the Second Amendment's scope, they indicate that age informs the relevant inquiry.

Equally unavailing is plaintiffs' suggestion (Br. 15) that constitutional provisions codifying age qualifications for federal elected offices indicate that the ratifiers meant to preclude legislatures from establishing similar qualifications in other constitutional contexts. This argument proves far too much: under plaintiffs' theory *no* age qualification—even age 18—could apply. By setting age qualifications for Presidents, Senators, and Members of Congress, the framers did not intend to forever preclude legislatures from enacting any age qualifications for all other activities. Indeed, the same logic that led the framers to set age qualifications for elected officials also supports similar qualifications for arms-bearing. To justify the age requirement for Senators, Federalist 62 explained that age helps ensure "stability of character." The Federalist No. 62 (Alexander Hamilton or James Madison), https://perma.cc/GH3N-F968. The age requirement for elected officials thus reflects the framers' recognition that younger individuals are more likely to suffer from poor "impulse control" and "emotional regulation." *NRA*, 700 F.3d at 210 n.21. That recognition underpins this Nation's "longstanding tradition" of regulating 18-to-20-year-olds' access to arms. *Id.* at 203.

**c.** Plaintiffs likewise err in inviting (Br. 2, 14) this Court to focus on modern attitudes rather than historical tradition.

Plaintiffs make no attempt to reconcile this aspect of their argument with Supreme Court precedent. *Heller* observed that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." 554

U.S. at 634-35. And *Bruen* confirms that although *Heller*'s historical approach does not amount to a "regulatory straightjacket," it does require that the interpretation of the Amendment's text be "informed by history"—not by modern attitudes. 142 S. Ct. at 2123, 2127. Indeed, the bulk of plaintiffs' brief (at 14-21, 26-42) examines whether historical legislatures had authority to restrict 18-to-20-year-olds' access to arms. It is thus contrary to precedent and to plaintiffs' other arguments in this case to bind the Second Amendment's scope to modern conceptions of adulthood.

Moreover, as this Court warned in rejecting the same argument plaintiffs advance here, modern concepts of adulthood are not "fixed" but fluctuate. *NRA*, 700 F.3d at 204 n.17. Plaintiffs' argument would therefore dictate that the Second Amendment's scope expands and contracts whenever state legislatures adjust the age of majority. This is a case in point: under plaintiffs' position, the federal laws at issue here, which Congress enacted in 1968, *see* Pub. L. No. 90-351, tit. IV, 82 Stat. at 225, were constitutional when passed, yet somehow are unconstitutional now based on changes in the state law age of majority that took place after 1968.

In any event, plaintiffs are wrong to assume (Br. 14) that the age of majority with respect to firearms is now 18. "There is no legal requirement that the same age of majority apply to all activities and circumstances, and statutes setting different ages at which a person may engage in an activity or be treated as an adult are within the province of the legislature." 42 Am. Jur. 2d Infants § 6 (WestLaw 2023 update). And many state legislatures continue to set 21 as the minimum age for certain activities,

including "purchas[ing] alcohol," "purchas[ing] lottery tickets," and—particularly relevant here—acquiring handguns. *NRA*, 700 F.3d at 204 n.17; *see also id.* at 190 n.4 (collecting state laws). So today, as at the founding, it remains within legislatures' discretion to set 21 as the age of majority for purposes of arms-bearing.

To the extent plaintiffs suggest (Br. 2) that the Twenty-Sixth Amendment, which set a national voting age of 18, transforms the Second Amendment's scope, they are mistaken. It is true that, at the founding, "arms bearing and suffrage were intimately linked." Amar, *supra*, at 48 n.*. It does not follow, however, that in 1971 when the Twenty-Sixth Amendment's ratifiers codified a national voting age, they meant to set the same age for arms-bearing. As noted above, *Heller* states that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," and plaintiffs identify no evidence that the people who ratified the Twenty-Sixth Amendment understood it as altering the scope of the right to bear arms. 554 U.S. at 634-35.

## II.  Historical Analogues Confirm that the Commercial Sale Restrictions Comport with the Second Amendment

This "Nation's historical tradition of firearm regulation" reflects that the Second Amendment does not strip legislatures of their authority to restrict the commercial sale of handguns to 18-to-20-year-olds. *Bruen*, 142 S. Ct. at 2126.

**A.** Legislatures have regulated 18-to-20-year-olds' access to handguns for most of American history.

**1.** The closest historical analogues for the commercial sale restrictions date to the mid-nineteenth century. The Supreme Court has described evidence from that period as a "critical tool of constitutional interpretation," *Heller*, 554 U.S. at 605, and this Court and others therefore look to nineteenth century sources in discerning the right's meaning, *see, e.g.*, *NRA*, 700 F.3d 199-204; *Bondi*, 61 F.4th at 1322-32.

Nineteenth century legislatures routinely prohibited 18-to-20-year-olds from obtaining handguns over their parents' objections. As early as 1856, Alabama forbade providing "to any male minor" any "air gun or pistol." Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17, 17. Two years later, Tennessee likewise barred providing "to any minor a pistol[] . . . or like dangerous weapon, except a gun for hunting or weapon for defence in travelling." Tenn. Code § 4864 (1858). And a year after that, Kentucky similarly prevented anyone other than parents or guardians from providing "any pistol[] . . . or other deadly weapon[] . . . to any minor." 1859 Ky. Acts 241, 245.

In the decades surrounding the passage of the Fourteenth Amendment, which recognized that the right to bear arms is enforceable against the states, at least 19 jurisdictions restricted the purchase of handguns by 18-to-20-year-olds. Although the precise scope of these laws varied, all of them at least prohibited 18-to-20-year-olds from purchasing handguns without the approval of their parents or guardians. In addition to the Alabama, Kentucky, and Tennessee laws discussed above, those laws were enacted in the following jurisdictions: Delaware (1881), the District of Columbia (1892), Georgia (1876), Illinois (1881), Indiana (1875), Iowa (1884), Kansas (1883),

Louisiana (1890), Maryland (1882), Mississippi (1878), Missouri (1879), North

Carolina (1893), Texas (1897), West Virginia (1882), Wisconsin (1883), and Wyoming

(1890). The prohibitions thus spanned every region of the country and covered much

of the population. The addendum to this brief provides source and citation

information for each prohibition.

Those prohibitions won approval from courts, commentators, and the public.

One review of historical newspaper editorials and other sources identified consistent

support for "laws restricting the sale of dangerous weapons to minors." Jacob

Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry*

ch. 4 & n.211-12 (2019). And "the judge and professor Thomas Cooley," who wrote

a "massively popular" treatise that *Heller* cited with approval, 554 U.S. at 616, likewise

included among the permissible exercises of state police power "[t]hat the State may

prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional*

*Limitations* 740 n.4 (5th ed. 1883).

What appears to be the sole nineteenth century judicial decision addressing

those prohibitions confirmed their constitutionality. *See State v. Callicutt*, 69 Tenn. 714

(1878). Soon after the Fourteenth Amendment's passage, the Tennessee Supreme

Court demonstrated its commitment to the right to bear arms by holding "that a

statute that forbade openly carrying a pistol" contravened the state constitution's

Second Amendment analogue. *Heller*, 554 U.S. at 629 (citing *Andrews v. State*, 50 Tenn.

165, 187 (1871)). When presented with a challenge to a state law prohibiting the sale

of pistols to under-21-year-olds, however, the same court upheld the law as "not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Callicutt*, 69 Tenn. at 716-17. "[T]he fact that there was apparently only a single challenge to these [restrictions'] constitutionality until well into the twentieth century" further illustrates that the public "considered the statutory prohibitions constitutionally permissible." *Bondi*, 61 F.4th at 1330.

These historical laws provide ample support for the commercial sale restrictions at issue here. In directing that courts consider "this Nation's historical tradition of firearm regulation," *Bruen* warned that history does not impose "a regulatory straightjacket." 142 S. Ct. at 2126, 2132-33. Thus, the question is not whether a modern law mirrors a "historical twin," but whether it is "relevantly similar" to a "historical analogue." *Id.* That "analogical inquiry" involves a review of "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*

Both metrics reflect that the commercial sale restrictions rest on firm historical foundations. With respect to the "why" metric, historical laws aimed "to prevent crime" at the hands of minors. *Callicutt*, 69 Tenn. at 716. The modern restrictions likewise address "the misuse of firearms by juveniles and minors." S. Rep. No. 89-1866, at 59. And with respect to the "how" metric, historical and modern laws both regulate the transfer of firearms by the same providers (commercial sellers) to the same recipients (18-to-20-year-olds). The metrics *Bruen* identified therefore confirm

that the commercial sale restrictions are constitutional.  Indeed, the Eleventh Circuit recently held that a significantly more expansive state law restricting the "sale of firearms to 18-to-20-year-olds"—which applied to all firearms, not just handguns, and applied to all sales, not just those by federal firearms licensees—comports with the Second Amendment.[9]  *Bondi*, 61 F.4th at 1325.

**2.** The nineteenth century prohibitions discussed above trace their origins to Founding Era practices.  As explained already, the founders designated those under the age of 21 as "infants," *NRA*, 700 F.3d at 201, and deemed them deficient in reason and judgment, *see supra* pp. 18-21.  Parents thus held substantial authority to oversee 18-to-20-year-olds.  *See Brown*, 564 U.S. at 829-30 (Thomas, J., dissenting).  That authority reached an apex with respect to firearms, the acquisition of which by underage individuals poses a heightened risk to the public and to those individuals themselves.

The founders accordingly approved various measures calculated to prevent 18-to-20-year-olds from accessing arms without supervision.  One example involves prohibitions on the possession of firearms by students at public universities.  Because those universities "stood in the place of parents to the students entrusted to their

---

[9] Notwithstanding this Court's decision in *NRA* and the Eleventh Circuit's decision in *Bondi*, a district court outside this circuit recently concluded that the commercial sale restrictions are not consistent with the Second Amendment.  *See Fraser v. ATF*, No. 3:22-cv-410, slip op. at 1 (E.D. Va. May 10, 2023).  For the reasons given in the relevant court of appeals decisions and in this brief, the district court's conclusion is incorrect.

care," their rules illustrate the extent of parental authority to oversee 18-to-20-year-olds' firearm use. Brian Jackson, *The Lingering Legacy of in Loco Parentis: An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1136 (1991). For instance, an 1824 University of Virginia resolution supported by Thomas Jefferson and James Madison forbade students from keeping "weapons or arms of any kind, or gunpower" on school grounds. Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes*, Encyclopedia Va. 6-7 (Oct. 5, 1824), https://perma.cc/HNY3-PXDZ; *see Bondi*, 61 F.4th at 1327 (collecting examples). And as an 1810 University of Georgia resolution attests, public universities retained authority to bar students from possessing firearms not just while they stayed on school grounds, but also when they left campus. *See* Univ. of Ga. Libraries, *The Minutes of the Senatus Academicus 1799-1842*, ¶ 86 (Nov. 4, 1976), https://perma.cc/VVT2-KFDB (prohibiting students from possessing "any gun" or "other offensive weapon in College" or "out of the college in any case whatsoever"). Thus, the founders accepted prohibitions on firearm use by university students, a group which included some of the most privileged 18-to-20-year-olds in the early republic.

Parents' authority to oversee arms-bearing by underage individuals is also reflected in the Founding Era militia laws on which plaintiffs rely. *See supra* pp. 23-26. Pennsylvania's 1755 militia act, drafted by Benjamin Franklin, permitted individuals under 21 to enroll in the militia but provided "[t]hat no [y]outh, under the [a]ge of [t]wenty-one [y]ears, . . . shall be admitted to enroll himself . . . without the [c]onsent

of his or their [p]arents or [g]uardians, [m]asters or [m]istresses, in Writing under their Hands." *Militia Act, [25 November 1755]*, National Archives (Nov. 25, 1755), https://perma.cc/2DFN-Z2GN. In a similar vein, at least six states—including Massachusetts (1810), New Hampshire (1821), Vermont (1807), North Carolina (1806), Maine (1821), and Missouri (1826)— required parents to furnish the firearms for their childrens' militia duty, presumably on the assumption that minors could not obtain arms themselves.[10] What these Founding Era laws have in common is that each presupposes active oversight of 18-to-20-year-olds' arms-bearing by their parents or guardians.

That parents held authority to restrict 18-to-20-year-olds' access to arms is further illustrated by historical policing practices. A leading treatise published in 1788 explained that when summoned by local authorities, citizens generally had a duty to serve as peace officers. *See* John Faucheraud Grimké, *The South Carolina Justice of Peace* 118 (R. Aitken & Son eds., 1788). Citizens ineligible for service included "idiots," "madmen," and "infants"—that is, individuals under the age of 21. *Id.* at 117-18. The comparison between 18-to-20-year-olds and those suffering from mental illnesses, which pervades historical materials, *see supra* pp. 18-19 (citing similar

---

[10] *See* Act of Mar. 6, 1810, ch. CVII, § 28, 1810 Mass Laws 151, 176; Act of Dec. 22, 1820, ch. XXXVI, § 46, 1820 N.H. Laws 287, 321; Act of Mar. 20, 1797, ch. LXXXI, No. 1, § 15, *reprinted in The Laws of the State of Vermont, Digested and Compiled* 122, 131-32 (1808); 2 *The Code of North Carolina* ch. 35, § 3168, at 346, 346-47 (William T. Dortch, John Manning, & John S. Henderson eds., 1883); ch. CLXIV, § 34, 1821 Me. Laws 687, 716; Act of July 4, 1825, ch. I, § 24, 1825 Mo. Laws 533, 554.

analogies drawn by John Locke and Thomas Jefferson), confirms that the ratifiers harbored substantial doubts about the judgment of individuals in this age group. Those individuals were therefore excluded from roles such as peace officer that entailed the unsupervised use of firearms.

It is a testament to the strength of this historical tradition that laws restricting 18-to-20-year-olds' access to arms remain prevalent today. In recent times, "all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms." *NRA*, 700 F.3d at 190 n.4. The commercial sale restrictions thus stand in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*, 142 S. Ct. at 2156; *see id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Unlike those exceptional laws, the federal restrictions whose validity plaintiffs seek to upend reflect a historical tradition that stretches from the founding to the present.

**B.** Plaintiffs do not dispute that many historical laws restricted the sale of handguns to 18-to-20-year-olds, and that courts, commentators, and the public approved such prohibitions. Instead, plaintiffs assert that this history must be disregarded. They claim that nineteenth century evidence has no place in Second Amendment analysis as a categorical matter, *see* Br. 37; launch piecemeal attacks that

would in combination produce the same result, *see* Br. 36-39; and renew their earlier attempt to tether the Second Amendment's scope not to historical practices but to modern attitudes, *see* Br. 39. Each of these efforts to evade our "Nation's historical tradition of firearm regulation" lacks merit. *Bruen*, 142 S. Ct. at 2126.

**1.** Plaintiffs' assertion (Br. 37) that nineteenth century laws arrived "too late" to inform Second Amendment analysis is at odds with Supreme Court precedent. Although that precedent does not "conclusively determine" the extent to which nineteenth century materials inform Second Amendment analysis, *Bruen*, 142 S. Ct. at 2162 (Barrett, J., concurring), it provides many indications that those materials merit substantial weight: *Heller* described nineteenth evidence as a "critical tool of constitutional interpretation," 554 U.S. at 614; both *Heller* and *Bruen* conduct an extensive review of nineteenth century sources, *see Heller*, 554 U.S. at 605-19 (considering evidence "through the end of the 19th century"); *Bruen*, 142 S. Ct. at 2136, 2145-56 (same); *see id.* at 2133 (looking to "18th- and 19th-century" evidence in discussing the scope of the sensitive places doctrine); and *Bruen* cited scholarship emphasizing the importance of those sources, 142 S. Ct. at 2138 (quoting Kurt Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://ssrn.com/sol3/papers/cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings.")).

When examining the historical scope of other constitutional rights, the Supreme Court has also placed significant emphasis on nineteenth century practices. In First Amendment cases, for example, the Court has recognized "historic and traditional" exceptions to the free speech right without tracing those exceptions back to the founding. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (quotation marks omitted); *see also United States v. Stevens*, 559 U.S. 460, 468 (2010) (surveying historical practice "[f]rom 1791 to the present" (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992))); *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (reviewing "two centuries of national practice"). In Sixth Amendment cases, the Court has likewise consulted nineteenth century evidence. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (citing evidence from "throughout the nineteenth century"). And the Court has similarly construed the Confrontation Clause by canvassing nineteenth century cases and commentaries. *See Crawford v. Washington*, 541 U.S. 36, 50 (2004) (citing materials from the mid-nineteenth century). There is no sound reason to adopt a more circumscribed view of the relevant evidence in the Second Amendment context.

To the contrary, three features of Second Amendment doctrine confirm that nineteenth century materials warrant substantial weight. First, the Supreme Court has explained that the Second Amendment codified a "pre-existing right" regarded as "venerable" when the Amendment was ratified in 1791, *Heller*, 554 U.S. at 570, 603, 605, and that "was still recognized to be fundamental" in the mid-to-late nineteenth century, *McDonald*, 561 U.S. at 773. Sources from both before and after 1791 thus

provide insight into what the right to bear arms entails.  Second, nineteenth century history assumes particular importance because the Supreme Court has determined that the Second Amendment and the Fourteenth Amendment, which was ratified in 1868 and which confirmed that the right to bear arms is enforceable against the states, "have the same scope." *Bruen*, 142 S. Ct. at 2137.  The Eleventh Circuit has concluded that to the extent historical practices in those periods diverge, the understanding that prevailed at the time of "the later-enacted [Amendment] controls." *Bondi*, 61 F.4th at 1323-24 (quotation marks omitted); *see also Bruen*, 142 S. Ct. at 2138 (citing scholarship reaching a similar conclusion).  At a minimum, tracing the meaning of a right codified in 1791 and renewed in 1868 requires a review of sources from both periods.  Third, the Supreme Court has recognized that "a regular course of practice" that arises after ratification "can liquidate [and] settle the meaning of disputed or indeterminate terms" in the Constitution.  *Bruen*, 142 S. Ct. at 2136 (citation and quotation marks omitted).

Plaintiffs' argument to the contrary (Br. 36) rests on the mistaken premise that they have provided conclusive evidence as to the right's meaning at the founding, and that this understanding cannot be varied by later practice.  But plaintiffs have provided no such evidence; apart from their misplaced reliance on Founding Era militia laws, *see supra* pp. 23-26, plaintiffs identify no legislative enactment or judicial decision from that period that supports their understanding.  Nor have plaintiffs pointed to any other materials demonstrating that the founders would have believed

regulations such as those at issue here to be unconstitutional. And there are of course many reasons other than constitutional limitations that the historical laws that most closely mirror the restrictions challenged in this case proliferated during a later period. *See United States v. Kelly*, No. 3:22-cr-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (observing, in applying *Bruen*, that "a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution").

Plaintiffs' position also relies on the implausible premise that the meaning of the right to bear arms underwent a radical shift between 1791 and 1868. Plaintiffs provide no explanation for such a shift. Nor do plaintiffs acknowledge that the implication of their position would be that the Second and Fourteenth Amendments carry different meanings—a result *Bruen* expressly rejected, *see* 142 S. Ct. at 2137.

**2.** Plaintiffs' highly selective account (Br. 36-39) of nineteenth century evidence likewise fails to advance their argument.

First, plaintiffs mistakenly urge that (Br. 37) this Court should discount the significance of laws from two regions, the South and West. Although plaintiffs suggest that racism motivated Southern firearms laws, they present no evidence that was true of restrictions on 18-to-20-year-olds' access to arms. And although plaintiffs claim that *Bruen* disregarded laws from jurisdictions in the West, the Supreme Court did so only for certain territorial laws that covered "miniscule" populations and that

lacked parallels in other parts of the country. 142 S. Ct. at 2154. Neither

consideration carries force here, where laws passed in the West mirrored those

enacted in many of the most populated areas of the East, Midwest, and South.

Plaintiffs would also have this Court disregard (Br. 37-38) laws from states

without Second Amendment analogues in their state constitutions. As an initial

matter, plaintiffs miss the mark because similar laws proliferated in many states whose

constitutions *did* contain Second Amendment analogues. *See, e.g.*, Eugene Volokh,

*State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208-16

(2006) (reflecting that the constitutions of Alabama, Georgia, Indiana, Kansas,

Mississippi, Missouri, North Carolina, Tennessee, and Wyoming incorporated a right

to bear arms at the time those states enacted age-based firearms regulations). And as

to the other cited historical laws, plaintiffs offer no evidence that any historical

prohibition on the purchase of firearms by 18-to-20-year-olds was enacted because of

the absence of a state constitutional provision securing the right to bear arms. As the

Supreme Court has explained, contemporaries regarded the right to bear arms as a

"fundamental" protection that constrained nineteenth century legislatures. *McDonald*,

561 U.S. at 773. That nineteenth century Americans pervasively legislated on this

issue regardless of whether their state constitutions expressly codified that protection

confirms that they perceived no inconsistency between the right to bear arms and

laws regulating 18-to-20-year-olds.

Finally, plaintiffs are likewise mistaken in dismissing evidence from nineteenth century courts and commentators. Plaintiffs contend (Br. 41-42) that Cooley's "massively popular" treatise, *Heller*, 554 U.S. at 616, cited a Tennessee Supreme Court decision upholding age-based firearms regulations without necessarily endorsing that conclusion, but the point is that Cooley understood the decision as accurately summarizing the law at the time. And plaintiffs' claim that the decision Cooley cited has no application here because it supposedly addressed a law restricting the "concealed carry of dangerous weapons, not the right to keep and bear arms" is simply wrong. Br. 41-42 (quotation marks omitted). The relevant law generally barred providing "to any minor a pistol[] . . . or like dangerous weapon," Tenn. Code § 4864 (1858), and the Tennessee Supreme Court did not interpret the law in the limited way plaintiffs suggest, *see Callicutt*, 69 Tenn. 714.

**3.** Plaintiffs fare no better in seeking to distinguish (Br. 38-39) historical and modern laws on the theory that historical laws regulated minors and modern laws do not. The argument that modern legislatures may only restrict arms-bearing by those they designate as minors echoes plaintiffs' earlier attempt to tie the Second Amendment's scope to contemporary attitudes, *see supra* pp. 29-31, and it suffers from similar shortcomings: It dictates that what firearms regulations are permissible depends on how state legislatures define the age of majority and ignores that many states continue to treat 18-to-20-year-olds as minors for purposes of arms-bearing.

In any event, plaintiffs misunderstand the justification for historical laws. Without citing any nineteenth century evidence, plaintiffs assert (Br. 39) that laws from that period proscribed arms-bearing by 18-to-20-year-olds "because [they] were minors." But as explained above, historical legislatures regulated those individuals not because of their abstract status as minors, but because of the immaturity of 18-to-20-year-olds and the concomitant danger they present to "public safety." *Bondi*, 61 F.4th at 1326; *see* Charles, *supra*, at ch. 4 & n.212 ("Generally speaking, lawmakers and the public supported these laws in the hopes of stemming the tide of firearm-related injuries at the hands of minors"). And although 18-to-20-year-olds' status as minors may have fluctuated over time, the threat they pose to public safety has not. *See NRA*, 700 F.3d at 210-11, 210 nn.20-21 (collecting empirical evidence showing that "18-to-20-year-olds accounted for a disproportionately high percentage of arrests for violent crimes"). Modern laws recognizing the heightened risk created by 18-to-20-year-olds thus rest on deep historical roots.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
   *General*

BRANDON BONAPARTE BROWN
   *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

 *s/ Steven H. Hazel*
STEVEN H. HAZEL
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7217*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-2498*
   *Steven.H.Hazel@usdoj.gov*

May 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*
Steven H. Hazel

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,606 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 922 ................................................................................................ A1

27 C.F.R. § 478.99 ........................................................................................... A2

Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-
 Twenty-Year-Olds ................................................................................... A3

**18 U.S.C. § 922**

**§ 922. Unlawful acts**

. . .

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

(1) any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age;

. . . .

(c) In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if--

(1) the transferee submits to the transferor a sworn statement in the following form:

"Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside.

Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are_____.

Signature ........ Date ........"

and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

. . . .

**27 C.F.R. § 478.99**

**§ 478.99. Certain prohibited sales or deliveries**

. . . .

(b) Sales or deliveries to underaged persons. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver (1) any firearm or ammunition to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 18 years of age, and, if the firearm, or ammunition, is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age, or (2) any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery, or other disposition, unless the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance.

. . . .

**Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-Twenty-Year-Olds**

| Jurisdiction | Year | Source | Available At |
|---|---|---|---|
| Alabama | 1856 | 1856 Ala. Acts 17, No. 26, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssal0178&i=17 |
| Chicago, Illinois | 1873 | Proceedings of the Common Council of the City of Chicago for the Municipal Year 1872-3, at 113-14 (1874) | https://hdl.handle.net/2027/uiug.30112089447939?urlappend=%3Bseq=192%3Bownerid=13510798902234869-196 |
| Delaware | 1881 | 16 Del. Laws 716 (1881) | https://heinonline.org/HOL/Page?handle=hein.ssl/ssde0173&id=430&collection=ssl |
| District of Columbia | 1892 | 27 Stat. 116-17 (1892) | https://hdl.handle.net/2027/hvd.hj1gjl?urlappend=%3Bseq=294%3Bownerid=27021597767057788-314 |
| Georgia | 1876 | 1876 Ga. Laws 112, No. CXXVIIII (O. No. 63), § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssga0180&i=112 |
| Illinois | 1881 | 1881 Ill. Laws 73, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssil0240&i=81 |
| Indiana | 1875 | 1875 Ind. Laws 59, ch. XL, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssin0221&i=59 |
| Iowa | 1884 | 1884 Iowa Acts and resolutions 86, ch. 78, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssia0095&i=114 |
| Kansas | 1883 | 1883 Kan. Sess. Laws 159, ch. CV, 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssks0111&i=169 |
| Kentucky | 1859 | Edward Bullock and William Johnson, *The General Statutes of the Commonwealth of Kentucky* 359, § 1 (1873) | https://heinonline.org/HOL/P?h=hein.sstatutes/gcucky0001&i=371 |

| Lincoln, Nebraska | 1895 | 1895 Neb. Laws 237-38, *Laws of Nebraska Relating to the City of Lincoln*, Art. XXVI, §§ 2, 5 | https://heinonline.org/HOL/P?h=hein.ssl/ssne0123&i=247 |
|---|---|---|---|
| Louisiana | 1890 | 1890 La. Acts 39, No. 46, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssla0223&i=39 |
| Maryland | 1882 | 1882 Md. Laws 656, ch. 424, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssmd0444&i=656 |
| Mississippi | 1878 | 1878 Miss. Laws 175, ch. 66, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssms0207&i=207 |
| Missouri | 1879 | *Revised Statutes of the State of Missouri* 224, § 1274 (1879) | https://heinonline.org/HOL/P?h=hein.sstatutes/ristesm0001&i=320 |
| Nevada | 1885 | 1885 Nev. Stat. 51, ch. 51, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnv0097&i=61 |
| North Carolina | 1893 | 1893 N.C. Pub. L. & Res. 468, ch. 514, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnc0078&i=498 |
| Tennessee | 1856 | 1856 Tenn. Acts 92, ch. 81, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/sstn0249&i=108 |
| Texas | 1897 | 1897 Tex. Gen. Laws 221-22, ch. 155, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sstx0251&i=245 |
| West Virginia | 1882 | 1882 W. Va. Acts 421-22, ch. 135, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sswv0101&i=421 |
| Wisconsin | 1883 | 1883 Wis. Sess. Laws 290, ch. 329, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/sswi0136&i=290 |
| Wyoming | 1890 | 1890 Wyo. Sess. Laws 140, § 97 | https://heinonline.org/HOL/P?h=hein.ssl/sswy0076&i=138 |