No. 23-30033

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

CALEB REESE; FIREARMS POLICY COALITION, INCORPORATED; SECOND AMENDMENT FOUNDATION; LOUISIANA SHOOTING ASSOCIATION; EMILY NAQUIN,

*Plaintiffs-Appellants,*

vs.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN DETTELBACH, DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; MERRICK GARLAND, U.S. ATTORNEY GENERAL,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Western District of Louisiana, No. 6:20-cv-01438

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES FOUNDATION IN SUPPORT OF DEFENDANTS-APPELLEES

[Additional Counsel Listed on Signature Page]

Timothy R.W. Kappel
WELLS & KAPPEL LLP
1615 Poydras Street, Suite 900
New Orleans, Louisiana  70112
(504) 905-2012
tkappel@wellskappel.com

May 19, 2023

*Counsel for* Amici Curiae

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

| *Plaintiffs-Appellants* | *Counsel for Plaintiffs-Appellants* |
|---|---|
| Caleb Reese<br>Louisiana Shooting Association<br>Emily Naquin<br>Second Amendment Foundation<br>Firearms Policy Coalition, Inc. | David H. Thompson<br>Peter A. Patterson<br>William V. Bergstrom<br>COOPER & KIRK, PLLC<br><br>George J. Armbruster, III<br>ARMBRUSTER & ASSOCIATES, APLC<br><br>Joseph Greenlee<br>FPC ACTION FOUNDATION<br><br>John W. Dillon*<br>DILLON LAW GROUP<br><br>Raymond M. DiGuiseppe*<br>DIGUISEPPE LAW FIRM<br><br>Adam Kraut*<br>SECOND AMENDMENT FOUNDATION |

| Defendants-Appellees | Counsel for Defendants-Appellees |
|---|---|
| Bureau of Alcohol, Tobacco, Firearms and Explosives<br><br>Steven Dettelbach, in his official capacity as ATF Director<br><br>Merrick Garland, in his official capacity as Attorney General of the United States | Abby C. Wright<br>Daniel M. Riess*<br>Steven H. Hazel<br>U.S. DEPARTMENT OF JUSTICE |
| **Amici Curiae** | **Counsel for Amici Curiae** |
| Giffords Law Center to Prevent Gun Violence<br><br>Brady Center to Prevent Gun Violence<br><br>March For Our Lives Foundation | Timothy R.W. Kappel<br>WELLS & KAPPEL LLP<br><br>*Of counsel to* Amici Curiae:<br><br>Esther Sanchez-Gomez<br>GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE<br><br>Douglas N. Letter<br>Shira Lauren Feldman<br>BRADY CENTER TO PREVENT GUN VIOLENCE<br><br>Ciara Malone<br>MARCH FOR OUR LIVES<br><br>Robert A. Sacks<br>Leonid Traps<br>Elizabeth A. Rose<br>Madeline B. Jenks<br>Sophie A. Kivett<br>SULLIVAN & CROMWELL LLP |

Attorneys whose names are denoted with an asterisk entered appearances in the district court but have not entered appearances in the Fifth Circuit.

Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives Foundation state that each organization does not have parent corporations. They do not have stock, and therefore no publicly held company owns 10% or more of their stock.

/s/ *Timothy R.W. Kappel*
Timothy R.W. Kappel
*Counsel for* Amici Curiae
*Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives Foundation*

May 19, 2023

# TABLE OF CONTENTS

**Page**

CONSENT DECREE ...................................................................... 1

INTEREST OF *AMICI CURIAE* ................................................ 2

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 6

ARGUMENT ................................................................................ 11

    I.    EIGHTEEN-TO-TWENTY-YEAR-OLDS ARE NOT
         AMONG "THE PEOPLE" PROTECTED BY THE
         SECOND AMENDMENT. ............................................. 11

    II.   THE DISTRICT COURT CORRECTLY FOUND THAT
         THE CHALLENGED LAWS ARE CONSISTENT
         WITH LONGSTANDING AGE AND SAFETY-BASED
         RESTRICTIONS. ......................................................... 12

    III.  NEUROSCIENCE AND SOCIAL SCIENCE
         CONFIRM THAT THE CHALLENGED LAWS ARE
         ANALOGOUS TO HISTORICAL REGULATIONS OF
         GROUPS POSING A HEIGHTENED RISK OF
         VIOLENCE WHEN ARMED. ......................................... 19

         A.    Eighteen-to-Twenty-Year-Olds Are Generally
             More Impulsive Than Older Cohorts. ......................... 20

         B.    Eighteen-to-Twenty-Year-Olds Attempt Suicide
             at Disproportionately High Rates, and Access to
             Firearms Increases the Likelihood and Lethality
             of Those Suicide Attempts. ......................................... 22

         C.    Eighteen-to-Twenty-Year-Olds Are
             Disproportionately Likely to Commit Violent
             Crimes with Firearms. ............................................. 26

         D.    Federal and State Minimum-Age Laws Have
             Proven Effective at Reducing Gun Violence
             Among Minors. ......................................................... 32

CONCLUSION .......................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*,
 910 F.3d 106 (3d Cir. 2018) ................................................................. 3

*Bevis* v. *City of Naperville*,
 No. 23-1353 (7th Cir. May 10, 2023) ................................................. 5

*Binderup* v. *Att'y Gen. U.S.*,
 836 F.3d 336 (3d Cir. 2016) ............................................................... 15

*District of Columbia* v. *Heller*,
 554 U.S. 570 (2008) ................................................................. *passim*

*Gall* v. *United States*,
 552 U.S. 38 (2007) ............................................................................ 11

*Graham* v. *Florida*,
 560 U.S. 48 (2010) ............................................................................ 11

*Hanson* v. *District of Columbia*,
 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ......................................... 4

*Hirschfeld* v. *BATFE*,
 417 F. Supp. 3d 747 (W.D. Va. 2019) ................................................. 3

*Kanter* v. *Barr*,
 919 F.3d 437 (7th Cir. 2019) ............................................................. 16

*Lara* v. *Evanchick*,
 534 F. Supp. 3d 478 (W.D. Pa. 2021) ............................................... 17

*McDonald* v. *City of Chicago*,
 561 U.S. 742 (2010) ..................................................................... 3, 13

*Md. Shall Issue* v. *Hogan*,
 353 F. Supp. 3d 400 (D. Md. 2018) ..................................................... 3

*Miller* v. *Alabama,*
    567 U.S. 460 (2012) ............................................................ 21

*N.Y. State Rifle & Pistol Ass'n* v. *Bruen,*
    142 S. Ct. 2111 (2022) ................................................. *passim*

*Nat'l Paint & Coatings Ass'n* v. *City of Chicago,*
    45 F.3d 1124 (7th Cir. 1995) ............................................ 35

*Nat'l Ass'n for Gun Rights* v. *City of Highland Park,*
    No. 1:22-cv-04774 (N.D. Ill. Jan. 26, 2023) ......................... 5

*NRA* v. *BATFE,*
    700 F.3d 185 (5th Cir. 2012) ....................................... *passim*

*NRA* v. *Bondi,*
    61 F.4th 1317 (11th Cir. 2023) .................................... 14, 18

*NRA* v. *McCraw,*
    719 F.3d 338 (5th Cir. 2013) ............................................ 17

*NRA* v. *Swearingen,*
    545 F. Supp. 3d 1247 (N.D. Fla. 2021) .............................. 18

*Peruta* v. *County of San Diego,*
    824 F.3d 919 (9th Cir. 2016) ............................................. 3

*Stimmel* v. *Sessions,*
    879 F.3d 198 (6th Cir. 2018) ............................................. 3

*United States* v. *Bena,*
    664 F.3d 1180 (8th Cir. 2011) .......................................... 19

*United States* v. *Chovan,*
    735 F.3d 1127 (9th Cir. 2013) .......................................... 15

*United States* v. *Hayes,*
    555 U.S. 415 (2009) ...................................................... 4

*United States* v. *Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) ............................................ 36

*VanDerStok* v. *Garland*,
  Nos. 22-11071, 22-11086 (5th Cir. Dec. 27, 2022) ............................ 4

*Wade* v. *Univ. of Mich.*,
  No. 156150 (6th Cir. Mar. 1, 2021) ...................................................... 5

## Constitution, Statutes, and Rule

U.S. CONST. amend. II .......................................................... *passim*

U.S. CONST. amend. XXVI .............................................................. 6

21 U.S.C. § 387f ............................................................................. 6

23 U.S.C. § 158 .............................................................................. 6

TEX. ALCO. BEV. CODE ANN. §§ 106.01-106.07 ........................... 6

TEX. GOV'T CODE ANN. § 466.3051 ............................................. 6

Fed. R. App. P. 29 ..................................................................... 1, 2

## Other Authorities

*A Partial List of Mass Shootings in the United States in
  2022*, N.Y. TIMES (Jan. 24, 2023) ............................................ 7, 29, 30

Adam Winkler & Cara Natterson, *There's a Simple Way to
  Reduce Gun Violence: Raise the Gun Age*, WASH. POST
  (Jan. 6, 2016) ......................................................................... 20

Adrian Sainz, *Memphis Gunman Arrested in Livestreamed
  Shootings That Killed 4*, PBS (Sept. 8, 2022) ..................... 30

American Public Health Association, *Reducing Suicides by
  Firearms* (Nov. 13, 2018) ...................................................... 24

Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers
  that Grow with Each Mass Shooting*, WASH. POST (last
  updated May 12, 2021) .......................................................... 29

Centers for Disease Control and Prevention, Web-based
    Injury Statistics Query and Reporting System
    (WISQARS), *Leading Cause of Death Reports, 1981-2020* .......... 23, 24

Daniel A. Medina & Casey Tolan, *Highland Park Gunman's
    Family Was in Turmoil for Years Leading Up to Parade
    Shooting*, CNN (July 9, 2022)............................................................. 29

Daniel W. Webster et al., *Association Between Youth-Focused
    Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004)................ 33

Daniel W. Webster et al., *The Case for Gun Policy Reforms in
    America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH.
    (2012) .................................................................................................... 28

Don B. Kates & Clayton E. Cramer, *Second Amendment
    Limitations and Criminological Considerations*, 60
    HASTINGS L.J. 1339 (2009).................................................................... 15

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and
    Public Policy*, 103 AM. J. PUB. HEALTH 27 (2013) ............................. 23

Eberhard A. Deisenhammer et al., *The Duration of the
    Suicidal Process: How Much Time Is Left for Intervention
    Between Consideration and Accomplishment of a Suicide
    Attempt?*, 70 J. CLIN. PSYCHIATRY 19 (2009) ...................................... 23

Elise Hammond et al., *The Latest on Mass Shooting in
    Farmington, New Mexico*, CNN (May 16, 2023)........................... 7, 30

Erin Douglas & Alex Ford, *Deaths from Firearms Keep
    Climbing in Texas, Decades After Lawmakers Began
    Weakening Gun Regulations*, TEXAS TRIBUNE
    (May 10, 2023)....................................................................................... 33

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor
    for Completed Suicide: Even More Lethal Than We Knew*,
    173 AM. J. PSYCHIATRY 1094 (2016).............................................. 25, 26

Jane E. Brody, *After a Suicide Attempt, the Risk of Another
    Try*, N.Y. TIMES (Nov. 7, 2016) .......................................................... 26

Jenna Fisher et al., *Teen and Woman Killed in Shooting at St. Louis High School*, N.Y. TIMES (Oct. 24, 2022) ............................ 30

Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022) ...................................................................... 24

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26 (2013).............. 35

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010) .......................................................... 21

Luis Melgar, *Are School Shootings Becoming More Frequent? We Ran the Numbers*, WAMU (Aug. 13, 2019) ................................... 32

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013) ............. 20, 21

Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Buffalo and Uvalde*, BUSINESS INSIDER (last updated Jan. 23, 2023) .................................. 31

*Mass Shootings in 2023*, MASS SHOOTING TRACKER (last visited May 18, 2023) ..................................................... 7

Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989 (2008) ....................... 25

Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV., Fall 2001 ................................ 25

Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH 393 (2012) ................................. 26

Maya Rossin-Slater et al., *Local Exposure to School Shootings and Youth Antidepressant Use*, 117 PNAS 23484 (2020).......................................................... 31

Merete Nordentoft et al., *Absolute Risk of Suicide after First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058 (2011) ....................................................... 22

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) .................................................... 22

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS, Aug. 2019 ................... 33

RAND Corp., *The Effects of Minimum Age Requirements* (updated Apr. 22, 2020) ........................................................ 26

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, YALE L. & POL'Y REV INTER ALIA (Oct. 26, 2021). .................. 12

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150 (2019)........................................ 34

Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT (2019) ..................................................................................... 16

*Ten Years of Mass Shootings in the United States*, EVERYTOWN (Nov. 21, 2019)................................................... 29

Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREATENING BEHAV. 49 (2001)............................................. 23

Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947 (2008) ................................................. 22

U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010-2019 ........................................................................... 27

U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013* (June 2018) ........................... 34

U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38.................................................................. 27

William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 17 (SUPP.) J. STUD. ON ALCOHOL & DRUGS 108 (2014)............................. 32

## CONSENT DECREE

Appellants and Appellees have both consented to *amici* filing

this brief.  *See* Fed. R. App. P. 29(a)(2).

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence.[2] Together with its partner

---

[1] No counsel for a party authored this brief in whole or in part; no party or its counsel made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than *amicus*, its members, or its counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E).

[2] Giffords Law Center's website, www.giffords.org/lawcenter, is the premier clearinghouse for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun-safety legislation and community violence prevention strategies.

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.,* *District of Columbia* v. *Heller*, 554 U.S. 570 (2008); *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010); *N.Y. State Rifle & Pistol Ass'n* v. *Bruen*, 142 S. Ct. 2111 (2022). Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g., Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Hirschfeld* v. *BATFE*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204, 208, 210 (6th Cir. 2018); *Peruta* v. *County of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring).[3]

---

[3] Giffords Law Center filed the last two briefs under its former name, the Law Center to Prevent Gun Violence.

*Amicus curiae* Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to take action to prevent gun violence. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.

Brady has filed *amicus* briefs in many cases involving the regulation of firearms, including in this Court. *See, e.g., VanDerStok* v. *Garland*, Nos. 22-11071, 22-11086 (5th Cir. Dec. 27, 2022); *Bruen*, 142 S. Ct. 2111; *Heller*, 554 U.S. 570. Multiple decisions have cited Brady's research and expertise on these issues. *See, e.g., United States* v. *Hayes*, 555 U.S. 415 (2009); *Hanson* v. *District of Columbia*, 2023 WL 3019777, at \*10, \*14, \*16 & nn.8, 10 (D.D.C. Apr. 20, 2023).

*Amicus curiae* March For Our Lives Foundation ("MFOL") is a nonprofit organization of young people from across the country that

seeks to promote civic engagement in support of sensible gun regulation and give voice to those who have been harmed by gun violence.  After a gunman armed with an AR-15-style assault weapon murdered 17 people at Marjory Stoneman Douglas High School in Parkland, Florida on February 14, 2018, MFOL formed and immediately began organizing the largest single day of protest against gun violence in the nation's history. Five years later, MFOL has established itself as one of the foremost authorities at the intersection of youth-led activism and advocacy for gun violence prevention, and thousands of young people have formed MFOL chapters across the country.  In the nationwide effort to enact sensible gun regulation, MFOL serves as a platform for the indispensable voice of the younger generations and those impacted by gun violence.

MFOL has filed *amicus* briefs in multiple cases, contributing its expertise on the voices and experiences of the individuals, families, and communities indelibly harmed by gun violence. *See, e.g.*, *Bruen*, 142 S. Ct. 2111; *Nat'l Ass'n for Gun Rights* v. *City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill. Jan. 26, 2023); *Bevis* v. *City of Naperville*, No. 23-1353 (7th Cir. May 10, 2023); *Wade* v. *Univ. of Mich.*, No. 156150 (6th Cir. Mar. 1, 2021).

## INTRODUCTION AND SUMMARY OF ARGUMENT

When minors turn 18, certain privileges previously unavailable to them become accessible: They can cast a ballot in a federal election or purchase a lottery ticket.[4] But other privileges remain unavailable, such as buying a beer or a pack of cigarettes.[5] And for good reason: although 18-year-olds may be more mature than when they entered high school, scientific research reveals that their brains are still very much developing. Their prefrontal cortex—the part of the brain that governs impulsivity and emotional regulation—has not yet fully matured. That makes them more prone to risk-taking and to deprioritizing long-term outcomes.

When it comes to firearms, 18-year-olds are generally permitted to purchase a variety of firearms—including shotguns and rifles. However, they may not purchase handguns from a federally licensed firearms dealer (FFL) until they turn 21. The recent wave of mass shootings by 18-to-20-year-olds is a tragic demonstration of the

---

[4] U.S. CONST. amend. XXVI; TEX. GOV'T CODE ANN. § 466.3051.

[5] 23 U.S.C. § 158; 21 U.S.C. § 387f(d)(5); TEX. ALCO. BEV. CODE ANN. §§ 106.01-106.07.

particular dangers posed by this age group's access to firearms. Earlier this week, an 18-year-old killed 3 people and injured 6 others in Farmington, New Mexico, with a gun that was purchased shortly after his 18th birthday.[6] In just the past *month*, 18-to-20-year-olds committed at least eight other mass shootings across the nation, leaving 7 people dead and 47 people wounded.[7] And in the past year, the nation has experienced a wave of mass shootings by 18-to-20-year-olds, including on May 24, 2022, when an 18-year-old killed 19 children and 2 teachers at an elementary school in Uvalde, Texas.[8]

Nothing in the Second Amendment prevents Congress from enacting restrictions on 18-to-20-year-olds' commercial purchases of firearms. As the Supreme Court has emphasized, the right to bear arms is far from boundless. Although it protects certain rights of "responsible"

---

[6] Elise Hammond et al., *The Latest on Mass Shooting in Farmington, New Mexico*, CNN (May 16, 2023), https://www.cnn.com/us/live-news/farmington-new-mexico-shooting-05-16-23.

[7] *Mass Shootings in 2023*, MASS SHOOTING TRACKER, https://massshootingtracker.site/data/?year=2023 (last visited May 18, 2023).

[8] *A Partial List of Mass Shootings in the United States in 2022*, N.Y. TIMES (Jan. 24, 2023), https://www.nytimes.com/article/mass-shootings-2022.html.

and "law-abiding" individuals, the Second Amendment coexists with the extensive authority of the federal government to regulate firearm purchase, possession, and use, including by banning certain categories of people from purchasing or possessing firearms. Indeed, in *District of Columbia* v. *Heller*, the Court provided a non-exhaustive list of "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. 570, 626-27 & n.26 (2008).

In its most recent Second Amendment decision, *New York State Rifle & Pistol Association* v. *Bruen*, the Supreme Court reiterated the limits articulated in *Heller* and emphasized that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 142 S. Ct. 2111, 2128 (2022). The Court rejected the means-end balancing test most federal courts of appeals had incorporated into their Second Amendment analyses. Instead, the Court established a new two-part test: first, courts must determine whether the regulated conduct is protected by the "plain text" of the Second Amendment, and if so,

"whether modern firearms regulations are consistent with . . . historical understanding" of the Second Amendment, which "will often involve reasoning by analogy." *Id.* at 2131-32. To uphold a "modern-day regulation" implicating the Second Amendment right, courts need not find that the regulation is "a dead ringer for historical precursors," but rather must identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphasis in original).

In a well-reasoned decision applying *Bruen* and binding Fifth Circuit precedent, the district court here rejected Plaintiffs' challenge to federal laws and regulations restricting the ability of 18-to-20-year-olds to purchase handguns from FFLs (the "Challenged Laws"). As the district court noted, the very same Challenged Laws were previously upheld by this Court in *NRA* v. *BATFE*, 700 F.3d 185 (5th Cir. 2012), and were cited favorably in Justice Alito's concurrence in *Bruen*. R. 1144, 1148-50.

This Court has already concluded that these laws survive constitutional scrutiny because of "considerable evidence" that they are "consistent with a longstanding, historical tradition," *BATFE*, 700 F.3d at 203, a conclusion that remains undisturbed following *Bruen*. Indeed,

in accordance with *Bruen*'s framework, this Court found that the Challenged Laws are consistent with both a specific historical tradition of "public-safety-based limitations of juvenile possession of firearms," and, at a "high[er] level of generality," the "longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *Id.* at 203-04.

That numerous courts, including this one, have held restrictions on 18-to-20-year-olds to be among the "longstanding," "presumptively lawful" regulations that *Heller* and *Bruen* recognize as constitutional is reason enough to affirm. *Amici* submit this brief to provide further context to show how the Challenged Laws are consistent with our longstanding tradition of firearm restrictions for this age group, and to identify an established body of empirical research that demonstrates why restrictions on 18-to-20-year-olds are analogous to historical firearm regulations for groups that have been understood to pose a heightened public safety risk when armed.

Modern research in the fields of neuroscience and social science demonstrates that 18-to-20-year-olds tend to be more impulsive than older adults because their brains are still developing. They are at a

heightened risk of suicide, account for a disproportionate share of homicides and violent crimes, and are all too frequently involved in mass shootings. This contemporary research demonstrates why regulation of this age group's ability to purchase firearms is consistent with longstanding and presumptively lawful firearms regulations and thus comports with the Second Amendment.[9]

## ARGUMENT

## I.    EIGHTEEN-TO-TWENTY-YEAR-OLDS ARE NOT AMONG "THE PEOPLE" PROTECTED BY THE SECOND AMENDMENT.

The district court assumed without deciding that 18-to-20-year-olds are within "the people" protected by the Second Amendment, and proceeded to the second step of the *Bruen* analysis on that basis. R. 1147-1148. Under *Bruen*, Plaintiffs bear the burden of establishing that they "are part of 'the people' whom the Second Amendment protects."

---

[9] *Cf. Graham* v. *Florida*, 560 U.S. 48, 68 (2010) ("As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence."); *Gall* v. *United States*, 552 U.S. 38, 58 (2007) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage.").

142 S. Ct. at 2134.  As Appellees establish, they are unable to make this showing here because the weight of the historical evidence is against them.  *See* Appellees' Br. 27-29.  Should this Court choose to address the *Bruen* framework's preliminary question of whether the Challenged Laws implicate the Second Amendment, history dictates that it must be answered in the negative.  *See, e.g.*, Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, YALE L. & POL'Y REV. INTER ALIA (Oct. 26, 2021), https://yalelawandpolicy.org/inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-record    (18-to-20-year-olds "were considered 'minors' or 'infants' from the time of the nation's Founding up through the latter half of the twentieth century. . . . [And, s]imply put, minors in the Founding Era had no legal standing to assert a claim in court to vindicate their rights, including Second Amendment-type claims.").

## II.    THE DISTRICT COURT CORRECTLY FOUND THAT THE CHALLENGED LAWS ARE CONSISTENT WITH LONGSTANDING AGE AND SAFETY-BASED RESTRICTIONS.

The district court correctly concluded that the Challenged Laws are constitutional under the Supreme Court's and this Court's

precedent. In *Heller*, the Supreme Court made clear that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms" by people with felony convictions and certain people suffering from severe mental illness, as well as "laws imposing conditions and qualifications on the commercial sale of arms," adding that these "presumptively lawful regulatory measures [serve] only as examples" and do "not purport to be exhaustive." 554 U.S. at 626-27 & n.26.

In *McDonald* v. *City of Chicago*, the Court "repeat[ed] [*Heller*'s] assurances" that such laws should not be called into question. 561 U.S. 742, 786 (2010).

And Justice Kavanaugh's concurrence in *Bruen*, joined by Chief Justice Roberts, again confirmed the presumptive legality of these measures. 142 S. Ct. at 2162. Justice Alito's concurrence also explained that *Bruen* did "not expand the categories of people who may lawfully possess a gun." 142 S. Ct. at 2157. In the same sentence, Justice Alito approvingly cited the Challenged Laws, observing that "federal law generally forbids the possession of a handgun by a person who is under

the age of 18, *and bars the sale of a handgun to anyone under the age of 21.*" *Id.* at 2157-58 (emphasis added).

This Court has held that "age- and safety-based restrictions on the ability to access arms" are presumptively lawful because they are "consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *BATFE*, 700 F.3d at 203.[10] Consistent with that tradition, Congress has identified that armed 18-to-20-year-olds pose greater risks to the public than does the rest of the population and accordingly has restricted their ability to purchase handguns from FFLs. *See* Appellees' Br. 1-4 (collecting legislative history). And as this Court recognized, the "temporary nature" of the Challenged Laws' regulation of 18-to-20-year olds' ability to purchase firearms "reduces" their burden, another similarity to the examples the Supreme Court has provided of presumptively lawful

---

[10] As Appellees make clear, the Challenged Laws are "presumptively lawful" for the independent reason that they merely "impos[e] conditions and qualifications on the commercial sale of firearms," which is one of *Heller*'s examples of presumptively lawful regulatory measures. *NRA* v. *Bondi*, 61 F.4th 1317, 1320 (11th Cir. 2023); *see* Appellees' Br. 12-14. *Amici* focus on the separate longstanding tradition of regulating 18-to-20-year-olds' possession of and access to firearms.

restrictions on individuals experiencing a non-permanent condition such as severe mental illness or (to a lesser extent) felony conviction. *BATFE*, 700 F.3d at 207; *cf. United States* v. *Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (burden of the federal statute prohibiting felons from possessing firearms "is lightened by the[] exceptions" for "those with expunged, pardoned, or set-aside convictions, or those who have had their civil rights restored").

Prohibiting individuals who (perhaps temporarily) pose a heightened risk of dangerousness to the public was a familiar notion to the Founders. "[T]he founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms." *Binderup* v. *Att'y Gen. U.S.*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring); *see also* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1360 (2009) ("[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms. American legislators at the time of the Bill of Rights seem to have been aware of this tradition[.]"). Awareness of this tradition—

and agreement with it—is evident from colonial ratifying conventions, where these notions were voiced with regularity. *See, e.g.*, Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT 190-215 (2019) (surveying debates at the constitutional ratifying conventions and highlighting the shared understanding that "dangerous persons could be disarmed").

This "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns" in order to protect the broader public. *Kanter* v. *Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting).

Furthermore, this "common sense" understanding of presumptively lawful measures is not limited to the laws in place at the Founding. To uphold a "modern-day regulation," courts need not find that the regulation is "a dead ringer for historical precursors," but rather must identify a "well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133 (emphasis in original). Thus, a "regulation can be deemed 'longstanding,'" and therefore constitutional, "even if it cannot boast a precise founding-era analogue." *BATFE*, 700 F.3d at 196. Indeed, *Heller*'s enumerated examples of

presumptively lawful measures themselves "are of mid-20th century vintage." *Id.*

Age-based regulations like the Challenged Laws fall into this presumptively lawful category.   As this Court previously concluded: "[S]tatutes enacted to safeguard the public using age-based restrictions on access to and use of firearms are part of a succession of 'longstanding prohibitions,' that are likely outside the scope of the Second Amendment, because such restrictions are 'consistent with' both the 'longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety' and the 'longstanding tradition of age-and safety-based restrictions on the ability to access arms.'" *NRA* v. *McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (citations omitted); *see BATFE*, 700 F.3d at 203 ("summariz[ing] considerable evidence that burdening the conduct at issue—the ability of 18-to-20-year-olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment's protection").[11]

---

[11] *See also Lara* v. *Evanchick*, 534 F. Supp. 3d 478, 486-89 (W.D. Pa. 2021) ("[A]ge-based restrictions limiting the rights of 18-20-year-old adults to keep and bear arms fall under the 'longstanding' and 'presumptively

Indeed, numerous "revolutionary and founding-era gun regulations . . . targeted particular groups for public safety reasons," including "minors" and "infants," terms which were understood at the time to "appl[y] to persons under the age of 21, not only to persons under the age of 18." *BATFE*, 700 F.3d at 200-01; *see also* Appellees' Br. 31-45.

For all of these reasons, the Challenged Laws fall squarely within "the Nation's historical tradition of firearm regulation" and are consistent with the Second Amendment. *Bruen*, 142 S. Ct. at 2130. The district court thus correctly held that "the Second Amendment does not protect the ability of 18 to 20-year-olds to purchase handguns from federal firearms licensees." R. 1153. While nothing more is required to affirm the district court's order, as discussed *infra* Section III, modern-day empirical research further supports Appellees' argument that the

---

lawful' measures recognized by the Supreme Court in *Heller* as evading Second Amendment scrutiny." (collecting cases)); *NRA* v. *Swearingen*, 545 F. Supp. 3d 1247, 1267 (N.D. Fla. 2021) ("age-based restrictions on the purchase of firearms are longstanding" because "restrictions on 18-to-20-year-olds' right to purchase firearms are both longstanding in time in relation to *Heller*'s list and analogous to other restrictions on that list"); *Bondi*, 61 F.4th at 1320 (describing "longstanding tradition" of regulating 18-to-20-year-olds' access to firearms).

Challenged Laws comport with the Second Amendment because they are analogous to historical regulation.

## III. NEUROSCIENCE AND SOCIAL SCIENCE CONFIRM THAT THE CHALLENGED LAWS ARE ANALOGOUS TO HISTORICAL REGULATIONS OF GROUPS POSING A HEIGHTENED RISK OF VIOLENCE WHEN ARMED.

*Bruen* contemplates a broad "reasoning by analogy" that compares "how and why [historical] regulations burden[ed] a law-abiding citizen's right to armed self-defense" to the how and why of modern regulations. 142 S. Ct. at 2132-33. This comparative inquiry determines "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. Furthermore, courts may look beyond "how and why" to identify other "features that render regulations relevantly similar." *Id.* at 2132.

As part of this inquiry, this Court naturally should consider the modern-day "justifi[cations]" for the Challenged Laws to assess how they comport with their historical analogues. *See, e.g.*, *United States* v. *Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (discussing modern empirical studies and findings from the Surgeon General on domestic violence to show how the challenged law was justified in a manner "consistent with

our common law tradition"). Those justifications include neuroscience and social science research confirming that, like groups who were restricted from accessing firearms during the Founding era, 18-to-20-year-olds with unencumbered access to firearms pose a substantial risk to themselves and others.

### A.    Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive Than Older Cohorts.

The scientific literature is clear that the human brain does not finish developing until the mid-to-late twenties.[12] The *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning.[13] The prefrontal cortex matures well after the limbic system, which controls basic emotions like fear, anger, and pleasure, resulting in a period of reduced self-control in the late teens and early twenties.[14] As a result, 18-to-20-year-olds are

---

[12] Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016), https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age/?utm_term=.e8adc7e6c1da.

[13] *Id.*; Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013).

[14] Arain, *supra* note 13, at 453.

prone to taking risks and deprioritizing long-term outcomes. *See BATFE*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *Miller* v. *Alabama*, 567 U.S. 460, 471-72 (2012) (noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control"—and finding that juveniles possess "transient rashness, proclivity for risk, and inability to assess consequences").

Minors are also uniquely prone to negative emotional states.[15] Adolescents' responses to "frequent" negative states "tend to be more intense, variable and subject to extremes relative to adults."[16] And minors are more likely to *act* on negative emotions like stress or rage because their limbic systems have matured while their cerebral cortices (*i.e.*, impulse control centers) are still developing.[17] Because the

---

[15] Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010).

[16] *Id.*

[17] Arain, *supra* note 13, at 458.

behavior-regulating functions of their brains are still developing, 18-to-20-year-olds are at a higher risk of violence when they have unfettered access to firearms.[18]

### B. Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates, and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts.

Eighteen-to-twenty-year-olds are disproportionately at risk of attempting suicide, and firearm access exacerbates this risk. Many major psychiatric conditions first develop in adolescence,[19] and "suicide risk increase[s] steeply during the first few years after [an individual's] first contact with psychiatric services."[20] Eighteen-to-twenty-year-olds' impulsivity and propensity toward negative emotional states puts them at particular risk of suicide, which "is commonly an impulsive act by a

---

[18] *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults . . . . Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

[19] Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947, 952 (2008).

[20] Merete Nordentoft et al., *Absolute Risk of Suicide After First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058, 1061 (2011).

vulnerable individual."[21] One study found that, of 153 survivors of nearly lethal suicide attempts aged 13 to 34, close to 25% reported that *less than five minutes* passed between their decision to attempt suicide and their suicide attempt.[22]

In another study, 47.6% of people who were referred to a psychiatric hospital following a suicide attempt stated that ten minutes or fewer had passed between when they first began contemplating the act and their attempt.[23]  It is unsurprising then that suicide accounts for a higher percentage of deaths for 15-to-24-year-olds than for older age groups.[24]

---

[21] E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

[22] Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREATENING BEHAV. 49, 50-52 (2001).

[23] Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLIN. PSYCHIATRY 19, 20 (2009).

[24] Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981-2020*, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

From 2010 to 2020, suicide was the third most common cause of death among 18-to-20-year-olds.[25]   And the upward trend in gun suicides among young people was especially acute among youth of color: from 2012 to 2020, the firearm suicide rate rose 35% among white teens.[26] During the same period, it rose 88% among Native American teens and *more than doubled* among Black, Latino, and Asian teens.[27]

This striking increase in firearm suicides across our nation's youth constitutes an "unprecedented societal concern[]," requiring "a more nuanced approach" to the Second Amendment analysis to account for "circumstances beyond those the Founders specifically anticipated." *Bruen*, 142 S. Ct. at 2131.

Given the rapidity with which suicidal ideation gives way to action, "[a]ccess to firearms is a key risk factor for suicide."[28]   In fact, "at

---

[25] *Id.* Centers for Disease Control and Prevention has not reported cause of death statistics post-dating 2020.

[26] Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022), https://www.thetrace.org/2022/02/firearm-suicide-rate-cdc-data-teen-mental-health-research/.

[27] *Id.*

[28] American Public Health Association, *Reducing Suicides by Firearms* (Nov. 13, 2018), https://www.apha.org/policies-and-advocacy/public-

least a dozen U.S. case-control studies in the peer-reviewed literature . . . have found that a gun in the home is associated with an increased risk of suicide.  The increase in risk is large, typically 2 to 10 times that in homes without guns."[29]  Those prone to "act impulsively . . . are more likely to be affected by availability of the means at hand," which explains why "the preponderance of current evidence indicates that gun availability is a risk factor for suicide, especially among youth."[30]

Compounding the increased risk of suicide posed by firearm access is the inherent lethality of firearms.  Firearm suicide is the suicide method with the highest fatality rate—the odds of completing a suicide attempt are 140 times greater when a gun is used than for any other commonly used method.[31]  Framed differently, while 4% of non-firearm

---

health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

[29] Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989, 990 (2008).

[30] Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV., Fall 2001, at 34.

[31] J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094, 1098 (2016).

suicide attempts are fatal, 85% of suicide attempts with a gun are fatal.[32]
In 2017, nearly half of the 3,556 suicide deaths among 16-to-21-year-olds
involved firearms.[33]

Regulating access to firearms can save lives because research
shows that fewer than 3% of people who survive one suicide attempt later
die by suicide.[34]   Although "[s]uicide attempters often have second
thoughts, . . . when a method like a gun works so effectively, there's no
opportunity to reconsider."[35]   A young adult's access to firearms when
contemplating a suicide attempt, therefore, often determines whether
they live or die.

### C.    Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes with Firearms.

Eighteen-to-twenty-year-olds   also   account   for   a
disproportionate share of violent crimes and homicides—both as victims

---

[32] Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN.
REV. PUB. HEALTH 393, 397 (2012).

[33] RAND Corp., *The Effects of Minimum Age Requirements* (updated Apr.
22, 2020).

[34] Bostwick, *supra* note 31, at 1098.

[35] Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y.
TIMES   (Nov.   7,   2016),   https://www.nytimes.com/2016/11/08/well/live/
after-a-suicide-attempt-the-risk-of-another-try.html.

and as perpetrators.   The below statistics demonstrate that 18-to-20-year-olds pose a heightened risk of dangerousness when armed and illustrate why restrictions on their purchase of firearms, such as the Challenged Laws, are analogous to historical restrictions on groups who likewise posed an increased threat to public safety when armed.

- Arrests for homicide, rape, and robbery are higher among 18-to-20-year-olds than older adults.[36]

- Though 18-to-20-year-olds make up less than 5% of the U.S. population, they account for more than 15% of homicide and manslaughter arrests.[37]

- This general pattern has persisted.  The following chart, showing homicide offending rate by age in 2009,

---

[36] U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38.

[37] *Id.*; U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex:  April 1, 2010 to July 1, 2019*, National Population by Characteristics:  2010-2019, https://www.census.gov/data/datasets/time-series/demo/popest/2010s-national-detail.html.

illustrates the disproportionate share of homicides committed by 18-to-20-year-olds that year:[38]



Moreover, the Challenged Laws' regulation of *handgun* purchases is especially relevant to mass shootings, a form of firearm violence that all too often involves 18-to-20-year-olds as both victims and perpetrators. In a study of 189 mass shootings, 9mm semiautomatic handguns were the most commonly used weapons, including by the

---

[38] Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH. 1, 5 (2012), https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/WhitePaper020514_CaseforGunPolicyReforms.pdf.

college student who killed 32 people at Virginia Tech in 2007.[39]  Another

study found that 81% of mass shootings involved the use of at least one

handgun, and that 60% involved only handguns.[40]

In recent years, our nation has faced a disturbing wave of

mass shootings, many involving 18-to-20-year-old perpetrators.  On May

14, 2022, an 18-year-old gunman at a supermarket in Buffalo, New York,

killed 10 people and wounded 3 others.[41]  Just ten days later, on May 24,

2022, an 18-year-old killed 19 children and 2 teachers at an elementary

school in Uvalde, Texas.[42]  On July 4, 2022, a 21-year-old killed 7 people

and wounded dozens more at a parade in Highland Park, Illinois—with

a gun he purchased prior to turning 21.[43]  On July 17, 2022, a 20-year-

---

[39] Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers that Grow with Each Mass Shooting*, WASH. POST, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/ (last updated May 12, 2021).

[40] *Ten Years of Mass Shootings in the United States*, EVERYTOWN (Nov. 21, 2019), https://everystat.org/massshootingsreports/mass-shootings-in-america-2009-2019/.

[41] *Partial List*, *supra* note 8.

[42] *Id.*

[43] Daniel A. Medina & Casey Tolan, *Highland Park Gunman's Family Was in Turmoil for Years Leading Up to Parade Shooting*, CNN (July 9,

old gunman killed 3 people and wounded 2 others at a mall in Greenwood, Indiana.[44]  In September 2022, a 19-year-old killed 4 people and wounded 3 others in Memphis, Tennessee.[45]  On October 24, 2022, a 19-year-old killed 2 people and wounded 7 others at his former high school in St. Louis, Missouri.[46]  Most recently, on May 16, 2023, an 18-year-old gunman killed 3 people and wounded 6 others in Farmington, New Mexico, with a firearm purchased shortly after his 18th birthday.[47]

Tragically, these recent mass shootings by 18-to-20-year-olds are not a new phenomenon to the current generation of schoolchildren, as several of the deadliest mass school shootings in our nation's history were also committed by young adults in the age range addressed by the

---

2022),       https://www.cnn.com/2022/07/08/us/highland-park-suspect-family-turmoil-invs/index.html.

[44] *Partial List*, *supra* note 8.

[45] Adrian Sainz, *Memphis Gunman Arrested in Livestreamed Shootings That Killed 4*, PBS (Sept. 8, 2022), https://www.pbs.org/newshour/nation/four-dead-in-memphis-livestreamed-shooting-one-man-arrested-police.

[46] Jenna Fisher et al., *Teen and Woman Killed in Shooting at St. Louis High School*, N.Y. TIMES (Oct. 24, 2022), https://www.nytimes.com/2022/10/24/us/st-louis-high-school-shooting.html.

[47] Hammond, *supra* note 6.

Challenged Laws: the February 14, 2018 Parkland, Florida school shooting, in which a 19-year-old shooter killed 17 children and educators; the December 14, 2012 Newtown, Connecticut elementary school shooting, in which a 20-year-old shooter killed, among others, 20 schoolchildren; and the April 20, 1999 Littleton, Colorado shooting at Columbine High School, in which an 18-year-old and a 17-year-old killed 12 fellow students and a teacher.[48]

In addition to the victims killed or injured in school shootings, there are lasting effects on youth who experience these traumatic incidents: one study found that in the two years following a fatal school shooting, antidepressant use by youth aged 20 and younger in the area increased by 21.3%,[49] a statistic that is all the more troubling given the risk of suicide discussed in Section III.B.

But gun violence by young people in schools is—tragically— more commonplace than the list of high-profile mass shootings suggests.

[48] Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Buffalo and Uvalde*, BUSINESS INSIDER, https:// www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10/ (last updated Jan. 23, 2023).

[49] Maya Rossin-Slater et al., *Local Exposure to School Shootings and Youth Antidepressant Use*, 117 PNAS 23484, 23486 (2020).

In the 20 years following the Columbine High School massacre, there have been 486 reported incidents involving firearms at schools and 68 incidents of an active shooter on school property during the school day.[50] And school shootings have only become more frequent: "From 1999 to 2014, the average number of days between [active school] shootings was 124 days."[51]

### D. Federal and State Minimum-Age Laws Have Proven Effective at Reducing Gun Violence Among Minors.

Age-based restrictions such as the Challenged Laws are also "justifi[ed]" under the *Bruen* framework because they are effective. Studies have found a connection between age-based regulations and a decline in firearm-related adolescent deaths, especially suicides and unintentional shootings.[52] For instance, a 2004 study found that state

---

[50] Luis Melgar, *Are School Shootings Becoming More Frequent? We Ran the Numbers*, WAMU (Aug. 13, 2019), https://wamu.org/story/19/08/13/are-school-shootings-becoming-more-frequent-we-ran-the-numbers/.

[51] *Id.*

[52] The same concerns regarding minors' heightened impulsiveness motivated passage of laws in all 50 states establishing 21 as the minimum legal age for alcoholic beverage consumption. Studies confirm that these laws led to significant reductions in death from car crashes involving minor drivers. William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age*

laws raising the minimum legal age to purchase a handgun to 21 were associated with a 9% decline in firearm suicide rates among 18-to-20-year-olds.[53]  Loosening firearm regulations has the opposite effect:  as Texas loosened firearm regulations over the past two decades, the state experienced a "50% jump" in firearm deaths from 1999 to 2021.[54]

Age-based regulations have also proven effective in reducing firearm fatalities among young people, including in the 18-to-20-year-old range.  While a 2019 study found that 18-to-21-year-olds made up more than half (68.7%) of the 21,241 firearm-related deaths among U.S. children and adolescents from 2011 to 2015, the study found that every 10-point increase in a score measuring the strength of a state's gun laws "decreases the firearm-related mortality rate in children by 4%."[55]

*21 Minimum Legal Drinking Age in the United States*, 17 (SUPP.) J. STUD. ON ALCOHOL & DRUGS 108, 113 (2014).

[53] Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

[54] Erin Douglas & Alex Ford, *Deaths from Firearms Keep Climbing in Texas, Decades After Lawmakers Began Weakening Gun Regulations*, TEXAS TRIBUNE (May 10, 2023), https://www.texastribune.org/2023/05/10/texas-gun-fatalities-laws/.

[55] Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS, Aug. 2019, at 3 & tbl. 1.

Another study using the same gun-law scores found that the pediatric firearm mortality rate amongst children aged 0-to-19-years-old was almost twice as high in the quartile of states with the weakest laws than in the quartile of states with the strongest laws.[56]

Finally, research demonstrates that most mass shooters obtain their weapons lawfully. In a report examining active shootings from 2000 to 2013, the FBI concluded that "only very small percentages [of shooters] obtain[ed] a firearm illegally,"[57] indicating that the perpetrators seek easy access to weapons and are not necessarily sophisticated participants in the black market for firearms.

Indeed, a survey of convicted gun offenders in 13 states found that 17% of the offenders would have been prohibited from obtaining firearms at the time of the crime if the minimum legal age in that state

---

[56] Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150, 152 (2019).

[57] U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

had been 21 years old, a finding that "underscore[d] the importance of minimum-age restrictions."[58]

Lawmakers therefore can, and should, conclude that restricting access to firearms will deter the criminal use of firearms— precisely the type of reasonable conclusion that underlies virtually all laws aimed at regulating dangerous products, and consistent with our nation's history and tradition of regulating access to firearms. *Cf., e.g., Nat'l Paint & Coatings Ass'n* v. *City of Chicago*, 45 F.3d 1124, 1128-29 (7th Cir. 1995) (discussing the reasonableness of legislatures' restricting access to hazardous products including guns, fireworks, and liquor despite the fact that other means of procurement exist).

## CONCLUSION

For the foregoing reasons and those set forth by Appellees, the Challenged Laws are part of a "longstanding" tradition of regulations restricting firearm access for 18-to-20-year-olds as persons who pose a heightened risk of violence. These restrictions easily survive *Bruen*'s historical analogy test because "how" the Challenged Laws regulate

---

[58] Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26, 29-30 (2013).

firearms—restricting the ability to procure firearms by those who pose a heightened risk—and "why" they regulate firearms—protecting the public from individuals who pose a danger—are consistent with a long history of analogous regulation.

The "why" of this analogy is further confirmed by modern neuroscience and social science research on the dangers of individuals under the age of 21 with easy access to firearms. Nothing in the Second Amendment requires this Court to overrule Congress's considered judgment on this critical public safety issue. As one court of appeals stated: "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."[59]

---

[59] *United States* v. *Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Dated: May 19, 2023

Respectfully submitted,

*Of Counsel for* Amicus Curiae
*Giffords Law Center to Prevent*
*Gun Violence:*

/s/ *Timothy R.W. Kappel*
Timothy R.W. Kappel
WELLS & KAPPEL LLP
1615 Poydras Street, Suite 900
New Orleans, Louisiana  70112
(504) 905-2012
tkappel@wellskappel.com

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. #555
San Francisco, CA  94104
(415) 433-2062

*Counsel for* Amici Curiae *Giffords*
*Law Center to Prevent Gun*
*Violence, Brady Center to Prevent*
*Gun Violence, and March For Our*
*Lives Foundation*

Robert A. Sacks
Leonid Traps
Sophie A. Kivett
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
(212) 558-4000

*Of counsel for* Amicus Curiae
*Brady Center to Prevent Gun*
*Violence:*

Elizabeth A. Rose
Madeline B. Jenks
SULLIVAN & CROMWELL LLP
1700 New York Ave. NW #700
Washington, DC  20006
(202) 956-7500

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT
GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC  20002
(202) 370-8100

*Of counsel for* Amicus Curiae
*March For Our Lives Foundation*:

Ciara Malone
MARCH FOR OUR LIVES
90 Church Street, #3417
New York, NY  10008
(913) 991-4440

## CERTIFICATE OF SERVICE

I certify that on May 19, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Timothy R.W. Kappel*
Timothy R.W. Kappel
*Counsel for* Amici Curiae
*Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives Foundation*

May 19, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,499 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Timothy R.W. Kappel*

Timothy R.W. Kappel
*Counsel for* Amici Curiae
*Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives Foundation*

May 19, 2023