No. 23-30033

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

CALEB REESE; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT
FOUNDATION; LOUISIANA SHOOTING ASSOCIATION; and EMILY NAQUIN,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN
DETTELBACH, Director of the Bureau of Alcohol, Tobacco, Firearms and
Explosives; MERRICK GARLAND, U.S. Attorney General,

*Defendants-Appellees*.

———————————————

On Appeal from the United States District Court
for the Western District of Louisiana (No. 6:20-cv-01438)

———————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

———————————————

Janet Carter
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017

Ivan E. Wohner
Everytown Law
P.O. Box 14780
Washington, DC 20044
(202) 897-1882
iwohner@everytown.org

May 19, 2023

# CERTIFICATE OF INTERESTED PERSONS

*Reese v. ATF*, No. 23-30033

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiffs-appellants:
   a. Caleb Reese
   b. Louisiana Shooting Association
   c. Emily Naquin
   d. Second Amendment Foundation
   e. Firearms Policy Coalition, Inc.

2. Counsel for Plaintiffs-appellants (including in district court):
   a. David H. Thompson, Cooper & Kirk, PLLC
   b. Peter A. Patterson, Cooper & Kirk, PLLC
   c. William V. Bergstrom, Cooper & Kirk, PLLC
   d. George J. Armbruster, III, Armbruster & Associates, APLC
   e. Joseph Greenlee, FPC Action Foundation
   f. John W. Dillon, Dillon Law Group
   g. Raymond M. DiGuiseppe, DiGuiseppe Law Firm
   h. Adam Kraut, Second Amendment Foundation

3. Defendants-appellees:
   a. Bureau of Alcohol, Tobacco, Firearms and Explosives
   b. Steven Dettelbach, in his official capacity as ATF Director
   c. Merrick Garland, in his official capacity as Attorney General of the United States

4. Counsel for defendants-appellees (including in district court):
   a. Abby C. Wright, U.S. Department of Justice
   b. Daniel M. Riess, U.S. Department of Justice
   c. Steven H. Hazel, U.S. Department of Justice

5. Amici curiae
   a. States of Illinois, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia
   b. Giffords Law Center to Prevent Gun Violence
   c. Brady Center to Prevent Gun Violence
   d. March For Our Lives Foundation
   e. Everytown for Gun Safety[1]

6. Counsel for amici curiae
   a. Kwame Raoul, Illinois Attorney General
   b. Jane Elinor Notz, Illinois Solicitor General
   c. Sarah A. Hunger, Office of the Illinois Attorney General
   d. Alex Hemmer, Office of the Illinois Attorney General
   e. Attorneys General of amici curiae States and District of Columbia, as listed on pages 24-25 of Dkt. 35
   f. Timothy R.W. Kappel, Wells & Kappel LLP
   g. Esther Sanchez-Gomez, Giffords Law Center to Prevent Gun Violence
   h. Douglas N. Letter, Brady Center to Prevent Gun Violence
   i. Shira Lauren Feldman, Brady Center to Prevent Gun Violence
   j. Ciara Malone, March for Our Lives
   k. Robert A. Sacks, Sullivan & Cromwell LLP
   l. Leonid Traps, Sullivan & Cromwell LLP
   m. Elizabeth A. Rose, Sullivan & Cromwell LLP
   n. Madeline B. Jenks, Sullivan & Cromwell LLP
   o. Sophie A. Kivett, Sullivan & Cromwell LLP
   p. Ivan E. Wohner, Everytown Law
   q. Janet Carter, Everytown Law

Dated: May 19, 2023

By: /s/ Ivan E. Wohner
Attorney of record for Everytown for Gun Safety

---

[1] Everytown for Gun Safety's formal name is Everytown for Gun Safety Action Fund. It has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

ARGUMENT.................................................................................................. 4

I.   Plaintiffs Have Not Met Their Burden to Establish that the Second
     Amendment's Plain Text Covers Their Conduct....................................... 4

II.  If this Court Proceeds Past the Plain Text Inquiry, the Historical Analysis in
     *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives* Remains
     Binding and Compels Upholding the Commercial Sale Restrictions ........ 8

III. If this Court Conducts the Historical Inquiry Anew, the Proper Focus for
     Analysis Is the Reconstruction Era, Not the Founding Era...................... 12

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

## *CASES*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
910 F.3d 106 (3d Cir. 2018) ................................................................ 2

*Bucklew v. Precythe,*
139 S. Ct. 1112 (2019) ..................................................................... 11

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,*
492 U.S. 573 (1989) ........................................................................ 12

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .......................................................... 4, 8, 22, 23

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ................................................ 14, 16, 17

*Gould v. Morgan,*
907 F.3d 659 (1st Cir. 2018) ............................................................ 14

*Jarkesy v. Sec. & Exch. Comm'n,*
34 F.4th 446 (5th Cir. 2022) ............................................................ 11

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) ........................................................... 11

*Kennedy v. Bremerton School District,*
142 S. Ct. 2407 (2022) ...................................................................... 5

*Lindenau v. Alexander,*
663 F.2d 68 (10th Cir. 1981) .............................................................. 8

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ................................................................... 14, 15

*Nat'l Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir. 2023), *petition for reh'g en banc filed* (Mar. 30, 2023) ... 8, 16

*Nat'l Rifle Ass'n v. McCraw,*
  719 F.3d 338 (5th Cir. 2013)............................................................................ 10

*National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
  700 F.3d 185 (5th Cir. 2012)..................................................... 3, 6, 9, 10

*New York State Rifle & Pistol Association v. Bruen,*
  142 S. Ct. 2111 (2022) ................................................................. passim

*Oregon Firearms Fed'n, Inc. v. Brown,*
  No. 2:22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022), *appeal dismissed,*
  No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022)............................... 6

*Presser v. Illinois,*
  116 U.S. 252 (1886) ...................................................................................... 8

*Rehaif v. United States,*
  139 S. Ct. 2191 (2019) .................................................................................. 2

*Rupp v. Becerra,*
  401 F. Supp. 3d 978 (C.D. Cal. 2019), *vacated and remanded,* No. 19-56004, 2022
  WL 2382319 (9th Cir. June 28, 2022) ......................................................... 2

*Teter v. Connors,*
  460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed,* No. 20-15948 (9th Cir. May
  19, 2020) ...................................................................................................... 2

*United States v. Greeno,*
  679 F.3d 510 (6th Cir. 2012)....................................................................... 15

*United States v. Jackson,*
  No. 1:22-cr-00141, 2023 WL 2242873 (D. Md. Feb. 27, 2023)........................... 6

*United States v. Meyer,*
  No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)....................... 21

*United States v. Ramirez,*
  No. 22-50042, 2023 WL 3336423 (5th Cir. May 10, 2023).............................. 13

*United States v. Reyna,*
  No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................... 4

### STATUTES

18 U.S.C. § 922(b)(1) ................................................................................ 2

18 U.S.C. § 922(c)(1) ................................................................................ 2

### OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ............... 21, 22

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ................................................................ 23

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ........................................................... 22

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ... 18

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ............................................... 17, 19

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ..... 21, 22

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) .............................................................. 18

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ............................................................... 18

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ...................... 18

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ....................................................................... 17

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 575,000 in Louisiana, Mississippi, and Texas. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of twenty-one cities in the Fifth Circuit are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[2]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis, as

---

[2] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

well as social science and public policy research, that might otherwise be overlooked. Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92 & n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210-11 nn.4 & 7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Federal law restricts 18-to-20-year-olds from purchasing handguns from federally licensed dealers. *See* 18 U.S.C. § 922(b)(1), (c)(1) (together with the challenged implementing regulations, the "commercial sale restrictions"). Those restrictions are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons in the Brief for Appellees, Dkt. 32 ("U.S. Br.").

Everytown submits this amicus brief to expand on three points. *First*, plaintiffs have the burden in the initial, textual inquiry of the *Bruen* framework to show that the regulations they challenge implicate the Second Amendment's text. The Court should not move on to the second, historical inquiry—asking whether

the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—without first determining that Plaintiffs have met this burden, and, as the government explains, they have failed to do so. *Second*, if this Court does proceed to the historical inquiry, it should follow the analysis of the historical tradition of regulating access to and use of firearms by individuals aged 18 to 20 in *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA*"). That analysis remains binding on this Court and compels the conclusion that the commercial sale restrictions are constitutional under *Bruen*. *Third*, if this Court decides to conduct the historical analysis anew, it should conclude that the government has proven that the commercial sale restrictions are consistent with this nation's historical regulation of firearms both in the founding era and in the Reconstruction era. If, however, it perceives a difference between the two eras, it should conclude that the inquiry under the *Bruen* framework should center on the Reconstruction era, not the founding era. Moreover, whichever period the Court focuses on, it should not treat that period as a cutoff. Examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of

constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added).

## ARGUMENT

### I.    Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. The court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. *Bruen*'s analysis makes clear that the "people" challenging a gun regulation, the "weapons" they put at issue, and their "proposed course of conduct" must *all* fall within the Second Amendment's plain text. *See id.* at 2134. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, weapons, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (dismissing defendant's challenge to indictment and plea because "§ 922(k)'s regulated conduct [possession of a firearm with an

4

obliterated serial number] is outside [the] scope of the Second Amendment" and that fact "is enough to decide" the case; declining to reach historical inquiry).

Plaintiffs have the burden on the initial, textual inquiry; the government's burden to show consistency with historical tradition only arises *after* plaintiffs have carried their burden. *Bruen* itself makes that clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises after ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an unusual departure from ordinary principles of constitutional litigation—the Court would have said so. Placing the initial burden on the plaintiff also accords with the Court's approach to other constitutional rights. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that, "[u]nder th[e] Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] ... its actions[.]" *Id.* at 2421. Accordingly, multiple courts have read *Bruen* to place the burden on the plaintiff to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022) (explaining that "if Plaintiffs demonstrate that their conduct is covered by the text of the Second Amendment,

the Constitution presumptively protects that conduct and the burden shifts to the government," and holding that Plaintiffs had not met their textual burden at the preliminary injunction stage), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022)).

It is especially important that a plaintiff meets their burden at the textual step before a court undertakes the historical inquiry, given the "institutional challenges in conducting a definitive review of the relevant historical record." *See NRA*, 700 F.3d at 204; *see also, e.g.*, *United States v. Jackson*, No. 1:22-cr-00141, 2023 WL 2242873, at *10-12 (D. Md. Feb. 27, 2023) (noting that "judges are not historians" and historical analysis under *Bruen* presents "challenges" and "problems"). Under the pre-*Bruen* framework, a court could uphold a challenged law under means-end scrutiny at the second step as an alternative to undertaking the complex and unfamiliar historical analysis at the first step. In those circumstances—and in light of the difficulties associated with the historical analysis—it made sense that this Court chose in *NRA*, "in an abundance of caution," to confirm the result it reached in its historical analysis with a means-end scrutiny analysis. *See* 700 F.3d at 204. In doing so, the Court demonstrated its preference for grounding its rulings in familiar legal methodology.

After *Bruen*, by contrast, the first, textual step is the one that involves more familiar legal methodology—as well as establishing a burden plaintiffs must carry

before triggering the government's burden. Accordingly, this Court should not consider the historical analysis unless convinced that the plaintiffs satisfied their burden at the textual step.

Plaintiffs have failed to do so. The restrictions do not implicate the Second Amendment because they regulate only underage individuals. *See* U.S. Br. 15-31. The age of majority at common law was 21, and those under that age "did not enjoy the full range of civil and political rights." *Id.* at 16-17 (citations omitted). Given the founders' view that "reason and judgment are not fully developed before the age of 21," *see id.* at 18-19 (citing John Adams, Gouverneur Morris, and Thomas Jefferson), restricting access to firearms for those under 21 "accord[s] with legislatures' more general authority to disarm groups historically deemed irresponsible." *Id.* at 19; *see also id.* at 20-22. And plaintiffs' efforts to carry their burden by relying on early militia laws, other constitutional provisions, or—abandoning all pretense of history-focused analysis—modern attitudes all fail for the reasons the government explains. *See id.* at 22-31 (explaining, among other things, that *Heller* disconnected the Second Amendment right from militia service, legislatures could (and many did) exclude those under 21 from service, and inclusion of other groups in militias while excluding them from private firearms

possession demonstrates that being part of the militia did not establish an entitlement to Second Amendment rights).[3]

## II.    If this Court Proceeds Past the Plain Text Inquiry, the Historical Analysis in *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives* Remains Binding and Compels Upholding the Commercial Sale Restrictions

Plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry, and that should end the case. If the Court nevertheless proceeds to the second, historical inquiry, it should conclude—as did the district court—that *NRA*'s historical analysis remains controlling, and likewise resolves the case in the Government's favor.

*NRA* thoroughly analyzed the historical justifications for restricting individuals under 21 from purchasing handguns from licensed dealers in upholding the commercial sale restrictions in 2012. At the first, history-focused step of the

---

[3] In addition, plaintiffs' militia-based argument fails to recognize that a government mandate to engage in certain conduct does not create an individual right to do so. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1331 (11th Cir. 2023) ("*NRA v. Bondi*") ("The NRA mistakes a legal obligation for a right."), *petition for reh'g en banc filed* (Mar. 30, 2023). For example, even though there is a duty to serve in the military if drafted, "[i]t is well established that there is no right to enlist in this country's armed services." *Lindenau v. Alexander*, 663 F.2d 68, 72 (10th Cir. 1981). The Supreme Court made that clear in the militia context almost 150 years ago. *See Presser v. Illinois*, 116 U.S. 252, 267 (1886) (holding that participation in a non-government-organized militia "cannot be claimed as a right independent of law"). And it reaffirmed that principle in *Heller*, explaining that "weapons … most useful in military service," which are not typically possessed by law-abiding citizens for lawful purposes, fall outside of the Second Amendment's scope, *see* 554 U.S. at 627-28, even though the government may mandate their use in the military or militia.

analytical framework that applied prior to *Bruen*,[4] *NRA* found "considerable evidence" that the commercial sale restrictions are "consistent with a longstanding, historical tradition," which "suggests that" the ability of 18-to-20-year-olds to purchase handguns from licensed dealers "falls outside the Second Amendment's protection." *NRA*, 700 F.3d at 203; *see also id.* at 204 ("Modern restrictions on the ability of persons under 21 to purchase handguns … seem, to us, to be firmly historically rooted."). One year later, this Court acknowledged that *NRA* "held that statutes enacted to safeguard the public using age-based restrictions on access to and use of firearms are part of a succession of 'longstanding prohibitions' that are likely outside the scope of the Second Amendment, because such restrictions are 'consistent with' both the 'longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety' and the 'longstanding

---

[4] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

tradition of age-and safety-based restrictions on the ability to access arms[.]'" *Nat'l Rifle Ass'n v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (citation omitted).

Nothing in *Bruen* permits this Court to disregard the conclusions *NRA* reached at step one of the pre-*Bruen* framework. Those conclusions closely track the analysis *Bruen* subsequently mandated. *Compare, e.g.*, *NRA*, 700 F.3d at 203 (finding "considerable evidence" that the commercial sale restrictions are "consistent with a longstanding, historical tradition"), *with Bruen*, 142 S. Ct. at 2130 (where regulation implicates the Second Amendment's text, government must show that it is "consistent with the Nation's historical tradition of firearm regulation"); *see also Bruen*, 142 S. Ct. at 2127 (explaining that "[s]tep one of the predominant framework is broadly consistent with *Heller*"); *id.* at 2157-58 (Alito, J., concurring) ("Our decision … does not expand the categories of people who may lawfully possess a gun, and federal law … bars the sale of a handgun to anyone under the age of 21[.]"). For example, in addition to discussing the wealth of 19th-century authorities that support restricting the ability of 18-to-20-year-olds to access firearms, *NRA* relied on "revolutionary and founding-era gun regulations … that targeted particular groups for public safety reasons," such as "laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation. … American legislators had determined that permitting these persons to keep and bear arms posed a potential danger." *NRA*, 700 F.3d at 200.

This analysis also coheres with the analogical approach to historical inquiry that *Bruen* mandated. *See Bruen*, 142 S. Ct. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." (cleaned up)). The commercial sale restrictions are "comparably justified" vis-à-vis the revolutionary and founding-era regulations *NRA* discussed, because both targeted those considered to be dangerous if entrusted with firearms. *Cf., e.g.*, *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."). And the commercial sale restrictions impose a significantly *smaller* burden—not just a comparable burden—relative to the historical disarmament laws, since they apply to any individual only until they turn 21.

Accordingly, as the government explains, "*NRA*'s detailed review of the historical record shows that the commercial sale restrictions satisfy *Bruen*'s historical standard." U.S. Br. 15. This Court is bound to reach the same conclusion. *See Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 459 n.9 (5th Cir. 2022) ("This circuit follows the rule that alternative holdings are binding precedent and not obiter dictum." (cleaned up)); *Bucklew v. Precythe*, 139 S. Ct. 1112, 1126 (2019) ("[J]ust as binding as [a prior case's] holding is the reasoning underlying it."); *County of*

*Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., concurring in part and dissenting in part) ("As a general rule, the principle of stare decisis directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law."). That alone is enough to defeat Plaintiffs' Second Amendment claim.

### III.    If this Court Conducts the Historical Inquiry Anew, the Proper Focus for Analysis Is the Reconstruction Era, Not the Founding Era

Plaintiffs' claims fail both under *Bruen*'s textual inquiry and *NRA*'s controlling historical analysis. However, if the Court does see fit to conduct its own historical inquiry, it will confront the question whether the most relevant time period for that inquiry centers on the Reconstruction era, and the ratification of the Fourteenth Amendment in 1868, or the founding era, and the ratification of the Second Amendment in 1791.

The government has explained that the commercial sale restrictions are entirely consistent with the American tradition of firearms regulation regardless of which period this Court considers. *See* U.S. Br. 32-35 (19th century); *id.* at 35-38 (founding era). If the public understanding of the Second Amendment right remained consistent in the 77 years between 1791 and 1868, an inquiry into that understanding in 1791 will be just as revelatory of the scope of the right as an inquiry into the public understanding in 1868. *See Bruen*, 142 S. Ct. at 2138 (2022)

(explaining that the Court did not need to resolve the issue because, with respect to carrying handguns in public without special need, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same"). Accordingly, like the Supreme Court in *Bruen*, this Court need not resolve the issue of the correct time period in this case. *Cf. United States v. Ramirez*, No. 22-50042, 2023 WL 3336423, at *5 n.4 (5th Cir. May 10, 2023) (in a Fourth Amendment challenge in a federal criminal case, observing that, "[l]ike the Court in *Bruen*, [it] need not resolve th[e] debate" over whether 1791 or 1868 is the "relevant historical period for determining the original meaning of enumerated rights" because the relevant legal principles "were consistent through both ratification periods"). Nevertheless, if this Court wishes to do so to guide district courts in future cases, it should hold that the inquiry centers on 1868—including in challenges, like this one, to federal gun laws.

To understand why the 1868 understanding establishes the scope of the right to keep and bear arms in cases challenging federal laws, it is necessary first to understand why that is correct in cases challenging state laws. In a case challenging the constitutionality of a state law, focusing on 1868 is the only correct way to answer the originalist question: How did the people understand the right at the time of its adoption? The U.S. Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a

13

state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

Prior to *Bruen*, several circuits reached this conclusion in analyzing the tradition of firearm regulation at the first, historical step of the then-applicable Second Amendment framework.[5] *See Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was

---

[5] *See supra* n.4 (explaining the two-step framework that federal courts of appeals applied between *Heller* and *Bruen*).

proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*).

*Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*"). Moreover, there is good reason for these courts to have reached that conclusion: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald*, 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how

15

the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

The Eleventh Circuit recently reached the same conclusion post-*Bruen*, holding that in cases involving state laws where "the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms … differ[s] from the 1789 understanding, … the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *NRA v. Bondi*, 61 F.4th at 1323. The court continued:

> This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." … The opposite rule would be illogical.

*Id.* at 1323-24 (alterations in original) (citations omitted). The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from a radical position. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or

16

tradition, should we look at the founding, or should we look at the time of
the adoption of the Fourteenth Amendment, which then, of course, applies it
to the states?

MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where
there was a contradiction between those two, you know, and the case arose
in the states, I would think there would be a decent argument for looking at
the history at the time of Reconstruction … and giving preference to that
over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position prominent scholars of originalist theory have taken. As

the Eleventh Circuit explained, "[m]any prominent judges and scholars—across

the political spectrum—agree that, at a minimum, 'the Second Amendment's scope

as a limitation on the States depends on how the right was understood when the

Fourteenth Amendment was ratified.'" (quoting *Ezell*, 651 F.3d at 702) (citing,

among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo);

*see also* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or*

*Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms*

*to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("Federal protection against state

encroachments on individual liberty began with the ratification of the Fourteenth

Amendment. 1868 is thus the proper temporal location for applying a whole host

of rights to the states, including the right that had earlier been codified as the

Second Amendment as applied against the federal government. Interpreting the

right to keep and bear arms as instantiated by the Fourteenth Amendment—based

on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right"—"the question is controlled not by the original meaning of the first ten Amendments in 1791 but instead by the meaning those texts and the Fourteenth Amendment had in 1868"); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) ("The view is ascendant among originalists who hold that the Fourteenth Amendment requires states to respect some or all of the individual rights listed in the first eight amendments that those rights ought to be understood *as they were understood in 1868*."). Others who have endorsed this view include Michael Rappaport[6] and Stephen Siegel.[7] In sum, originalist analysis compels applying the

---

[6] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008) ("[T]he incorporated Bill of Rights under the Fourteenth Amendment may have had a different meaning than the original Bill of Rights. If the rights in the original Bill had developed a new meaning in the years leading up to Reconstruction, and if the enactors of the Amendment had used those new meanings, the incorporated Bill would have a different meaning than the original Bill.").

[7] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unaware of any discussion by an originalist asserting, as a matter of theory, that the meaning of the Bill of Rights in 1789 should be preferred to its meaning in 1868 when the subject is the limitations the Fourteenth Amendment imposes on the states. In addition, I am unable to

1868 understanding of the right to keep and bear arms in a case challenging a state law.[8]

The pertinent question in this case, of course, is whether the 1868 understanding should also control in challenges to *federal* gun laws, to which the Second Amendment applies directly rather than through the Fourteenth Amendment. Again, this Court need not decide that issue here, because "the federal restrictions whose validity plaintiffs seek to upend reflect a historical tradition that stretches from the founding." U.S. Br. 38; *see also id.* at 35-38. If the

_____

conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868. In discussions, some originalists have suggested the importance of 'consistency' between the rights held against the national and state governments. The desire for consistency, however, is not justified on originalist grounds. In addition, consistency may be brought about by imposing the meaning of the Bill in 1868 on the national government, rather than vice-versa.").

[8] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 20-22.

Court decides to resolve the issue for future cases, however, it should conclude that 1868 is the correct focus in cases challenging both federal and state laws.

To be sure, the choice between 1791 and 1868 is a less straightforward one with respect to challenges to federal laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Lash, 97 Ind. L.J. at 1441. But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the

relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g., United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[9]

---

[9] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that

More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[10]

Moreover, 1868 is neither a starting-line nor a cutoff; *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S.

---

"the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

[10] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and

Ct. at 2135-36, 2142-45, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory authority)

---

1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

settle the meaning of the Second Amendment right and demonstrate that the challenged laws are constitutional. *See also* U.S. Br. 39-40 (describing Supreme Court's reliance on 19th-century authorities and practices in *Heller*, *Bruen*, and decisions involving other constitutional rights).

In light of these principles, the plaintiffs' suggestion that this Court should simply disregard the wealth of 19th-century laws that operated just as the challenged laws do is profoundly mistaken, *even if* the meaning of the right is keyed to the public understanding in 1791. As the Government observes, the plaintiffs proceed from the "mistaken premise that they have provided conclusive evidence as to the right's meaning at the founding, and that this understanding cannot be varied by later practice." *Id.* at 41. Plaintiffs have provided no such evidence; their claims about the import of founding-era militia laws are mistaken. *See id.* at 23-26, 41. Nor have they provided any evidence of a "radical shift" in the meaning of the right "between 1791 and 1868." *Id.* at 42. In these circumstances, the actions of state legislatures in the decades around Reconstruction—starting *within the lifetimes* of individuals who were alive at the founding—are robust evidence of how the public understood the right to keep and bear arms at the founding. For plaintiffs to suggest that they have better insight into the founding-era understanding of the

Second Amendment right in 2023, 232 years distant from its ratification, than the

Reconstruction generation had when 77 years distant, is nothing short of hubris.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

Dated: May 19, 2023                    By:  /s/ Ivan E. Wohner

Janet Carter
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017

Ivan E. Wohner
Everytown Law
P.O. Box 14780
Washington, DC 20044
202-897-1882
iwohner@everytown.org

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,118 words, excluding the portions exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

May 19, 2023                    /s/Ivan E. Wohner
                               Ivan E. Wohner

                               *Counsel for Amicus Curiae*
                               *Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

On May 19, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. All parties in the case are registered CM/ECF users.

May 19, 2023                              /s/Ivan E. Wohner
                                         Ivan E. Wohner

                                         *Counsel for Amicus Curiae*
                                         *Everytown for Gun Safety*