No. 23-30033

# In the United States
# Court of Appeals for the Fifth Circuit

CALEB REESE; FIREARMS POLICY COALITION, INCORPORATED; SECOND
AMENDMENT FOUNDATION; LOUISIANA SHOOTING ASSOCIATION;
EMILY NAQUIN,

*Plaintiffs-Appellants,*

V.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN
DETTELBACH, DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES; MERRICK GARLAND, U.S. ATTORNEY GENERAL,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, No. 6:20-cv-01438

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

George J. Armbruster, III
ARMBRUSTER & ASSOCIATES, APLC
332 E. Farrel Road, Suite D
Lafayette, LA 70508
(337) 889-5511
george@arm-assoc.com

David H. Thompson
*Counsel of Record*
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

Joseph Greenlee
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149
(916) 517-1665
jgr@fpclaw.org

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

*Reese v. BATFE*, No. 23-30033

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| *Plaintiffs-Appellants* | *Counsel for Plaintiffs-Appellants* |
|---|---|
| Caleb Reese<br>Louisiana Shooting Association<br>Emily Naquin<br>Second Amendment Foundation<br>Firearms Policy Coalition, Inc. | David H. Thompson<br>Peter A. Patterson<br>William V. Bergstrom<br>COOPER & KIRK, PLLC<br><br>George J. Armbruster, III<br>ARMBRUSTER & ASSOCIATES, APLC<br><br>Joseph Greenlee<br>FPC ACTION FOUNDATION<br><br>John W. Dillon*<br>DILLON LAW GROUP<br><br>Raymond M. DiGuiseppe*<br>DIGUISEPPE LAW FIRM<br><br>Adam Kraut*<br>SECOND AMENDMENT FOUNDATION |

i

| *Defendants-Appellees* | *Counsel for Defendants-Appellees* |
|---|---|
| Bureau of Alcohol, Tobacco, Firearms and Explosives<br><br>Steven Dettelbach, in his official capacity as ATF Director<br><br>Merrick Garland, in his official capacity as Attorney General of the United States | Abby C. Wright<br>Daniel M. Riess*<br>Steven H. Hazel<br>U.S. DEPARTMENT OF JUSTICE |

Attorneys whose names are denoted with an asterisk entered appearances in the district court but have not entered appearances in the Fifth Circuit.

Dated: June 2, 2023                     s/ David H. Thompson
                                        David H. Thompson


                                        *Counsel for Plaintiffs-Appellants*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION ...........................................................................1

ARGUMENT ..................................................................................2

    I.    The Handgun Ban Regulates Conduct Within the Plain Text of the Second Amendment...................................................................2

        A.    The Second Amendment Protects the Right to Purchase Firearms. .....................................................................3

        B.    Plaintiffs Are Part of "the People." .............................7

            1.    The Text of the Amendment Makes No Distinctions Based on Age. ...................................................8

            2.    The Reference to the Militia Removes Any Doubt Plaintiffs Are Part of "the People."..................13

    II.    History Makes Clear That the Challenged Laws Are Unconstitutional. ................................................................15

        A.    The Historical Arguments Misplaced in the Textual Section of the Government's Brief Cannot Justify the Handgun Ban...................................................16

        B.    The Government Has Presented No Founding Era Evidence Supporting the Handgun Ban....................................19

        C.    The Government's Reconstruction Era Evidence Is Too Little, Too Late.......................................................22

CONCLUSION..............................................................................26

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page**

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) ..................................................4

*County of Allegheny v. ACLU Greater Pittsburgh Chapter*,
    492 U.S. 573 (1989)................................................................................................10

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................3, 7, 9, 10, 11, 13

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975).....................................12, 13

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020)............................24

*Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017).....................................5, 6, 7

*Fraser v. BATFE*, No. 22-cv-410,
    2023 WL 3355339 (E.D. Va. May 10, 2023).........................................................5

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ..................... 4, 7, 8, 9, 14, 17, 21

*Hirschfeld v. BATFE*, 34 F.4th 14 F.4th 322 ...........................................................4

*Jones v. Bonta*, 34 F.4th 704, 722 (9th Cir. 2022).................................................24

*Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)......................................................24

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)..........................................................9

*Marsh v. Chambers*, 463 U.S. 783 (1983) ............................................................22

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985)............................................................13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S Ct. 2111 (2022) .......................................... 3, 4, 15, 16, 18, 19, 22, 24, 25

*NRA v. BATFE*, 700 F.3d 185 (5th Cir. 2012) .........................................................4

*NRA v. BATFE*, 714 F.3d 334 (5th Cir. 2013) ..............................................8, 14, 19

*NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) ...................................................4, 23

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) .......................................................23

*Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022).....................................................4

*State v. Callicutt*, 69 Tenn. 714 (1878) .................................................................26

*Teixeira v. County of Alameda*,
    873 F.3d 670 (9th Cir. 2017)...............................................................................5, 6

*Town of Greece v. Galloway*, 572 U.S. 565 (2014)................................................10

*United States v. Harrison*, No. 22-cr-00328,
    2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) ..................................................15

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) .........................11, 12

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) ......................8, 12, 15, 18, 22

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .......................................10

*Worth v. Harrington*, No. 21-cv-1348,
    2023 WL 2745673 (D. Minn. Mar. 31, 2023)................................8, 9, 13, 17, 21

## Statutes

1859 Ky. Acts 241 .....................................................................................................24

1859 Ky. Acts 245 .....................................................................................................24

## Other Authorities

2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 233
    (O.W. Holmes, Jr. ed., 12th ed., Little Brown & Co. 1873 (1836).....................17

3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257
    (Lyman H. Butterfield ed., 1961) .......................................................................19

8 THE PAPERS OF THOMAS JEFFERSON (Julian P. Boyd ed., 1984)..........................19

Act of May 5, 1777, in 9 HENING'S STATUTES AT LARGE 281 (1821)......................15

*Chapel History*, TATE STUDENT CTR. AT UNIV. OF GA.,
    https://bit.ly/42i4rcA (last accessed June 1, 2023) .............................................20

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward
    and Afro-Americanist Reconsideration*, 80 GEO. L. J. 309 (1991) .....................14

JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE
    PEACE 117 (3d ed. 1810)....................................................................................21

Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical
    Survey and Proposal for Reform*, 44 VAND. L. REV. 1135 (1991) .....................20

Letter from Thomas Jefferson to Samuel Smith, NAT'L ARCHIVES
    (May 3, 1823), https://perma.cc/2CJB-N7RS .....................................................18

**INTRODUCTION**

The Government's defense of the Handgun Ban is notable for a conspicuous absence: the lack of *any* Founding era law barring 18-to-20-year-olds from purchasing firearms from any source. To the contrary, shortly after adoption of the Second Amendment Congress affirmatively *required* 18-to-20-year-olds to acquire firearms. The Government's modern-day attempt to prohibit 18-to-20-year-olds from purchasing handguns from licensed dealers contradicts the Nation's history of firearm regulations and therefore must be invalidated.

The Government seeks to deny Plaintiffs any measure of Second Amendment protection by arguing that because of their age they are not part of "the people" who are protected by the plain text of the Second Amendment. But nothing in the plain text of the Second Amendment supports any distinction on the basis of age. And the Government's argument would make a hash of the constitutional text by making "the people" mean something different in the Second Amendment context than it does in the context of the First and Fourth Amendments, where it plainly includes individuals under the age of 21. The Supreme Court has already rejected such a counterintuitive reading of the constitution in *Heller*.

In the alternative, the Government claims that Plaintiffs' Second Amendment rights are not implicated because the Handgun Ban does not make it impossible for Plaintiffs to buy a handgun, but instead relegates them to the shadows of the

1

unregulated secondary market bereft of new products, warranties, licensed dealers, and background checks. This attempt to sneak the question of the degree of burden into the textual analysis should be rejected here just as it was in *Bruen*, where New York did not completely ban public carry but instead subjected the right to a discretionary licensing regime. At the textual level in *Bruen* the only issue was whether the Second Amendment's text extended to public carry, and here the only issue is whether the text covers acquisition of a firearm, which it plainly does. Whether the burden on that right can be justified is a question for history.

History cannot help the Government here. There is no evidence of anything like the Handgun Ban from the Founding era. In fact, the evidence shows 18-to-20-year-olds at the time had full firearm rights. The evidence the Government collects from the Reconstruction era is too little and too late, as it contradicts the Founding era evidence and in any event is insufficiently well-established and analogous to the Handgun Ban to justify it.

## ARGUMENT

### I.   The Handgun Ban Regulates Conduct Within the Plain Text of the Second Amendment.

The Government argues that the Handgun Ban does "not implicate the Second Amendment's text" because it "target[s] conduct the right does not protect and [it] regulate[s] an age group historically subject to exclusion from the right." Br. for Appellees, Doc. 32, at 12 (May 12, 2023) ("Resp."). Both arguments are wrong.

**A. The Second Amendment Protects the Right to Purchase Firearms.**

The Second Amendment necessarily protects the right to acquire firearms, since constitutional rights "implicitly protect those closely related acts necessary to their exercise." Br. of Pl's.-Appellants, Doc. 28, at 10–11 (Mar. 13, 2023) ("Br.") (quoting *Luis v. United States*, 578 U.S. 5, 26 (2016) and collecting cases). That the Handgun Ban does not bar *every* avenue by which an 18-year-old may acquire a handgun and instead targets only the most important one does not alter this conclusion; *Bruen* did not require a law to completely obliterate the Second Amendment right to pass its textual analysis. Instead, the Court asked only whether the Second Amendment's text covered "carrying handguns publicly for self-defense," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S Ct. 2111, 2134 (2022), even though New York did not *completely* bar the practice but instead subjected it to a discretionary licensing regime. Questions about the *degree* to which a challenged law infringes the right can only be addressed through historical analysis. *Bruen*, 142 S. Ct. at 2133. The Government offers two responses.

1. The Government claims that the Handgun Ban is "presumptively lawful" because it imposes "conditions and qualifications on the commercial sale of arms." *See District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008). After *Bruen*, *Heller*'s "presumptively lawful" language cannot have doctrinally significant import. That is because *Bruen* clarifies the test for assessing *all* Second Amendment

3

claims, and no part of that test involves presuming lawfulness. *See Bruen*, 142 S. Ct. at 2126, 2130. Instead, once the plain text is implicated, it is the Government's burden to justify the law, not Plaintiffs' to undermine it. That does not mean *Bruen* altered *Heller*. *Bruen* simply made clear that *Heller* was only stating that it presumed restrictions of the type it listed would be found lawful to some extent when the proper analysis was conducted. This language does not excuse the Court from conducting that analysis in a case where the issue is squarely presented. *See, e.g.*, *Binderup v. Att'y Gen.*, 836 F.3d 336, 367 (3d Cir. 2016) (en banc) (Hardiman, J., concurring), *abrogation recognized by Range v. Att'y Gen.*, 53 F.4th 262 (3d Cir. 2022).

Furthermore, the Handgun Ban is not simply a "condition[ or] qualification[]" on the commercial sale of arms." Resp. 12. This Court has said that "[i]t is not clear that the Court had an age qualification in mind when it penned that sentence," *NRA v. BATFE*, 700 F.3d 185, 206 (5th Cir. 2012) ("*NRA I*"), and the Fourth Circuit has held that it did not, reasoning "[a] condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records," *Hirschfeld v. BATFE*, 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 34 F.4th 14 F.4th 322. A law that indirectly bars law-abiding citizens from acquiring handguns from dealers operates not simply as a "condition" on selling handguns but as a ban on acquiring them. *Id.*; *but see NRA v. Bondi*, 61 F.4th 1317, 1320 (11th Cir. 2023).

4

2. The Government tries to reframe the question as whether Plaintiffs have the right to "purchase handguns from federal firearms licensees" and claims the Second Amendment "does not establish a right to buy any weapon at any time from any source." Resp. 12, 14. As Plaintiffs have explained, this is the wrong way to assess the text. It is enough to say that the Second Amendment protects the right to acquire firearms. Any question as to whether the government can keep some people out of the ordinary commercial marketplace while leaving unregulated avenues open to them is a question to be resolved by examining what burdens on the right have been historically accepted as constitutional. *See* Br. 12–14. Indeed, the Government's argument has absurd consequences: if right it would mean that it could bar commercial sale of firearms to *all* Americans and the Second Amendment's text would not even be implicated. That cannot possibly be right. Even in *NRA I* this Court *never* suggested that keeping people out of the commercial market for handguns raised no Second Amendment problem at all. This accords with how other courts have treated the issue. *See Fraser v. BATFE*, No. 22-cv-410, 2023 WL 3355339, at **7–8 (E.D. Va. May 10, 2023) (finding the Second Amendment protects the right to purchase firearms and holding the Handgun Ban unconstitutional following *Bruen*).

The Government points to *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017) ("*Ezell II*"), and *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)

5

(en banc), to establish the principle that while "extraordinarily severe restriction[s] on purchasing or practicing with firearms may implicate the Amendment's text, less extensive restrictions do not." Resp. 14 (citations omitted). Those cases do not support the Government's textual reading. Both predate *Bruen*, and both assessed whether the burden the challenged law placed on the Second Amendment right was adequately justified by the reasons for imposing it—a mode of analysis *Bruen* did away with. *See Ezell II*, 846 F.3d at 892; *Teixeira*, 873 F.3d at 682. It is in relation to this irrelevant question that both cases discuss the severity of the burden on the right. In *Ezell II*, which involved Chicago zoning ordinances that made it effectively impossible to operate firing ranges in the city, the Seventh Circuit pitched its textual analysis at the same level of generality that the Plaintiffs propose here and concluded that "the core individual right of armed defense … includes a corresponding right to acquire and maintain proficiency in firearm use through target practice at a range." 846 F.3d at 892 (describing the analysis of *Ezell I*). The severity of the burden—how difficult the ordinance made it to "acquire and maintain proficiency"—determined the level of scrutiny the court would apply, under which the court found the law invalid. *Id.* at 893. *Teixeira*, which contrasted its zoning ordinances against the one at issue in *Ezell II* to conclude that "gun buyers have no right to have a gun store in a particular location, *at least as long as their access is not meaningfully constrained*," was therefore also making a statement based upon the obsolete tiers-

6

of-scrutiny-analysis and the government's ability to justify a given burden. 873 F.3d at 680 (emphasis added). Furthermore, even if *Ezell II* and *Teixeira* stood for the proposition that the severity of the burden mattered to the textual analysis—and they do not—the burden on the right here is at least as "severe" as it was in *Ezell II*, where Chicagoans could at least leave the city to train at a range. Plaintiffs by contrast "can do nothing to purchase a handgun from a licensed dealer." *Hirschfeld*, 5 F.4th at 417. They are forced into "a less safe, less regulated market to defend themselves. Not to mention that these restrictions apply to ammunition as well … [which] shows why the laws at issue operate as a functional ban on 18- to 20-year-olds." *Id.* at 417–18 (internal citation omitted).

### B.  Plaintiffs Are Part of "the People."

The Government also argues the Handgun Ban does not implicate the text of the Second Amendment because it "regulate[s] only underage individuals." Resp. at 15. Of course, as legal adults Plaintiffs are in no sense "underage." In any event, the text makes no distinction based on age. The Second Amendment is a right of "the people," and "the people" means "all Americans." *Heller*, 554 U.S at 581. And the Amendment's stated purpose to preserve the militia removes any doubt that 18 year olds have Second Amendment rights.

### 1. The Text of the Amendment Makes No Distinctions Based on Age.

The Government argues that "legislatures can establish age limits on access to arms," and that "for the Second Amendment's ratifiers, a natural point at which to draw the line between underage individuals and responsible adults was age 21." Resp. 16. This misunderstands the stakes of the textual analysis. If this Court holds (as *Heller* commands) that "the people" means *all* the people, that does not necessarily establish that legislatures lack the power to pass laws limiting some Second Amendment activities based on age, only that those restrictions must be historically justified. *See United States v. Rahimi*, 61 F.4th 443, 451–52 (5th Cir. 2023).

To try to make this a textual limitation, the Government emphasizes that those under 21 were minors at the Founding and cites restrictions from that era on their exercise of certain rights, including the rights to petition, enter contracts, serve on juries, and vote. Resp. at 17. Notably absent from this list is any restriction on the use of firearms. *See NRA v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) ("*NRA II*") (Jones, J., dissental). That is crucial because, "the age of majority—even at the Founding—lacks meaning without reference to a particular right." *Hirschfeld*, 5 F.4th at 435.

> Although the full age of majority was often 21, 'that only mattered for specific activities'; for others, such as taking an oath (12), selling land (21), receiving capital punishment (14), serving as an executor or

executrix (17), being married (for a woman 12), choosing a guardian (for a woman 14), the age of majority varied widely.

*Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *8 (D. Minn. Mar. 31, 2023) (quoting *Hirschfeld*, 5 F.4th at 435). There is, simply put, *nothing* to suggest that because there were limits on 18-year-olds' rights to enter contracts "the voters who adopted the Second Amendment would have used the phrase 'the people' … to express a limitation based on the general common law age of majority." *Id.*

The Government's attempt to tie the right to bear arms to the right to vote (which 18-year-olds lacked at the Founding but have today) falls flat for the same reason: there is no indication that the ratifiers of the Second Amendment thought the two were related. Indeed, *Heller* forecloses linking the two. Voting is a "civic right" or "a right that was exercised for the benefit of the community … rather than for the benefit of the individual." *Kanter v. Barr*, 919 F.3d 437, 462–63 (7th Cir. 2019) (Barret, J., dissenting). "*Heller*, however, expressly rejects the argument that the Second Amendment protects a purely civic right. It squarely holds that 'the Second Amendment confer[s] an *individual right* to keep and bear arms,' and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself." *Id.* (quoting *Heller*, 554 U.S. at 595) (citations omitted).

The Government notes that *Heller* also described "the people" in the Second Amendment as referring to "the political community," 554 U.S. at 580, and argues that "at the founding, a hallmark of membership in the polity was the right to vote."

Resp. 17–18. But the Government is reading meaning into "the political community" that is not there, as *Heller*'s interchangeable use of "political community" and "all Americans" should be enough to prove. In fact, the Supreme Court has used that term in many contexts to refer to all citizens of a community, regardless of age or voting rights. *See, e.g.*, *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 594–95 (1989), *abrogated by Town of Greece v. Galloway*, 572 U.S. 565 (2014) ("The Establishment Clause, at the very least, prohibits government from … making adherence to a religion relevant in any way to a person's standing in the political community."). *Heller*'s own use of the term was a reference to an immigration decision which itself had used the phrase "national community," again with no suggestion that one could be denied membership based on age. *See Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Instead, that decision made a distinction between unlawful immigrants with no connection to the country and immigrants who had formed greater ties to the community. *See Verdugo-Urquidez*, 494 U.S. at 271. Plainly, citizenship or the right to vote was not a condition of being a member of "the people."

Plaintiffs' reading of "the people," also accords with how that phrase is used elsewhere in the Constitution to include 18-to-20-year-olds. *See* Br. at 14–16. The Government counters that "the people" were also referenced in the Preamble where the phrase merely connoted "those who approved the Constitution 'by majority vote

10

in special ratifying conventions,' " Resp. 27 (quoting Akhil Reed Amar, *The Bill of Rights* 27 (1998)), and Article 1, Section 2, which referred to "the People of the several States" meaning only those with the right to vote for their representatives, *id.* But again, the Government's argument runs headlong into *Heller* which already explained that these provisions are less useful than the First and Fourth Amendments in interpreting the Second Amendment since "they deal with the exercise or reservation of powers, not rights." 554 U.S. at 579–80. The Government's interpretation of these two passages cannot be used to limit the scope of the Second Amendment.

The Government further complains that Plaintiffs' comparisons to the other provisions of the Bill of Rights are inapt because "the Second and Fourth Amendments do not 'cover exactly the same groups of people.' " Resp. 28 (quoting *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011)). If that is the case, then it *must* be because of the historical analysis since *Heller* explicitly equates the text of the First, Second and Fourth Amendments on this point. 554 U.S. at 580. The Government points out that *Bruen* (and *Heller*) repeatedly referred to the Second Amendment as protecting the rights of "ordinary, law-abiding, adult citizens," suggesting that this was intended as a limitation on the right that does not apply to the First or Fourth Amendments. Even if that were right, and the Second Amendment's text were narrowed to "law-abiding adults," that shorthand *describes*

11

*Plaintiffs who are law-abiding adults.* But more importantly, *Bruen*'s repeated references to "law-abiding citizens" cannot be read as rejecting *Heller*'s interpretation of "the people." It was shorthand for the plaintiffs in the case, for whom there was no doubt that the Second Amendment's text *and* history offered the full measure of its protections. *See Rahimi*, 61 F.4th at 452. The Government also cites *Portillo-Munoz* as establishing that the Second Amendment is not equal to the First and Fourth in this regard, but that case is affirmatively helpful to Plaintiffs, since the Court—addressing a Second Amendment claim by an illegal alien—held that the alien was not part of "the people" protected by the Second Amendment because the Supreme Court *had* equated the Second and Fourth Amendments and "neither this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally." 643 F.3d at 440. The statement the Government cites—that everyone covered by the Fourth Amendment need not necessarily have Second Amendment rights—was non-binding dicta based on the counterfactual that would obtain "if there were precedent for the proposition that illegal aliens generally are covered by the Fourth Amendment." *Id*.

In the alternative, the Government claims that comparisons to the First and Fourth Amendment hurt Plaintiffs because the Supreme Court has held in both contexts that it can make rules for "youths" that would be unconstitutional if applied

12

to "adult[s]." Resp. 28 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975) and *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985)). But both *T.L.O.* and *Erznoznik* make clear (1) that the First and Fourth Amendments both apply to the whole people, including minors, *see T.L.O.*, 469 U.S. at 334; *Erznoznik*, 422 U.S. at 212, and (2) that both Amendments apply *fully* to all legal adults like Plaintiffs, *T.L.O.*, 469 U.S. at 339; *Erznoznik*, 422 U.S. at 212.

### 2.  The Reference to the Militia Removes Any Doubt Plaintiffs Are Part of "the People."

Further support for Plaintiffs' reading of the text is provided by the "prefatory clause," which "announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. The prefatory clause means that *at least* those who were members of the militia—a group that, at the Founding just as today, included 18-year-olds—must be among "the people" the Second Amendment's plain text protects. Br. 16–21. The Government responds that "plaintiffs err in suggesting Founding Era legislatures lacked authority to exclude 18-to-20-year-olds from militia service." Resp. 23. But Plaintiffs have suggested no such thing. The "militia" referenced in the Second Amendment refers to the pre-existing group of "all able-bodied men," while the "organized militia may consist of a subset of them." *Heller*, 554 U.S. at 596, 598; *see Worth*, 2023 WL 2745673, at *8. States could, if they wanted, exclude 18-year-olds from their organized militia, without changing the fact that they were part of the unorganized one. It is therefore

of no importance to this textual argument that the age for enrollment sometimes deviated from 18 or that the states had discretion to set their own age limits, *see* Resp. at 24, but it is notable that the federal Militia Act of 1792 set the age at eighteen and "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen." *NRA II*, 714 F.3d at 340 (Jones, J., dissental); *see also Hirschfeld*, 5 F.4th at 430–434 (discussing laws varying from this age cutoff).

The Government suggests that Plaintiffs' reading of the militia laws as informative about the scope of the Second Amendment cannot be squared with the fact that Black people served in state militias in some states during the Revolutionary War, as did Virginians who had been disarmed for refusing to swear a loyalty oath. Resp. at 26. The existence of Black militiamen in the Revolutionary War does not diminish the point that those in the militia were understood to be part of "the people" with Second Amendment rights. At the Founding, there was no racial definition of citizenship and free Blacks voted in most states. Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward and Afro-Americanist Reconsideration*, 80 Geo. L. J. 309, 331–32 (1991). While the 1792 Militia Act did not require Blacks to enroll, it also did not *exclude* them—and as discussed above, mere exclusion from the organized militia does not alter one's position in the unorganized militia. *Id.* at 332.

In Virginia during the revolution, those who would not swear allegiance were disarmed (and more, they were forbidden from "holding any office in this state, serving on juries, suing for any debts, electing or being elected, or buying lands, tenements, or hereditaments") but still required to appear for muster. Act of May 5, 1777, in 9 HENING'S STATUTES AT LARGE 281, 281–82 (1821). It does not follow from the fact that they were required to muster that those loyal to the Crown were considered members of the American people. Instead, the wide-ranging restrictions to which they were subject demonstrates that was not the case; failing to swear loyalty to America placed a person outside the political community and thus not a member of the people. And in any event, *Bruen* expressly rejected the relevance of "military dictates" to assessing the Second Amendment's "usual application during times of peace." 142 S. Ct. at 2152 n.26; *see also United States v. Harrison*, No. 22-cr-00328, 2023 WL 1771138, at *21 (W.D. Okla. Feb. 3, 2023). We are not at war, and Plaintiffs have not refused to pledge allegiance to their country. Revolutionary measures aimed at Loyalists are irrelevant.

## II.   History Makes Clear That the Challenged Laws Are Unconstitutional.

Because the text of the Second Amendment covers Plaintiffs' desired course of conduct, "the Government bears the burden of justifying its regulation by demonstrating it is consistent with this Nation's historical tradition of firearm regulation." *Rahimi*, 61 F.4th at 450 (cleaned up).

15

### A.    The Historical Arguments Misplaced in the Textual Section of the Government's Brief Cannot Justify the Handgun Ban.

1. The overarching historical theory of the Government's defense of the Handgun Ban is that 18-year-olds were minors for many purposes at the Founding so Plaintiffs should be treated like minors today. *See, e.g.*, Resp. 29–31; 44–45. But *Bruen* was very clear: when looking at historical restrictions, courts must look at "how and why the regulations burden[ed] a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. If a "modern and historical regulation[] impose a comparable burden on the right of armed self-defense … [and] that burden is comparably justified," then that historical restriction can provide support for the modern law, but if the burdens or their justifications differ, then the historical restriction should be disregarded. *Id.* The Government's argument boils down to accepting restrictions on the rights of 18-year-olds even though the historical reason for applying those restrictions is entirely absent in the modern context. *Bruen* forecloses this argument. And the treatment of Plaintiffs as legal adults is not merely a "modern attitude[]," Resp. 23, it is a legal status with real-world implications. There is no one in the world who is charged with the Plaintiffs' care and protection— they are responsible for themselves. And with that must come an equal right to any other adult American to self-defense. *See Bruen*, 142 S. Ct. at 2156 (rejecting the requirement of "a special need for self-protection distinguishable from that of the general community"). Any law from our nation's history that constitutionally

restricted the rights of "minors" is fundamentally unlike the laws at issue here today because those "minors" were under the care and protection of their parents and guardians. *See* Br. 38–39.

2. In discussing the importance of the "militia" to the Second Amendment, the Government points out that some members of Congress who passed the first Militia Act stated that they expected minors would acquire firearms for use in militia service through their parents. From this, it concludes, "[a]t the founding, then, individuals under 21 did not enjoy unregulated access to arms." Resp. 25. But the conclusion does not follow from the premise. A law that seeks to *ensure* certain individuals obtain access to arms is not equivalent to a law *restricting* those individuals' access to arms—of which there were none at the Founding. *See Hirschfeld*, 5 F.4th at 434; *see also Worth*, 2023 WL 2745673, at *8. Indeed, laws requiring parents or guardians to acquire firearms for their minor children at the Founding undoubtedly were rooted in the children's minority status—both because parents and guardians would have had legal obligations to provide for their children, and because the general restriction on contracting that applied to minors may have affected minors' ability to acquire firearms for themselves. 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 233 (O.W. Holmes, Jr. ed., 12th ed., Little Brown & Co. 1873 (1836)). These laws are wholly disanalogous to a modern law restricting the rights of legal adults.

3. The Government collects statements of notable founders about minors which it suggests "reflect the founders' view that reason and judgment are not fully developed before the age of 21." Resp. 18. Furthermore, the Government suggests "modern scientific research" shows the founders were right, and this Court should recognize their statements as support for exercising "legislatures' more general authority to disarm groups historically deemed irresponsible" against Plaintiffs. *Id.* at 19. This Court must reject the attempt to sneak back in the old interest balancing analysis, *see Bruen*, 142 S. Ct. at 2133 n.7, and it has already rejected the idea that "irresponsible" people can generally be denied Second Amendment rights, *see Rahimi*, 61 F.4th at 453.

In any event, the statements of founders are inapplicable. Those from John Adams and Gouverneur Morris are about voting, which as discussed above is different from the individual right to bear arms. The statement from Thomas Jefferson comes from a letter describing the need for excise taxes on whiskey, in which Jefferson explains that a legislator has a duty "as a guardian of those who … cannot take care of themselves, such are infants, maniacs, gamblers, [and] drunkards." Letter from Thomas Jefferson to Samuel Smith, NAT'L ARCHIVES (May 3, 1823), https://perma.cc/2CJB-N7RS. It is hard to imagine Jefferson meant to suggest a gambler lacked constitutional rights.

In fact, both Adams and Jefferson were vocally supportive of even minors keeping and being practiced with firearms. "I spent my time as idle Children do," Adams wrote in his autobiography, "above all in shooting, to which Diversion I was addicted to a degree of Ardor which I know not that I ever felt for any other Business, Study or Amusement." 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257 (Lyman H. Butterfield ed., 1961). Jefferson encouraged his nephew (who was fifteen) in a letter: "I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprize, and independence to the mind. … Let your gun therefore be the constant companion of your walks." 8 THE PAPERS OF THOMAS JEFFERSON816–17 (Julian P. Boyd ed., 1984).

In any event, any statements from the founders about the immaturity of 18-to-20-year-olds would support Plaintiffs, because they would show that the Founding generation was fully aware of potential maturity issues of people in this age group and yet did *nothing* to restrict their access to firearms but instead *mandated* it. *See Bruen*, 142 S. Ct. at 2131; *NRA II*, 714 F.3d at 342.

**B. The Government Has Presented No Founding Era Evidence Supporting the Handgun Ban.**

The Government claims that "legislatures have regulated 18-to-20-year-olds' access to handguns for most of American history." Resp. 31. For early support of this statement, it points to the fact that "the founders designated those under the age of 21 as 'infants,'" *Id*. at 35, but as already explained, Plaintiffs are *not* infants, so

19

any restrictions on infants are inapplicable. And in any case, the Government cites very few such restrictions, highlighting "prohibitions on the possession of firearms by students at public universities," *Id*. 35, a 1755 Pennsylvania militia statute requiring parental permission for enrollment by anyone under 21, *id.* at 36, militia statutes requiring parents to furnish firearms for their minor children, *id.* at 37, and a statement from a 1788 treatise which declared "infants" ineligible for service as peace officers, *id.* Taking these in turn, the restrictions on students at universities are inapplicable because the basis for these restrictions—as the Government freely admits, *id.* at 35–36—was not the authority of government to curtail the exercise of constitutional rights but the *in loco parentis* authority of schools charged with the care of their students, a concept that made particular sense at the time given the very young age of the students. *See* Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 VAND. L. REV. 1135, 1136 n.5 (1991) ("In 1826 two-thirds of Yale College's freshman class was 16 years of age and younger."). In this capacity, schools could require other things of their students that would, if commanded by the government outside the *in loco parentis* context, violate their constitutional rights. *See, e.g.*, *Chapel History*, TATE STUDENT CTR. AT UNIV. OF GA., https://bit.ly/42i4rcA (last accessed June 1, 2023) (explaining that the chapel, UGA's second, had hosted mandatory daily religious services since 1832). As such, these rules were not targeted at students because of their age, but

20

because they were students. "Indeed, they would not have prevented a person under the age of 21 who was not a student at one of the schools from possessing or carrying a firearm, and they undoubtedly applied with equal force to students older than 21." *Worth*, 2023 WL 2745673, at *13.

The 1755 Pennsylvania militia statute is similarly unavailing. It is too early to be a Founding-era analogue; the Founding-era Pennsylvania militia statute dates to 1777, and it set the age of enrollment at "18 where it remained through ratification." *Hirschfeld*, 5 F.4th at 433 & n.42. And as discussed above, nothing in Plaintiffs' argument that 18-year-olds were part of the unorganized, pre-existing militia is diminished by a state choosing to exempt that group from its *organized* militia. The laws requiring parents to furnish firearms for their children are irrelevant for the same reasons as the statements by legislators discussing the same feature of the 1792 Militia Act are irrelevant. Finally, the "leading treatise" cited for the proposition that, in 1788, "infants" were included with "madmen" and "idiots" as individuals who should not be "peace officers" is irrelevant. The treatise also included "clergymen, attorn[eys], … lawyers, … old and sick persons" on its list of those exempted from peace officer duty. JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (3d ed. 1810). Obviously such service was more limited than an individual's right to bear arms.

21

## C. The Government's Reconstruction Era Evidence Is Too Little, Too Late.

The Government admits the weakness of its Founding-era case, noting that "[t]he closest historical analogues … date to the mid-nineteenth century." Resp. at 32. This is a problem for the Government, as *Bruen* made clear that "not all history is created equal" and the most important history is from the period surrounding the adoption of the Second Amendment. 142 S. Ct. at 2136. Similarly, this Court has held that it "afford[s] greater weight to historical analogues more contemporaneous to the Second Amendment's ratification," *Rahimi*, 61 F.4th at 455–56; *see also* Br. 22–23. The Government argues in response that the Supreme Court has repeatedly (including in *Heller* and *Bruen*) looked to nineteenth century evidence in interpreting the constitution. Resp. 39–40. But *Heller* and *Bruen* were clear that Founding-era evidence was the critical tool of interpretation and "19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established' " by earlier evidence. *Bruen*, 142 S. Ct. at 2137 (citation omitted). Later evidence that is "inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (citation omitted). The Government's cases from other constitutional contexts all align with this approach. *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (placing particular emphasis on historical evidence that "sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to

22

the practice authorized by the First Congress"). There is no way to read these cases except to exemplify what *Heller* and *Bruen* made explicit—nineteenth century evidence can confirm what Founding era evidence shows, but it is secondary. *See, e.g.*, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395–96 (2020) (describing how the rule of unanimity in jury verdicts developed over 400 years and it was "against this backdrop that James Madison drafted and the States ratified the Sixth Amendment in 1791"). The Eleventh Circuit's recent decision in *Bondi* provides no support for the Government either, since that case involved application of the Second Amendment against the states through the Fourteenth Amendment, so there was a question in that case, not present in this one, as to whether the date of the ratification of the Second or the Fourteenth Amendment should control. Furthermore, *Bondi* was simply wrong for the same reasons the Government is—it failed to recognize that the Supreme Court *always* gives priority to Founding era evidence when analyzing the constitution. In any event, its statement that "the right's contours turn on the understanding that prevailed … when the Fourteenth Amendment was ratified," 61 F.4th at 1323, is directly contrary to this Court's controlling statement in *Rahimi* that it will "afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification," *Id*. at 456.

No matter the weight it is given, the Government's nineteenth century evidence is insufficient to support its Handgun Ban. It identifies 22 laws as relevant

23

analogues. *See* Resp. 32–33, A3–A4. Even taken at face value, that is less widespread than the laws of 30-plus states the Supreme Court rejected in *Espinoza* as not establishing a valid tradition for regulation in the First Amendment context. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020). But the Government's claimed tradition cannot be taken at face value. Only three of the purported analogues, from Alabama, Tennessee, and Kentucky, predate the Civil War. Plaintiffs addressed these laws in their opening brief, Br. 37–38 & n.2, though it is surprising the Government relies on the Kentucky law at all, given how that law illustrates the "deeply offensive nature" of many of these laws, *Jones v. Bonta*, 34 F.4th 704, 722 (9th Cir. 2022), *vacated and remanded in light of Bruen*, 47 F.4th 1124 (mem.), by targeting the firearm rights of "minor[s], or slave[s], or free negro[es]," 1859 Ky. Acts 241, 245. Plaintiffs have also already discussed the Government's proposed analogues from Delaware (1881), Illinois (1881), Iowa (1884), Kansas (1883), Louisiana (1890), Maryland (1882), Nevada (1885), West Virginia (1882), Wisconsin (1883), and Wyoming (1890), which are all distinguishable as placing a different burden on the right than the Handgun Ban does, coming from places where *Bruen* itself discounted restrictions (like the Western territories), or coming from states with no Second Amendment analogue. Br. 37–38. The government argues that, while Western territorial laws were discounted in *Bruen*, 142 S. Ct. at 2154, they should be treated differently here because they mirror

24

valid analogues in other regions of the country, Resp. 43, but the Government has very few valid analogues from *anywhere*. The Government also takes issue with discounting laws from states with no Second Amendment analogue, but such a requirement is only sensible given that the Supreme Court did not recognize that the Second Amendment applied against the states until *McDonald* in 2010. If the purpose of the historical inquiry is to determine whether a law is consistent with the "historical understanding" of the right, *Bruen*, 142 S. Ct. at 2131, laws from states that did not take that right into account are less probative. The Government asserts that nineteenth century legislatures that were not bound by state constitutional right-to-bear-arms provisions nevertheless felt "constrained" to accept it, but the only support for that claim is *McDonald*, which says no such thing. Resp. 43.

That leaves only two local restrictions, from Chicago (1873) and Lincoln, Nebraska (1895), as well as laws from the District of Columbia (1892), Georgia (1876), Indiana (1875), Mississippi (1878), Missouri (1879), North Carolina (1893), and Texas (1897). Each of the state-wide laws was addressed in Plaintiffs' opening brief. Br. 38–39. They (almost all explicitly, Indiana implicitly) sought to regulate the conduct of minors, and so are fundamentally dissimilar to the Handgun Ban. *Id.* The local restrictions should be disregarded both because they were "irrelevant" to most of the country, *Bruen*, 142 S. Ct. at 2154, and because, by virtue of being purely local, were lesser burdens on the right of 18-to-20-year-olds (who could leave town)

25

than the nationwide Handgun Ban. The Government's reliance on *State v. Callicutt*, 69 Tenn. 714 (1878), is also misplaced, again for the reasons Plaintiffs laid out in their opening brief. Br. 41–42.

## CONCLUSION

The district court's order should be reversed and this case should be remanded with instruction that judgment be entered in Plaintiffs' favor.

Dated: June 2, 2023                 Respectfully submitted,

                                    /s/David H. Thompson
George J. Armbruster, III           David H. Thompson
ARMBRUSTER & ASSOCIATES, APLC       *Counsel of Record*
332 E. Farrel Road, Suite D         Peter A. Patterson
Lafayette, LA 70508                 William V. Bergstrom
(337) 889-5511                      COOPER & KIRK, PLLC
george@arm-assoc.com                1523 New Hampshire Ave., NW
                                    Washington, D.C. 20036
                                    (202) 220-9600
                                    dthompson@cooperkirk.com

                                    Joseph Greenlee
                                    FPC ACTION FOUNDATION
                                    5550 Painted Mirage Road, Suite 320
                                    Las Vegas, Nevada 89149
                                    (916) 517-1665
                                    jgr@fpclaw.org

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit on June 2, 2023 by using the appellate CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.

Dated: June 2, 2023

<u>s/David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I certify that this Reply Brief of Plaintiffs-Appellants complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 6,396 words, excluding the parts exempted by FED. R. APP. P. 32(f).

This brief also complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 (Version 2212) in Times New Roman 14-point font.

Dated: June 2, 2023

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*