Cooper & Kirk
Lawyers
A Professional Limited Liability Company

David H. Thompson  
dthompson@cooperkirk.com

1523 New Hampshire Avenue, N.W.  
Washington, D.C. 20036

(202) 220-9600  
Fax (202) 220-9601

July 25, 2024

**VIA CM/ECF**

Mr. Lyle W. Cayce, Clerk  
U.S. Court of Appeals for the Fifth Circuit  
600 S. Maestri Place  
New Orleans, LA 70130-3408

 Re: *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 23-30033

Dear Mr. Cayce:

 We submit this letter brief in accordance with the Court's order of July 8, 2024, to address how the Supreme Court's decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), bears on this case. *Rahimi* reaffirmed the *Bruen* framework and undermines the Government's putative justifications for barring 18-to-20-year-olds from purchasing handguns in the regulated commercial market. *Rahimi* entirely rejects the premise that individuals can be disarmed merely because the Government believes they are not "responsible," and it demonstrates that any regulatory tradition outlining limitations on the Second Amendment right must have deeper foundations than the ones put forward by the Government in this case.

**I.**     ***Rahimi* Reaffirms That the Second Amendment's Plain Text Extends to All Americans.**

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). *Rahimi* reaffirms this "constitutional text and history" test, but *Rahimi* itself did no new textual analysis of its own because that ground was already covered by *Heller*. 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 22). This Court should follow the same approach and reject the Government's arguments that would carve 18-to-20-year-olds out of the Second Amendment's protections.

The Second Amendment's text protects the right to "retain [arms] in one's power or possession." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). But to *retain* arms, one must first *obtain* them. Accordingly, the circuit courts resoundingly hold that the Second Amendment's text covers purchasing firearms. *See* Pls' Br. at 11–12, Doc. 28 (Mar. 13, 2023) (collecting cases). And as Plaintiffs have argued at length, *Heller* defined "the people" as referring to the same group as the "people" whose rights are protected by the First and Fourth Amendments: "all Americans." 554 U.S. at 579–81; *see also Worth v. Jacobson*, No. 23-2248, 2024 WL 3419668, at *8 (8th Cir. July 16, 2024).

*Rahimi* alters none of this. Indeed, the Court apparently found the plain text so straightforward that its analysis immediately turned to historical firearms laws. *See* 144 S. Ct. at 1898–99. But the brevity of the Court's analysis is itself meaningful, for it demonstrates that the Second Amendment's presumptive protection of the rights of *all* "the people" is "unqualified." *Bruen*, 597 U.S. at 24, 26. *Rahimi* thus confirms that the Court can and should reject the Government's arguments that the text of the Second Amendment does not reach Plaintiffs or the act of purchasing from licensed dealers.

Resorting to modern psychology and out-of-context Founding-era quotes about imprudent minors, the Government contends that "[a]ge-based firearms regulations . . . accord with legislatures' more general authority to disarm groups historically deemed irresponsible." Appellees' Br. at 19, Doc. 32 (May 12, 2023) ("Gov't Br."). That argument was never a winner, and after *Rahimi* it does not even clear the starting blocks. There, the Government made a similar argument to exempt Rahimi from the Second Amendment's protections, *see* Br. for the United States at 11–13, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023), but the Court emphatically "reject[ed] the Government's contention that Rahimi may be disarmed simply because he is not 'responsible,'" *Rahimi*, 144 S. Ct. at 1903. Noting that "'[r]esponsible' is a vague term [and i]t is unclear what such a rule would entail," the Court

clarified that no such rule could be "derive[d] from our caselaw." *Id.* Recognizing this development, the Eighth Circuit concluded that in "the step one 'plain text' analysis, a claim that a group is 'irresponsible' or 'dangerous' does not remove them from the definition of the people." *Worth*, 2024 WL 3419668, at *8.

The Government also asserts that a miscellany of historical laws wholly unrelated to firearms reveals a general Founding-era distrust of 18-to-20-year-olds, and on that basis, exempts them from "the people" protected by the Amendment. Gov't Br. at 15–18. But under the *Bruen* framework, historical analogs are used to rebut the presumption of unconstitutionality that arises when a modern regulation infringes the plain text, *Bruen*, 597 U.S. at 24, not to decipher that text in the first place.

*Rahimi* thus leaves no doubt: ordinary "18 to-20-year-old [citizens] are unambiguously members of the people." *Worth*, 2024 WL 3419668, at *8.

II. **No Relevant Historical Tradition Prohibits Legal Adults from Buying Firearms.**

Because the challenged regulation is presumptively unconstitutional, the Government can justify it only "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. As *Rahimi* reaffirms, this "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" and requires

"ascertain[ing] whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29). The challenged age ban is irreconcilable with that balance.

A. *Rahimi* **Demonstrates That the Founding Is the Critical Period for Understanding the Scope of the Second Amendment.**

In *Rahimi*, the Court's conclusion that certain dangerous individuals could be disarmed on a temporary basis was firmly rooted in historical practice reaching back to the ratification of the Second Amendment. As the Court began its analysis: "*Since the founding*, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id*. at 1896 (emphasis added). The Court described the historical analogue test as "apply[ing] faithfully the balance struck *by the founding generation* to modern circumstances." *Id.* at 1898 (emphasis added) (quoting *Bruen*, 597 U.S. at 29). It explained that the Government could carry its burden "if laws *at the founding* regulated firearm use to address" similar problems. *Id.* (emphasis added). And it cautioned that a modern restriction "may not be compatible with the right if it [regulates] to an extent beyond what was done *at the founding*." *Id.* (emphasis added). From start to finish, and from the "how" to the "why" of firearm restrictions, *Rahimi* repeatedly stresses that Founding-era evidence controls.

Indeed, *Rahimi*'s ultimate conclusion that the law challenged there was consistent with the Second Amendment's historical scope was based on two "legal regimes" that were established "[b]y the 1700s and early 1800s." *Id.* at 1899. First, the Court cited a series of "surety laws" that were rooted in the common law and enacted in statutory form beginning in 1795. *Id.* at 1900. And second, the Court relied on various affray or "going armed" laws, which likewise came from common law and were codified in state statutes between 1751 and 1807. *Id.* at 1901. The Court concluded that Section 922(g)(8) is constitutional because "[t]his provision is 'relevantly similar' to those *founding era regimes* in both why and how it burdens the Second Amendment right." *Id.* (emphasis added).

The Court relied on these Founding-era legal restrictions because "the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law." *Id.* at 1924 (Barrett, J., concurring). But history "that long postdates ratification does not serve that function." *Id. Rahimi* thus repeatedly emphasizes the primacy of Founding-era evidence—both in principle and in practice.

That is fatal to the Government's case here, which primarily relies on mid-to-late-nineteenth-century laws, Gov't Br. at 32–33, and emphasizes the "prevalen[ce]" of age qualifications "today," *id.* at 38. But when it comes to analogous *Founding-*

*era* regulations, the Government comes up empty. Instead of relying on a "historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, it points to a smattering of statements in which "the founders designated those under the age of 21 as 'infants,'" Gov't Br. at 35. But Appellants are adults, not infants. And none of those statements called 18-to-20-year-olds' *firearm* rights into doubt anyway.

When it comes to actual Founding-era regulations, the best the Government can muster is a series of college resolutions restricting gun use. As the Government concedes, those restrictions were not justified as age qualifications. Instead, they were justified by the *in loco parentis* authority schools exercised over students' otherwise-protected activity. *See id*. at 35–36. The policing laws invoked by the Government were predicated on minority status, *id.* at 37–38, and they are also distinguishable on other grounds, *see* Pls.' Reply Br. at 19–21, Doc. 48 (June 2, 2023).

B. ***Rahimi* Also Undermines the Government's Nineteenth-Century Historical Arguments.**

*Rahimi* further confirms that Appellees' nineteenth-century laws fail to justify the challenged restriction even setting aside the Government's fatal timing problem. *Rahimi* reiterated that the Second Amendment inquiry centers on broad, mainstream traditions, not isolated outliers. Surety practices, for instance, were "[w]ell entrenched in the common law" and codified in at least ten states. 144 S. Ct. at 1900. Similarly, the affray (or "going armed") prohibitions "were incorporated into

American jurisprudence through the common law" and codified in several state statutes. *Id.* at 1901. By contrast, *Bruen* rejected New York's mid-to-late-nineteenth-century evidence as "a few late-in-time outliers" that did not demonstrate a tradition of "broadly prohibit[ing] the public carry of commonly used firearms." 597 U.S. at 70.

The Government's nineteenth-century laws in this case suffer from precisely the same defects as in *Bruen*. The Government relies on a territorial law of the type rejected in *Bruen*, *see id.* at 67; local laws that are "irrelevant" to most of "the American population," *id.*; laws from Southern states targeting slaves or "free negroes"; and several more from states with no Second Amendment analog (and therefore no "judicial scrutiny" to test their "legality," *id.* at 68). *See* Pls.' Reply Br. at 24–26. Under *Bruen*, those purported analogs count for little. The Government is left with just six outlier state laws—a small minority, not a "broad tradition of States," *Bruen*, 597 U.S. at 70—and *even those six laws* are disanalogous in fundamental ways, *see* Pls.' Reply Br. at 25.

Furthermore, the present ban on 18-to-20-year-olds purchasing handguns from licensed dealers is not supported by "the principle[] that underpin[s] [the Government's asserted] regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Justice Barrett's concurrence in *Rahimi* cautions that courts assessing historical analogies must

"be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 1926 (Barrett, J., concurring). And here, while the challenged restriction prohibits a subset of legal *adults* from buying handguns, the Government's nineteenth-century historical laws only applied to *minors*. Pls.' Br. at 38–39; *see Worth*, 2024 WL 3419668, at *14 (finding the same laws disanalogous on those grounds). The *why* of these historical laws thus precludes their use in this case.

In relying on these laws, the Government effectively advocates for "a law trapped in amber," *Rahimi*, 144 S. Ct. at 1897: a regime where even though the age of majority may "fluctuate," the Government's power to disarm 18-to-20-year-olds can *always* be excused by historical prohibitions that arose in a different legal environment, *see* Gov't Br. at 30. After *Rahimi*, just as before, the Court should reject that contention.

Sincerely,

/s/David H. Thompson
David H. Thompson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel of Record for Plaintiffs-Appellants*

cc: All counsel of record via CM/ECF