

U.S. Department of Justice

Civil Division

950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: (202) 514-2498

July 25, 2024

<u>**VIA CM/ECF**</u>

Mr. Lyle W. Cayce, Clerk
Office of the Clerk
U.S. Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408

    Re:   *Reese v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 23-30033 (oral argument held on November 6, 2023)
            <u>Supplemental Letter Brief for the United States</u>

Dear Mr. Cayce,

    The government respectfully submits this supplemental letter brief in response to the Court's order directing the parties to address the Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024). In *Rahimi*, the Court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8), the federal prohibition on the possession of firearms by individuals subject to certain domestic violence restraining orders. Although *Rahimi*'s holding is limited to the constitutionality of that prohibition, its reasoning supports the conclusion that 18 U.S.C. § 922(b)(1) and (c)(1), which bar the commercial sale of handguns to individuals under the age of 21, comport with the Second Amendment. *Rahimi* also rejects the unduly rigid approach to historical analysis on which plaintiffs' arguments in this case depend.

## A. *Rahimi* Clarifies the Analytical Framework Governing Second Amendment Challenges

In upholding the federal prohibition challenged in *United States v. Rahimi*, the Supreme Court explained that "some courts have misunderstood the methodology of our recent Second Amendment cases." 144 S. Ct. at 1897. Those cases "were not meant to suggest a law trapped in amber" because the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. As Justice Barrett emphasized in concurrence, "a test that demands overly specific analogues" would involve "serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices" and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring).

Instead, the Court held that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898 (emphasis added). Under this analysis, "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* Thus, even "when a challenged regulation does not precisely match its historical precursors," it may still "pass constitutional muster" if it "comport[s] with the principles underlying the Second Amendment." *Id.* (quotation marks omitted).

*Rahimi* recognized that this test affords legislatures significant leeway to enact firearms regulations. The Court observed that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Rahimi*, 144 S. Ct. at 1897 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Consistent with that understanding of the right, the Court noted that historical legislatures enacted a "rang[e]" of firearms regulations. *Id.* The Court further noted that "many" modern firearms regulations are "'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26). By way of example, the Court cited a passage in *Heller* that approved prohibitions on the possession of firearms "by felons and the mentally ill" as well as "laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27.

This analytical framework is illustrated by its application to the federal prohibition on firearm possession by individuals subject to domestic violence restraining orders. In sustaining that prohibition, the Supreme Court recognized that the government had "offer[ed] ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Rahimi*, 144 S. Ct. at 1898. That historical evidence included surety laws, which authorized magistrates to

"require individuals suspected of future misbehavior to post a bond," and "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 1900-01. There are a number of differences between these historical laws and the challenged modern prohibition. For example, "[a]fter providing sureties, a person kept possession of all his firearms," and "[e]ven if he breached the peace," the penalty "was that he and his sureties had to pay a sum of money," rather than forfeit weapons or face imprisonment. *Id.* at 1939 (Thomas, J., dissenting). Likewise, going armed laws generally applied to "public" misconduct, not to the "conduct [the modern prohibition] seeks to prevent—interpersonal violence in the home." *Id.* at 1942 (Thomas, J., dissenting).

The Court recognized that the challenged prohibition "is by no means identical to these founding era regimes," but held that "it does not need to be." *Rahimi*, 144 S. Ct. at 1901. Instead, the Court found it sufficient that the prohibition "is 'relevantly similar'" to historical laws "in both why and how it burdens the Second Amendment right." *Id.* (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29 (2022)). With respect to the prohibition's rationale, the Court explained that both the modern law and its historical antecedents regulate "individuals found to threaten the physical safety of another." *Id.* And with respect to the prohibition's scope, the Court emphasized that "like surety bonds of limited duration," the modern law "only prohibits firearm possession so long as the defendant 'is' subject to a restraining order," and thus involves "temporary" disarmament. *Id.* at 1902 (quoting 18 U.S.C. § 922(g)(8)). The Court further emphasized that as with historical "going armed laws," the modern prohibition's penalties include "imprisonment." *Id.* By viewing the distinct features of surety and going armed laws in combination, the Court had "no trouble" concluding that the challenged prohibition accords with "[o]ur tradition of firearm regulation." *Id.*

### B. The Analytical Framework Articulated in *Rahimi* Confirms the Constitutionality of the Federal Restrictions

The federal restrictions at issue here are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

**1.** One principle that emerges from the historical record is that legislatures hold authority to restrict access to arms by underage individuals. As the government has explained, the founders established age qualifications for a variety of important activities, from voting to entering contracts. *See* Gov't Br. 16-19. There is no historical basis for concluding that the founders viewed the Second Amendment as precluding legislatures from adopting similar qualifications in regulating access to arms.

For as long as legislatures have codified age restrictions for the purchase of handguns, they have drawn the line at age 21. At the founding, handguns were rare, fired only one shot, often misfired, took a long time to load, and could not be kept loaded for

3

extended periods. *See* Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, in Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 113, 117-18 (2019). By the mid-nineteenth century, "a burst of innovations in the arms industry" resulted in revolvers that could be loaded and fired quickly. *Id.* at 121-24.

As handguns became more lethal and more widespread, legislatures moved to limit the sale of those weapons to underage individuals. Before the Fourteenth Amendment's passage, several states enacted laws preventing the provision of handguns to minors, a term that at the time referred to those under the age of 21. *See* Gov't Br. 31-32.[1] By the close of the nineteenth century, at least 20 jurisdictions prohibited 18-to-20-year-olds from purchasing handguns without the approval of their parents or guardians. *See* Gov't Br. 32-34.[2] Those prohibitions were upheld by courts, *see State v. Callicutt*, 69 Tenn. 714, 716-17 (1878), endorsed by commentators, *see* Thomas M. Cooley, *A Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883), and approved by the public at large, *see* Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* ch. 4 & n.211-12 (2019).

The limited federal restrictions at issue here fit within this tradition. Sections 922(b)(1) and (c)(1) prohibit federal firearms licensees from selling handguns to 18-to-20-

---

[1] Relevant historical laws include: Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245; Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17, 17; *The Code of Tennessee* pt. IV, tit. 1, ch. 9, art. II, § 4864, at 871 (Return J. Meigs & William F. Cooper eds., 1858).

[2] Relevant historical laws include: Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17, 17; *Proceedings of the Common Council of the City of Chicago for the Municipal Year 1872-3*, at 113-14 (1874); Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716, 716; Act of July 13, 1892, ch. 159, 27 Stat. 116, 116-17 (District of Columbia); Act of Feb. 17, 1876, No. CXXVIII (O. No. 63), § 1, 1876 Ga. Laws 112, 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73, 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86, 86; Act of Mar. 5, 1883, ch. CV, §§ 1-2, 1883 Kan. Sess. Laws 159, 159; *Laws of Nebraska Relating to the City of Lincoln* pt. 2, ch. 11, art. XXVI, §§ 2, 5, at 237-38 (L.W. Billingsley & R.J. Greene eds., 1895); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39, 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656, 656; Act of Feb. 28, 1878, ch. 46, §§ 1-2, 1878 Miss. Laws 175, 175; 1 *The Revised Statutes of the State of Missouri* § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51, 51; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. L. & Res. 468, 468; 1897 Tex. Gen. Laws 221, 221-22, ch. 155, § 1; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421-22; Act of Apr. 3, 1883, ch. 329, §§ 1-2, 1883 Wis. Sess. Laws 290, 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140.

year-olds. They do not prevent those individuals from "possess[ing] and us[ing] handguns." *National Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F.3d 185, 189 (5th Cir. 2012). Nor do they prevent underage individuals from obtaining handguns "through unlicensed, private sales" or "from parents or guardians." *Id.* at 190-91. The restrictions therefore fall within the class of "commercial sale" regulations that the Supreme Court has repeatedly identified as "presumptively constitutional." *Rahimi*, 144 S. Ct. at 1923 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 627; citing *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)).

Sections 922(b)(1) and (c)(1) bear at least as close a resemblance to historical laws as the modern prohibition that *Rahimi* had "no trouble" upholding. 144 S. Ct. at 1902. As a leading nineteenth century judicial decision observed, historical laws were designed "to prevent crime" that results when under-21-year-olds have unrestricted access to handguns. *Callicutt*, 69 Tenn. at 716. Here, likewise, Sections 922(b)(1) and (c)(1) reflect a congressional judgment "that persons under 21 . . . can be prone to violent crime." *NRA*, 700 F.3d at 206 (citing Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(6), 82 Stat. 197, 225-26). Thus, the federal restrictions represent one application of legislatures' larger authority to restrict arms-bearing by "categories of persons" that "present a special danger of misuse," an authority on which *Rahimi* took pains not to cast doubt. 144 S. Ct. at 1901.

As in *Rahimi*, the restrictions at issue here are not "identical" to historical laws, "but [they] do[] not need to be." 144 S. Ct. at 1901. The restrictions are "relevantly similar" to their historical counterparts in all material respects. *Id.* They regulate the transfer of the same category of weapons (handguns), by the same providers (commercial sellers), to the same individuals (those under the age of 21), for the same "limited duration," *id.* at 1902 (until an individual turns 21). Historical tradition therefore "confirm[s] what common sense suggests," *id.* at 1901: underage individuals are not constitutionally entitled to obtain lethal weapons without parental approval.

The congruence between the federal restrictions and historical laws is further illustrated by their shared emphasis on empowering parents to supervise access to arms. Founding Era parents generally retained substantial authority to oversee individuals under the age of 21. *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 821-31 (2011) (Thomas, J., dissenting). Many nineteenth century laws likewise barred under-21-year-olds from purchasing handguns commercially but allowed them to obtain those weapons through their parents. *See, e.g.*, Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245 (preventing anyone other than a parent or guardian from providing "any pistol[] . . . or other deadly weapon[], which is carried concealed, to any minor"). The same calibrated approach, which does not preclude access to handguns altogether and instead empowers

parents to determine whether underage individuals can use those weapons safely, animates the modern restrictions.[3]

**2.** Plaintiffs' arguments are premised on the unduly narrow historical analysis that *Rahimi* rejected.

**a.** Plaintiffs do not contest that Founding Era legislatures established age qualifications for a variety of important activities. Nor do plaintiffs dispute that numerous nineteenth century legislatures prohibited the sale of handguns to individuals under the age of 21. Instead, plaintiffs urge the Court to ignore all of this historical evidence. Plaintiffs suggest (Reply Br. 19-21) that Founding Era laws are relevant only if they parallel the modern restrictions in all respects. And they claim (Reply Br. 22) that nineteenth century evidence came "too late" to inform the historical analysis.

*Rahimi* leaves no room for either of these arguments. As an initial matter, *Rahimi* makes clear that what matters is not whether a modern law imitates a "historical twin," but whether it accords with the "principles underlying the Second Amendment." 144 S. Ct. at 1898. As discussed, the Second Amendment's ratifiers understood legislatures as holding authority to implement an age qualification of 21 for various activities, and there is no evidence that they regarded the Amendment as precluding the adoption of similar qualifications for access to arms. Plaintiffs' demand for a Founding Era "twin" both disregards *Rahimi*, *id.*, and mistakenly "assumes that founding-era legislatures maximally exercised their power to regulate," *id.* at 1925 (Barrett, J., concurring).

In any event, "post-ratification history"—including the nineteenth century laws plaintiffs urge this Court to ignore—represents "a proper tool to discern constitutional meaning." *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring). As Justice Kavanaugh explained in concurrence, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." *Id.* at 1917. "Reliance on post-ratification history" has thus "shaped scores of Court cases spanning all domains of

---

[3] The Eighth Circuit recently sustained a Second Amendment challenge to a state age-based firearms regulation. *See Worth v. Jacobson*, No. 23-2248 (8th Cir. July 16, 2024). For the reasons given in the federal government's amicus brief in that case, that decision is incorrect. *See* Amicus Brief for the United States, *Worth v. Jacobson*, No. 23-2248 (8th Cir. July 18, 2023). In any event, the law challenged in *Worth* differs materially from the federal restrictions at issue here. In contrast to those restrictions, the state law "ban[ned] those under 21 years old from carrying handguns in public." Op. 3. The Eighth Circuit therefore viewed the state law as distinct from the many historical regulations that prohibited "the *sale* or *furnishing* of weapons" to underage individuals without preventing those individuals from "publicly bear[ing] arms." Op. 25-26. As explained in this brief and in the government's other filings, the Second Amendment does not strip legislatures of authority to prohibit the commercial sale of handguns to 18-to-20-year-olds.

constitutional law, every era of the nation's history, and Justices of every stripe." *Id.* at 1918 (quotation marks omitted); *see also id.* (citing dozens of Supreme Court decisions that look to post-ratification history). Justice Barrett likewise recognized that "postenactment history can be an important tool." *Id.* at 1924 (Barrett, J., concurring). The relevance of post-ratification history is especially apparent here, where that evidence reflects a tradition of age-based firearms regulations extending across many states and enduring for much of our Nation's history.

Plaintiffs' other grounds for disregarding nineteenth century evidence are similarly incompatible with *Rahimi*. Plaintiffs offer a highly selective account that addresses each historical law in isolation instead of deriving traditional principles by looking to historical laws when "[t]aken together." *Rahimi*, 144 S. Ct. at 1901. Plaintiffs' historical account also fails on its own terms, resting on the premise, rejected in *Rahimi*, that modern regulations must be "identical to ones that could be found in 1791," *id.* at 1898; *see* Gov't Br. 42-44.

**b.** *Rahimi* also precludes plaintiffs' alternative argument that historical laws barring the sale of arms to 18-to-20-year-olds were constitutional at the time they were passed but are impermissible today because states have altered the age of majority for certain activities unrelated to firearms. Under this theory, the federal restrictions were constitutional upon their enactment in 1968—when 21 remained the age of majority for most purposes in most states—and would become constitutional again if states return to that approach. Indeed, plaintiffs' position appears to dictate that the federal restrictions are still permissible in those states—including a state in this circuit, *see* Miss. Code Ann. § 1-3-27—that retain 21 as the age of majority.

Nothing in *Rahimi* justifies plaintiffs' uncertain and unstable understanding of the Second Amendment. There is no plausible historical "principle[]" that would require legislatures to establish identical age qualifications for access to arms as for activities that do not involve deadly weapons. *Rahimi*, 144 S. Ct. at 1898. Plaintiffs identify no evidence that the founders or their descendants viewed legislative authority to restrict access to arms by 18-to-20-year-olds as contingent on their status as minors. To the contrary, a number of historical laws described the class of regulated individuals by reference to their age, without regard to their classification as minors for other purposes.[4]

In any case, the modern practices on which plaintiffs seek to rely confirm that legislatures retain authority to establish an age qualification of 21. Legislatures continue to set 21 as the minimum age for certain activities, including "purchas[ing] alcohol" and "purchas[ing] lottery tickets." *NRA*, 700 F.3d at 204 n.17. With respect to firearms in particular, in recent years "[m]any States (and the District of Columbia)" have restricted

---

[4] *See, e.g.*, Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421-22; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140.

7

"the sale of handguns to persons under 21." *Id.* at 190 n.4. The age qualifications at issue here thus fall within the range accepted by historical and modern legislatures alike.

**c.** Plaintiffs' other arguments likewise derive no support from *Rahimi*. Although plaintiffs invoke Founding Era militia laws, those laws only serve to underscore legislatures' authority to restrict access to arms by 18-to-20-year-olds. *See* Gov't Br. 23-26. In any event, the Supreme Court has stated that the Second Amendment codifies "an individual right unconnected to militia service." *Heller*, 554 U.S. at 611. Consistent with that statement, *Rahimi*—like *Heller* and *Bruen*—does not rely on militia laws.

Nor do plaintiffs advance their argument by citing (*see* Pls.' July 5, 2024 Letter) *Rahimi*'s discussion of "citizens who [a]re not 'responsible,'" 144 S. Ct. at 1903. In *Heller* and *Bruen*, the Court described the Second Amendment as protecting "responsible" citizens, *see, e.g.*, *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 70, and the government has accordingly used the term "irresponsible" as a shorthand for those individuals whose possession of firearms would endanger themselves or others, *see, e.g.*, Gov't Br. 19-21. In *Rahimi*, the Court noted that while its prior decisions "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," those decisions "said nothing about the status of citizens who were not 'responsible'" because the government's authority to disarm those citizens "was simply not presented." 144 S. Ct. at 1903 (quoting *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 70). The Court made clear, however, that although it declined to adopt the term "irresponsible," it did not "suggest that the Second Amendment prohibits the enactment of laws" disarming "categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901. As explained, historical tradition establishes that underage individuals constitute one such category.

\*     \*     \*

For the reasons given above and in the government's other filings, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney
     General*

BRANDON BONAPARTE BROWN
   *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

 s/ *Steven H. Hazel*
STEVEN H. HAZEL
   *Attorneys, Appellate Staff
   Civil Division, Room 7217
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 514-2498
   Steven.H.Hazel@usdoj.gov*

# CERTIFICATE OF COMPLIANCE

This letter brief complies with the page limit established by this Court's July 8, 2024, order because it does not exceed ten pages, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally-spaced typeface.

*/s/ Steven H. Hazel*
Steven H. Hazel

# CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2024, I electronically filed the foregoing with the Clerk of the Court of the U.S. Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

<i>/s/ Steven H. Hazel</i><br>
Steven H. Hazel