**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**November 5, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

ROCKY MOUNTAIN GUN
OWNERS; TATE MOSGROVE;
ADRIAN S. PINEDA,

      Plaintiffs - Appellees,

v.

JARED POLIS, in his official
capacity as Governor of the State of
Colorado,

      Defendant - Appellant.

------------------------------

STATE OF ILLINOIS; STATE OF
ARIZONA; STATE OF
CALIFORNIA; STATE OF
CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF
COLUMBIA; STATE OF
MICHIGAN; STATE OF HAWAII;
STATE OF MINNESOTA; STATE
OF MARYLAND; STATE OF
NEVADA; STATE OF
MASSACHUSETTS; STATE OF
NEW JERSEY; STATE OF NEW
YORK; STATE OF OREGON; STATE
OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF
VERMONT; STATE OF
WASHINGTON; MARCH FOR OUR
LIVES FOUNDATION; GUN

No. 23-1251

OWNERS FOR SAFETY; DENVER
PUBLIC SCHOOLS; EVERYTOWN
FOR GUN SAFETY; BRADY
CENTER TO PREVENT GUN
VIOLENCE; NATIONAL
SHOOTING SPORTS
FOUNDATION, INC.; FIREARMS
POLICY COALITION; FPC ACTION
FOUNDATION,

      Amici Curiae.

—————————————————

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:23-CV-01077-PAB-NRN)**

—————————————————

Shannon Wells Stevenson, Solicitor General (Philip J. Weiser, Attorney
General, Grant T. Sullivan, Assistant Solicitor General, Michael T. Kotlarczyk,
Senior Assistant Solicitor General, Matthew J. Worthington, Assistant
Attorney General, with her on the briefs) Colorado Department of Law,
Denver, Colorado, for Defendant-Appellant.

Barry K. Arrington, Arrington Law Firm, Denver, Colorado, for Plaintiffs-
Appellees.

Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Alex
Hemmer, Deputy Solicitor General, and John R. Milligan, Assistant Attorney
General, Office of the Attorney General for the State of Illinois, Chicago,
Illinois, filed an amicus curiae brief for District of Columbia, State of Arizona,
State of California, State of Connecticut, State of Delaware, State of Hawaii,
State of Illinois, State of Maryland, State of Massachusetts, State of Michigan,
State of Minnesota, State of Nevada, State of New Jersey, State of New York,
State of Oregon, State of Pennsylvania, State of Rhode Island, State of
Vermont, and State of Washington.

Ciara Malone, March for Our Lives Foundation, New York, New York, and
James C. Dugan, Willkie Farr & Gallagher LLP, New York, New York, filed
an amicus curiae brief for March for Our Lives Foundation.

Sophie A. Kivett, Sullivan & Cromwell LLP, New York, New York, filed an amicus curiae brief for Gun Owners for Safety.

Janet Carter, Everytown Law, New York, New York, filed an amicus curiae brief for Everytown for Gun Safety.

Jared R. Ellis, Hall & Evans, LLC, Denver, Colorado, filed an amicus curiae brief for Denver Public Schools.

Patrick Hall, Arnold & Porter Kaye Scholer LLP, Denver, Colorado, Rebecca Zoller, Arnold & Porter Kaye Scholer LLP, New York, New York, and Matthew Diton, Arnold & Porter Kaye Scholer LLP, San Francisco, California, filed an amicus curiae brief for Brady Center to Prevent Gun Violence.

Michael L. Rice, Harrison Law LLC, Chicago, Illinois, filed an amicus curiae brief for National Shooting Sports Foundation, Inc.

Joseph G.S. Greenlee, Greenlee Law, PLLC, McCall, Idaho, filed an amicus curiae brief for FPC Action Foundation and Firearms Policy Coalition.

―――――――――――――――

Before **McHUGH**, **MURPHY**, and **FEDERICO**, Circuit Judges.

―――――――――――――――

**FEDERICO**, Circuit Judge.

―――――――――――――――

On April 28, 2023, Colorado Governor Jared Polis signed a law duly enacted by the Colorado General Assembly that established twenty-one (21) as the minimum age for the sale and purchase of guns in Colorado. The law was to take effect on August 7, 2023. Plaintiffs, two Coloradans and a firearms advocacy group, filed suit in federal court and moved for a preliminary injunction. Without a hearing, on August 7 – the day the law was to take effect – the district court granted Plaintiffs' motion and enjoined

3

the enforcement of the law, thus stopping the law from taking effect. On behalf of the People of Colorado, Governor Polis timely appealed.

We have jurisdiction under 28 U.S.C. § 1292(a)(1). As set forth below, we reverse the district court's order and remand with instructions to dissolve the injunction.

## I

## A

At the heart of this case is Colorado Senate Bill 23-169 ("SB 23-169"). Colo. Gen. Assemb. 23-169, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023). The elected representatives of the people of Colorado in the General Assembly enacted this law to reduce youth suicide and accidental death, mass shootings, and overall gun violence. SB 23-169 was to become effective on August 7, 2023. Once in effect, the act would raise the minimum age to purchase a firearm in Colorado from 18 to 21, amending Sections 18-12-112 and 18-12-112.5 of the Colorado Revised Statutes, two provisions in the Colorado Criminal Code.

SB 23-169 begins by altering Section 18-12-112, which governs private firearms transfers. As amended, Section 18-12-112 would include two additional provisions:

- **Seller restriction**. "A person who is not a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age."

- **Buyer restriction**. "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm."

Colo. Rev. Stat. § 18-12-112(2)(e), (2)(f). Violating either of these provisions constitutes a class 2 misdemeanor. *Id.* at § 18-12-112(9)(a). Additionally, the offender would be prohibited from possessing a firearm for two years, starting from the date of conviction. *Id.*

Next, SB 23-169 amends Section 18-12-112.5, which governs firearms transfers by licensed gun dealers. The revised Section 18-12-112.5 includes the following two new provisions:

- **Seller restriction**. "A person who is a licensed gun dealer shall not make or facilitate the sale of a firearm to a person who is less than twenty-one years of age."

- **Buyer restriction**. "It is unlawful for a person who is less than twenty-one years of age to purchase a firearm."

*Id.* at § 18-12-112.5(1)(a.3), (a.5). Transferring or selling a firearm in violation of these provisions is a class 1 misdemeanor, while purchasing a firearm in violation of these provisions is a class 2 misdemeanor. *Id.* at § 18-12-112.5(1)(b), (c). Of relevance, federal law has long prohibited licensed gun dealers from selling firearms to anyone under 21, except shotguns or rifles which may be sold to those over 18. 18 U.S.C. § 922(b)(1) (enacted in 1968).

Sections 18-12-112 and 18-12-112.5 include exceptions for firearm sales to persons under 21 if the purchaser is:

- an active-duty member of the United States Armed Forces while on duty and serving in conformance with the policies of the United States Armed Forces,

- a peace officer, as defined in Section 16-2.5-101 of the Colorado Revised Statutes, while on duty and serving in conformance with the policies of their employing agency, as set forth in Sections 16-2.5-101 and 16-2.5-135, or

- an individual "certified by the P.O.S.T. board" per Section 16-2.5-102 of the Colorado Revised Statutes, such as a sheriff or police officer.

*Id.* at §§ 18-12-112(2)(g)(I)–(III), 18-12-112.5(1)(a.5)(I)–(III).

SB 23-169 neither prohibits individuals aged 18 to 20 from possessing and using firearms – for self-defense or otherwise – nor bars them from otherwise acquiring, inheriting, or receiving firearms as gifts.

**B**

Prior to the law taking effect, Plaintiffs Rocky Mountain Gun Owners ("RMGO"), Tate Mosgrove ("Mosgrove"), and Adrian S. Pineda ("Pineda") (collectively "Plaintiffs") challenged SB 23-169[1] as allegedly infringing upon

---

[1] We note Plaintiffs do not challenge 18 U.S.C. § 922(b)(1) as unconstitutional. Additionally, Plaintiffs make no argument that the unamended versions of Sections 18-12-112 and 18-12-112.5 of the Colorado Revised Statutes, which set a minimum purchase age of 18, are unconstitutional.

their rights under the Second Amendment to the United States Constitution.

RMGO is a nonprofit organization with a mission of defending "the right of all law-abiding individuals to keep and bear arms." Aplt. App. I at 58. Mosgrove and Pineda are both citizens of Colorado and the United States, and neither has been charged with, nor convicted of, any misdemeanor or felony offense. They also do not purport to be military or law enforcement members. At the time of filing the operative complaint, both Mosgrove and Pineda were over the age of 18 but under the age of 21. During the pendency of this appeal, however, Mosgrove reached the age of 21. Pineda, on the other hand, is still between 18 and 20.

Prior to SB 23-169's effective date, both Mosgrove and Pineda had the "intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in [their] home[s]." *Id.* at 58–59. Once enforced, SB 23-169 would have precluded them from purchasing a firearm.

## II

On April 28, 2023, Plaintiffs initiated this action in the United States District Court for the District of Colorado. They filed their operative complaint on May 26, 2023, against Governor Polis in his official capacity, asserting a single count under 42 U.S.C. § 1983. Therein, Plaintiffs alleged that SB 23-169 infringed upon their Second Amendment right to acquire

firearms by prohibiting them from purchasing them. Plaintiffs requested declaratory and injunctive relief, as well as actual or nominal damages.

On June 7, 2023, Plaintiffs filed a motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), seeking to enjoin enforcement of SB 23-169 two months before it was to go into effect. In support of their motion, the only evidence they included was a declaration from each plaintiff.

Governor Polis responded, explicitly waiving his Eleventh Amendment immunity from suit, and attached declarations from the following individuals in support of SB 23-169's constitutionality:

- **Dr. Saul Cornell:** Dr. Cornell is the Paul and Diane Guenther Chair in American History at Fordham University. He provides an expert opinion on "the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of sales of and access to firearms of those below the age of 21, including those old enough to participate in the militias." *Id.* at 147.

- **Dr. Robert Spitzer:** Dr. Spitzer is a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. He provides an expert opinion on "the history of firearms restrictions as they pertain to minors, enacted in the eighteenth, nineteenth, and early twentieth centuries." Aplt. App. II at 7.

- **Dr. Brennan Rivas:** Dr. Rivas is a historian specializing in the regulation of weapons in American history. She provides an expert opinion on "historical regulations that prohibited the possession, carrying, and sale of certain weapons." *Id.* at 125.

- **Dr. Laurence Steinberg:** Dr. Steinberg is a Distinguished University Professor and the Laura H. Carnell Professor of Psychology and Neuroscience at Temple University. He provides an expert opinion on "whether the current scientific understanding of development in adolescence and young adulthood supports regulating the purchase of firearms by adults aged 18 to 20 through statutes such as those at issue in this case; and whether the statutes are likely to reduce firearm-related crimes, deaths, and injuries in Colorado." *Id.* at 160.

On August 7, 2023, the same day SB 23-169 was to go into effect, the district court granted the request for injunctive relief and enjoined enforcement of SB 23-169 until disposition of the case on the merits. First, the district court concluded that RMGO lacked standing to seek an injunction either on its own right or on behalf of its members but that Mosgrove and Pineda had each established standing. Then, proceeding to the merits, the district court determined that Mosgrove and Pineda demonstrated a likelihood of success on the merits of their Second Amendment challenge.

Specifically, the district court concluded: (1) Mosgrove and Pineda properly established that their proposed conduct is covered by the plain text of the Second Amendment; (2) SB 23-169 is not a presumptively lawful firearm regulation; and (3) Governor Polis failed to meet his burden of demonstrating that SB 23-169 is consistent with our Nation's historical tradition of firearms regulation. Lastly, the district court ruled that the

9

three remaining preliminary injunction factors weighed in Mosgrove and Pineda's favor.

On August 11, 2023, Governor Polis filed a motion for a stay of the preliminary injunction pending appeal, which the district court denied. Governor Polis then timely filed an interlocutory appeal, pursuant to 28 U.S.C. § 1292(a)(1), of the district court's order granting the request for a preliminary injunction.

On appeal, Governor Polis argues the district erred by concluding:

- Mosgrove and Pineda have standing when they did not state concrete plans to purchase guns after SB 23-169 went into effect;

- the Second Amendment's plain text covers Mosgrove and Pineda's desires to buy guns before they turn 21;

- SB 23-169's minimum age restriction is not presumptively lawful;

- SB 23-169's minimum age restriction is not consistent with our Nation's historical tradition of gun regulation; and

- Mosgrove and Pineda satisfied the remaining preliminary injunction factors.

To date, SB 23-169 remains enjoined by the district court's order.

# III

# A

Justiciability being a prerequisite to our jurisdiction, we first assess whether Mosgrove and Pineda's challenge to SB 23-169 is justiciable.[2] Mosgrove and Pineda sought to enjoin enforcement of SB 23-169 as unconstitutional before it was to take effect. However, during the pendency of this appeal, Mosgrove turned 21, thereby rendering his challenge to SB 23-169 moot. *See, e.g.*, *Atherton Mills v. Johnston*, 259 U.S. 13, 15–16 (1922) (holding action moot once plaintiff reached an age that made them no longer subject to the statute at issue); *Worth v. Jacobson*, 108 F.4th 677, 685 (8th Cir. 2024) (same). As such, we dismiss Mosgrove from this appeal and focus our analysis solely on Pineda's eligibility to challenge the statute.

To establish standing and in support of Plaintiffs' motion for a preliminary injunction, Pineda submitted a declaration, which reads as follows:

> 1. My name is Adrian Pineda. I am over the age of 18 and have personal knowledge of the matters set forth in this Declaration.
>
> 2. I am over the age of 18 but under the age of 21 and a citizen of Colorado and the United States. I have never been charged with nor convicted of any misdemeanor or felony offense. It is my present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in my home. I am or

---

[2] Because Plaintiffs did not cross-appeal the district court's denial of standing as to RMGO, our analysis concerns only Mosgrove and Pineda.

soon will be precluded from purchasing a firearm by SB23-169, which bars me from exercising this fundamental right to keep and bear arms for lawful purposes protected by the Second Amendment.

Aplt. App. I at 90–91.

Governor Polis argues Pineda's declaration is insufficient to establish standing, specifically challenging whether Pineda has adequately demonstrated an injury-in-fact. We address each standing element in turn.

**B**

Article III of the Constitution confines the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. A "Case" or "Controversy" must be justiciable. To satisfy Article III's justiciability requirements, (1) a plaintiff must have standing, (2) their claims must not have become moot, and (3) their case must be ripe for review. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 159, 171 & n.3 (1970) (Brennan, J., concurring and dissenting). "We review questions of justiciability de novo." *Awad v. Ziriax*, 670 F.3d 1111, 1119–20 (10th Cir. 2012) (quoting *Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1114 (10th Cir. 2008)).

Standing ensures the plaintiff "ha[s] a 'personal stake' in the dispute," distinguishing them from "a mere bystander." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *TransUnion LLC v. Ramirez*, 594

U.S. 413, 423 (2021)). This personal stake requirement guarantees "that courts decide litigants' legal rights in specific cases, as Article III requires," and "do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982)).

To establish standing, a plaintiff must prove: (1) they "ha[ve] suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief." *Id.* at 380. In other words, "a plaintiff must establish three elements: an injury-in-fact, causation, and redressability." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

The plaintiff "bears the burden of establishing standing as of the time [they] brought th[e] lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)) (second alteration in original). And "[e]ach plaintiff must have standing to seek each form of relief in each claim." *Bronson*, 500 F.3d at 1106.

Standing must be substantiated "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that [they] [are] 'likely' to establish each element of standing." *Murthy*, 144 S. Ct. at 1986 (quoting *Winter*, 555 U.S. at 22). The type of evidence that must be presented to make this showing depends on the necessity and status of discovery in the case. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("'[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.' A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules." (quoting *Uni. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981))). If the information pertaining to standing is in the plaintiff's possession (as in this case), the plaintiff neither alleges nor makes a showing that discovery is essential to proving standing, or discovery has already been conducted, then the plaintiff must move beyond the "mere allegations" in their pleadings and provide specific facts, supported by affidavits or other evidence, to demonstrate standing. *Murthy*, 144 S. Ct. at 1986 (applying summary judgment standard for establishing

standing at preliminary injunction stage where the parties conducted discovery).

1

The first standing element, injury-in-fact, acts "to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context . . . ." *Dir., Off. of Workers' Comp. Programs v. Perini N. River Assocs.*, 459 U.S. 297, 305 (1983) (quoting *Valley Forge Christian Coll.*, 454 U.S. at 472). This fosters "a realistic appreciation of the consequences of judicial action, as well as [] assure[s] an actual factual setting in which the litigant asserts a claim of injury in fact." *Id.* (quoting *Valley Forge Christian Coll.*, 454 U.S. at 472) (internal quotation marks omitted). To establish an injury-in-fact, a plaintiff must show that they have suffered or likely will suffer "an invasion of a legally protected interest" that is both (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (internal quotation marks omitted).

*Concrete and particularized*. To elaborate, for an injury to be "concrete," it must be "de facto," it must "exist," and it must be "real" rather than "abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (citations omitted and emphasis removed). It need not, however, be "tangible." *Id.* And

15

to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).

Pineda's declaration, dated June 2, 2023, asserts a "present intention and desire to lawfully purchase a firearm for lawful purposes, including self-defense in [his] home." Aplt. App. I at 90. Once SB 23-169 goes into effect, it will preclude him, as an individual under 21, from purchasing a firearm. His stated intention is sufficient to establish a concrete and particularized future injury, as his desire to exercise a fundamental right, specifically his Second Amendment right to "possess a [firearm] in the home for self-defense," will be affected if it becomes more difficult for him to acquire a firearm legally. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 9 (2022).

*Actual or imminent.* Next, with respect to an imminent – as opposed to actual – injury, a plaintiff need not wait for the harm to occur to satisfy the injury-in-fact requirement. Rather, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013)). This means "'[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore*, 495 U.S. at 158) (alteration in original). Still, "it is not necessary

that petitioner first expose [them]self to actual arrest or prosecution to be entitled to challenge a statute that [they] claim[] deters the exercise of [their] constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

Typically, pre-enforcement challenges are brought against an existing law under which the plaintiff has previously been prosecuted, *see, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 708 (1977), an existing law where the plaintiff has yet to be prosecuted, *see, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 10, (2010), or an enacted law before it takes effect, *see, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988). For such a suit to be justiciable, the plaintiff must establish both (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute," and (2) that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Regarding the former requirement, the plaintiff must present "concrete plans to engage in conduct that ha[s] [the] potential to violate" the challenged statute once it goes into effect. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016). Speculative plans or vague intentions to *potentially* violate the challenged statute are insufficient. *See Lujan*, 504 U.S. at 564 ("'[S]ome day' intentions—without any description

of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Applied to this case, Governor Polis argues that Pineda's bare allegation of an intent to purchase guns at some unspecified time in the future falls short of establishing a concrete plan to engage in allegedly protected conduct. Recall Pineda's declaration asserts a "present intention and desire to lawfully purchase a firearm for lawful purposes," which he "[is] or soon will be precluded from" doing by enforcement of SB 23-169. Aplt. App. I at 90.

To Governor Polis's point, Pineda does not specify any details of his proposed purchase. However, such granular specificity is unnecessary in this context. Once SB 23-169 takes effect, it will categorically bar individuals between 18 and 20 years old from purchasing firearms from both licensed gun dealers and private sellers, subject to exceptions. Pineda, being under 21 and ineligible for an exception, has articulated a clear intention to do what the statute forbids. And, although Pineda did not explicitly state that he wishes to make a purchase after SB 23-169's effective date, such intention is clearly implied by his "present" plan to purchase a firearm that he "soon will be precluded from" effectuating, Aplt. App. I at 90, as SB 23-169 was scheduled to go into effect two months after

18

Plaintiffs filed their motion for a preliminary injunction. Accordingly, Pineda has sufficiently articulated a concrete plan to engage in conduct that has the potential to violate SB 23-169 once it goes into effect.

As for the threat of prosecution requirement, "[t]he mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006). The threat of prosecution is generally credible where the defendant "has not disavowed any intention of invoking" the statute against the plaintiff. *Babbitt*, 442 U.S. at 302.

Nothing indicates that Governor Polis has disavowed enforcing SB 23-169 against Pineda. As such, Pineda faces a credible threat of future enforcement were he to attempt to effectuate a purchase of a gun in Colorado, a desire he professes by declaration to possess. The last requirement being satisfied, we conclude Pineda has established a future injury-in-fact, thus clearing the first standing hurdle.

**2**

The second standing element, causation, requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and

19

not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)) (alterations in original and internal quotation marks omitted). "[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular [statute], the causation element of standing requires the named defendants to possess authority to enforce the complained-of [statute]." *Bronson*, 500 F.3d at 1110.

The Colorado Constitution declares that "[t]he supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed." Colo. Const. art. IV, § 2. As such, Governor Polis, acting in his official capacity, is authorized to carry out and oversee enforcement of SB 23-169. Therefore, the causation element is satisfied because Pineda's future (though short-term) inability to purchase firearms will directly be caused by the enforcement of SB 23-169 by Governor Polis and the State of Colorado.

**3**

Lastly, the third element, redressability, requires it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43) (internal quotation marks omitted). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not

relieve his or her every injury." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005). "A showing that the relief requested *might* redress the plaintiff's injuries is generally insufficient to satisfy the redressability requirement . . . ." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012).

At first blush, existing federal restrictions on firearm sales, which Plaintiffs do not challenge, may pose redressability issues. If SB 23-169 is enjoined, as requested by Plaintiffs, federal law still prohibits licensed firearm dealers from selling or delivering any firearm, except shotguns or rifles, to individuals under 21 years of age. 18 U.S.C. § 922(b)(1).

Nonetheless, 18 U.S.C. § 922(b)(1) does not pose a problem to satisfying this third element. Although Pineda does not specify the type of firearm he wishes to purchase or from whom he intends to buy it, he does state his intention to "lawfully purchase" a firearm. Aplt. App. I at 90. The qualifier "lawfully" specifies what he intends to do while also still abiding by federal constraints. In other words, he aims to purchase a firearm in a way that complies with 18 U.S.C. § 922(b)(1) but is otherwise prohibited by SB 23-169. Thus, enjoining SB 23-169 would redress his alleged future injury by allowing him to make a lawful purchase within the limits set by federal law.

To conclude, Pineda has demonstrated, by clear proof, a future injury-in-fact, causation, and redressability. As such, he has successfully established standing to support his pre-enforcement challenge to SB 23-169.

## IV

After concluding Pineda has standing, we now consider whether the district court abused its discretion in ordering a preliminary injunction enjoining Governor Polis from enforcing SB 23-169. Our analysis proceeds as follows: we start with our standard of review, move to the legal test governing preliminary injunctions, and, finally, assess each preliminary injunction factor as applied to this case.

## A

A district court's decision to grant or deny a preliminary injunction is reviewed for abuse of discretion. *Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1254 (10th Cir. 2022). An abuse of discretion occurs when there is a legal error or the decision "lacks a rational basis in the record." *Id.* (quoting *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019)). When reviewing a district court's decision on a preliminary injunction, we examine the district court's factual findings for clear error and legal conclusions de novo. *Id.*

**B**

A preliminary injunction requested under Rule 65(a) is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking such an injunction must establish:

(1) a substantial likelihood that they will ultimately succeed on the merits of their suit;

(2) that they are likely to suffer irreparable harm in the absence of preliminary relief;

(3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and,

(4) if issued, the injunction will not adversely affect the public interest.

*Id.* at 20.

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (discussing stays but acknowledging "substantial overlap" between the factors for stays and preliminary injunctions). And the third and fourth factors "merge" when, like here, the government is the opposing party. *Id.* at 435. In sum, "the [movant's] right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)). We next examine whether Pineda has

established a substantial likelihood of success on the merits of his Second Amendment challenge to SB 23-169.

V

The Second Amendment to the United States Constitution reads in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment is incorporated against the States through the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), meaning its scope is the same irrespective of whether federal or state action is being challenged. *Bruen*, 597 U.S. at 37; *McDonald*, 561 U.S. at 765.

When ratified, the Second Amendment did not establish a novel principle but rather affirmed a pre-existing right inherited from our English ancestors. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). "[T]he central component" to this pre-existing right is the entitlement to individual self-defense, untethered from militia service. *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599) (emphasis removed). Self-defense is an "individual right to possess and carry weapons in case of confrontation," *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592), which extends to both inside the home, *Heller*, 554 U.S. at 635, and public spaces (with certain qualifications), *Bruen*, 597 U.S. at 30, 33.

The liberty to keep and bear arms, however, "is not unlimited." *Heller*, 554 U.S. at 626; *accord Voisine v. United States*, 579 U.S. 686, 714 (2016) (Thomas, J., dissenting) ("The protections enumerated in the Second Amendment . . . are not absolute prohibitions against government regulation."). This entitlement does not bestow a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. It is no surprise, then, that the government may still lawfully regulate firearms, as it has done for centuries. *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024).

To ascertain the constitutionality of a law burdening an individual's exercise of the Second Amendment, we apply a two-part burden-shifting framework first established in *Bruen* and later clarified in *Rahimi*. At step one, the plaintiff has the burden of establishing that "the Second Amendment's plain text covers" either the conduct they engaged or intended to engage in. *Bruen*, 597 U.S. at 17. If the plaintiff meets this burden, "the Constitution presumptively protects that conduct." *Id.* Should the plaintiff not satisfy this burden, they fail to allege a Second Amendment violation and our analysis ends. *Id.*

If the plaintiff does meet their burden, the burden then shifts to the government to justify its regulation by demonstrating that it is "consistent with the *principles* that underpin our" Nation's historical tradition of

firearm regulation. *Rahimi*, 144 S. Ct. at 1898 (emphasis added). If the government satisfies this burden, then "a court [may] conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).

In our analysis, "we follow the principle of party presentation." *Id.* at 25 n.6 (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). Accordingly, we base our decision on the historical record as compiled by the parties, or in this case, solely by Governor Polis. *Id.*

## A

At step one, the plaintiff is tasked with establishing that the Second Amendment's explicit text, "as informed by history," encompasses the conduct they seek to engage in. *Id.* at 17, 19. We ask (1) "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" (2) whether the item at issue is an "arm" that is "'in common use' today for self-defense," and (3) "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 31–32). If not, the inquiry ends: self-evidently, if the people, weapons, or conduct at issue are outside the Second Amendment's protection, then the government may regulate them without infringing upon the Second Amendment.

26

Our understanding of these elements is anchored to the Second Amendment's original meaning at the time of the Founding. *Heller*, 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them . . . ."). Therefore, we give these elements their "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation." *Id.* at 576–77.

Nonetheless, the Amendment's *coverage* is not limited to the conditions of the 18th century. *Rahimi*, 144 S. Ct. at 1897. Rather, the Second Amendment's protections must be interpreted with both historical context and contemporary application in mind, extending to modern contexts not specifically envisioned by the founders. *Heller*, 554 U.S. at 582 (analogizing to First and Fourth Amendment protections, which apply to modern technology).

Take "arms," for example. "Arms" should be understood as it was at the time of the Founding but we are not limited to just those arms that existed then. *Rahimi*, 144 S. Ct. at 1897. Any invention that fits the 18th century definition of "arms" is also eligible for protection. *Id.*

To meet their burden on step one, a challenger can rely on several interpretative tools to ascertain original meaning. Nothing in *Heller* or its progeny disturbs how we conduct this textual analysis. To aid in interpreting the plain text, the challenger may consult 18th century

dictionaries and treatises, utilize corpus linguistics, put forth historical sources such as the Federalist and Anti-Federalist Papers, ratification debates, and writings of the framers, examine early American court cases, and refer to English common law. And, of course, where binding precedent, even if not from early American history, provides insight, it may be authoritative too. This is all to say, the burden at step one differs from step two's history and tradition test in that it does not necessitate bringing forth evidence of *historical practice* – though such evidence could be helpful. Pineda made no attempt to present evidence of historical practice, relying exclusively on his own declaration and legal arguments.

With this in mind, we examine whether Pineda has met his burden of demonstrating that (1) 18- to 20-year-olds fall within "the people," (2) the arms he wishes to purchase constitute protected "arms," and (3) purchasing a firearm is encompassed by the right to "keep and bear" arms.

**1**

"The people," as referred to in the Second Amendment, denotes "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). It "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* As

28

such, we begin with "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.

Pineda, supported by amici, relies upon *Heller*'s expansive presumption that "the people" includes him. *See* Firearms Policy Coalition and FPC Action Foundation Amicus Br. at 14–15. Governor Polis, also supported by amici, argues that Pineda cannot meet his burden because 18- to 20-year-olds were not part of the political community at the Founding. *See* Denver Public Schools Amicus Br. at 14; Everytown for Gun Safety Amicus Br. at 10–14. In support, Governor Polis emphasizes that at the Founding, those under 21 lived under the supervision of their parents or guardians and did not possess full rights, including the right to vote. Whatever the definite contours of who "the people" encompasses,[3] we reject

---

[3] For example, we do not purport to shed light on whether non-citizens are included in "the people," as this question is not before us. *Compare United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) (assuming, for the purposes of the decision, that non-citizens are included in "the people," yet still recognizing that they may be part of a group that can be lawfully prohibited from possessing firearms); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (same); *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) (holding that non-citizens can be among "the people" for Second Amendment purposes), *with United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (holding that "unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend") *and United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011) (same).

the notion that it is limited to only the class of persons with full legal rights, including the right to vote, at the time of the Founding or otherwise.

The Constitution deliberately employs specific terms to delineate between certain groups of people and not others. For example, the First, Second, and Fourth Amendments protect "the people." U.S. Const. amend. I ("Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."); U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."); U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

In contrast, the Fifteenth Amendment refers to "citizens." U.S. Const. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."). And the Fifth and Fourteenth Amendments address "person." U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law. . . ."); U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

Precedent tells us "person[s]" include "'all persons within the territory of the United States,' including aliens unlawfully present," *Plyler v. Doe*, 457 U.S. 202, 212 (1982) (quoting *Wong Wing v. United States*, 163 U.S. 228, 238 (1896)), and "citizens" are "[a]ll persons born or naturalized in the United States," *Afroyim v. Rusk*, 387 U.S. 253, 262 (1967) (quoting U.S. Const. amend. XIV, § 1). We also know that "the people" is a phrase "of broader content than 'citizens,' and of narrower content than 'persons.'" *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012). Logically, then, at least some individuals who fall between "person" and "citizens," and are thus naturally encompassed by "the people," would be excluded under Governor Polis's criteria.

Governor Polis would require the possession of full legal rights, including the right to vote, at the Founding to be a prerequisite to membership in "the people." But as one example of how that cannot be, consider American citizens with felony convictions.

These individuals are both "person[s]" and "citizens," and thus, must also be included in "the people." *See United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024) (concluding that individuals with felony convictions fall within "the people"); *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (same). Yet this group has consistently been disenfranchised from the Founding through modern day. *Jones v. Governor*

*of Fla.*, 975 F.3d 1016, 1028–29 (11th Cir. 2020) ("The practice of disenfranchising persons who commit serious crimes has a long history that predates the founding of the Republic. . . . Today, almost all States disenfranchise felons in some way, although the recent trend is toward expanding access to the franchise."); *Muntaqim v. Coombe*, 366 F.3d 102, 123–24 (2d Cir. 2004) (noting the "the prevalence of felon disenfranchisement [provisions] in every region of the country since the Founding"), *opinion vacated on reh'g en banc*, 449 F.3d 371 (2d Cir. 2006). Focusing too narrowly on the Supreme Court's use of the phrase "political community," *Heller*, 554 U.S. at 580, to refer only to those with the full legal rights or the ability to vote – at the Founding or otherwise – is to miss the forest for the trees.

What is more, the meaning of the phrase "the people" does not appear to vary across the Constitution. *Verdugo-Urquidez*, 494 U.S. at 265 (noting that "'the people' seems to have been a term of art employed in select parts of the Constitution"). Under Governor Polis's definition, then, Pineda and other 18- to 20-year-olds would not be entitled to First and Fourth Amendment protections either. But, in fact, we know this is not accurate.

This is all to say, Pineda, who presents himself to be an ordinary, law-abiding citizen under the age of 21 – is part of "the people" as defined by the Second Amendment. *See, e.g.*, *Worth*, 108 F.4th at 689. This "does not,"

32

however, "mean that the government cannot prevent [him] from possessing guns." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). "Instead, it means that the question is whether the government has the power to disable the exercise of a right that [he] otherwise possess[es] . . . ." *Id.*

## 2

The term "arms" within the Second Amendment encompasses "all instruments that constitute bearable arms," regardless of their existence at the time of the Founding. *Heller*, 554 U.S. at 581–82. Nonetheless, this term "extends only to certain types of weapons." *Id.* at 623.

Protected "arms" include only those weapons commonly used and possessed by law-abiding citizens for lawful purposes. *Id.* at 625, 627. Conversely, the Second Amendment does not extend to weapons rarely used or possessed by law-abiding citizens, such as short-barreled shotguns, *id.* at 625, or those adapted for unlawful uses, for instance sawed-off shotguns, *Friedman v. City of Highland Park*, 577 U.S. 1039, 449 (2015) (Thomas, J., dissenting from the denial of cert.). This distinction underscores the Second Amendment's protection of the right to carry common, lawful weapons but not "dangerous and unusual" ones. *Heller*, 554 U.S. at 627.

Pineda does not specify the type of firearm he intends to purchase, only that he seeks to purchase one *lawfully*. However, because the parties do not dispute this element and Pineda cabined his intentions to lawful

arms, we presume he intends to purchase a firearm that falls under the protection of the Second Amendment.

3

Finally, we address whether the right to "keep and bear" arms is implicated by SB 23-169. "Keep" means to "have weapons." *Id.* at 582. And "bear" means to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

Pineda contends that his plan to purchase a firearm is protected by the Second Amendment because the right to "keep and bear" firearms necessarily implies a corresponding right to acquire them. Put differently, the right to "keep and bear" arms inherently includes the right to acquire them – at least through some means – as one cannot possess or bear arms without first obtaining them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.") (citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a

corresponding right to acquire and maintain proficiency in their use . . . ."); The National Shooting Sports Foundation, Inc. Amicus Br. at 10.

Governor Polis counters with several arguments on the scope of "keep and bear." First, he argues implied rights are inconsistent with the plain text analysis that *Bruen* requires, and that the Second Amendment was never understood to cover firearm purchases by those under the age of 21. Second, he contends SB 23-169 is a presumptively lawful regulation and, therefore, falls outside the scope of the Second Amendment's protections.

*Heller* dissected the terms "keep" and "bear" to define them but did not fully determine their scope. Although *Bruen* commands that we undertake this analysis, it does not provide a definitive answer as the contours of "keep and bear" were not before the Court in that case. Likewise, *Rahimi* does no work for our analysis of the "keep and bear" question either because, in that case, "no one question[ed] that the law Mr. Rahimi challenge[d] addresse[d] individual conduct covered by the text of the Second Amendment." 144 S. Ct. at 1907 (Gorsuch, J., concurring). In other words, the scope of "keep and bear" was not a question directly presented in *Heller*, *Bruen*, or *Rahimi*.

Nonetheless, we start with the text of the Second Amendment. "The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution . . . ." *Rahimi*, 144 S. Ct.

at 1910–11 (Kavanaugh, J., concurring). Governor Polis is correct that the terms "sale," "acquire," or "purchase" are not included in the definitions of "keep" or "bear." *See B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) (noting that "[o]n its face, ['keep and bear'] says nothing about commerce"); *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) (noting that "on its face, 'keep and bear' does not include purchase").

On the other hand, Constitutional rights may "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). Take the First Amendment as an example. Its plain text covers the "freedom of speech" and "the press," U.S. Const. amend. I, but "[t]he right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read and freedom of inquiry, freedom of thought, and freedom to teach—indeed the freedom of the entire university community." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (citations omitted). "Without those peripheral rights the specific rights would be less secure." *Id.* at 482–83.

The concurrence concludes that purchasing a firearm is a necessary concomitant of the right to "keep and bear" because acquisition is a

prerequisite to possession.[4] Concurrence at 24. However, we need not decide in this case the full scope of concomitant rights, if any, to "keep and bear" because embedded within the quartet of recent Supreme Court Second Amendment cases is the recognition that certain "longstanding" regulations – including "laws imposing conditions and qualifications on the commercial sale of arms" – are "presumptively lawful." *Heller*, 554 U.S. at 626–27, 627 n.26.

Following *Heller*, this Court noted that by listing some presumptively lawful regulations, the *Heller* Court had "emphasize[d] the narrowness" of its holding. *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1124 (10th Cir. 2015). One judge of this Court also opined that "the existence of on-point dicta regarding various regulations short-circuits at least some of the analysis and refinement that would otherwise take place in the lower courts." *United States v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009) (Tymkovich, J., concurring). Because of the presumption that certain

---

[4] The concurrence illustrates the concomitant rights inherent in "keep and bear" by pointing to historical references of conduct that are much more closely related to the actual text than the conduct at issue here, i.e., sale and purchase. Concurrence at 20-21. The conduct described in the concurrence falls within the definitional margins of "keep and bear," for example, "*carrying* of a weapon," *id.* (emphasis added) "*use*[ing] [arms] if necessary in self defence," *id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 609 (2008)) (emphasis added), and "learning to *handle* and *use* [arms]," *id.* (quoting *Heller*, 554 U.S. at 365 (Alito, J., dissenting)) (emphasis added).

firearm regulations are lawful, we must peer a little closer to determine how this presumption impacts the scope of the Second Amendment's right to "keep and bear" arms.

4

The Supreme Court has identified several types of firearm regulations as "presumptively lawful." *Heller*, 554 U.S. at 627 n.26. These include:

(1) "prohibitions on carrying concealed weapons," *id.* at 626,

(2) "prohibitions on the possession of firearms by felons and the mentally ill," *id.*,

(3) "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *id.*,

(4) "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626–27, and

(5) "'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain'" a concealed carry permit, *Bruen*, 597 U.S. at 38 n.9 (quoting *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)).

This safe harbor[5] list, however, is not exhaustive. *Heller*, 554 U.S. at 627 n.26.

---

[5] The term "safe harbor" has been used by academics, not the Supreme Court, to describe the list of laws and regulations that are presumptively lawful under the Second Amendment. *See, e.g.*, Brannon P. Denning & Glenn H. Reynolds, *Trouble's Bruen: The Lower Courts Respond*, 108 Minn. L. Rev. 3187, 3191 (2024).

Moreover, the Supreme Court reinforced that certain firearm regulations are presumptively lawful in *McDonald* when a plurality of the Court said:

> We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here.

561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626–27). In *Bruen*, Justice Kavanaugh, joined by Chief Justice Roberts, reemphasized this same language yet again in a concurring opinion. 597 U.S. at 81 (Kavanaugh, J., concurring). So, when it came to the statement and restatement that there are presumptively lawful firearm regulations under the Second Amendment, from *Heller* – to *McDonald* – to *Bruen*, our High Court went three-for-three.

This leads to *Rahimi*. At first glance, *Rahimi* had little to say about presumptively lawful regulations because it was mostly confined to examining "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 144 S. Ct. at 1898. However, Justice Kavanaugh again repeated the presumptively lawful non-exhaustive list in a concurrence, *id.* at 1923 (Kavanaugh, J., concurring), rendering a complete quartet for this language.

39

Because the "presumptively lawful regulatory measures" language, first stated in *Heller,* has not been abrogated, it remains good law. 554 U.S. at 627 n.26. And even if it is dicta, "we are 'bound by Supreme Court dicta almost as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *Bonidy*, 790 F.3d at 1125 (quoting *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007)).

**5**

We turn now to whether SB 23-169 is covered by *Heller*'s presumption of legality for "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. We hold that as an aged-based condition or qualification on the sale of arms, SB 23-169 is covered by the safe harbor and, as such, falls outside of the scope of the Second Amendment's right to "keep and bear" arms.

SB 23-169 regulates conduct: selling and purchasing firearms. *Supra* at 4-5. Pineda's challenge centers on *his* role in the transaction – specifically, his intention to purchase a firearm. Both actions – selling and purchasing – are dependent upon the other; that is, there can be no sale if there is no purchase. Pineda argues the right to "keep and bear" implies the right to acquire (e.g., purchase). But the contrary is also true, a presumption that laws imposing conditions and qualifications on the commercial *sale* of

arms are lawful extends equally to laws imposing conditions and qualifications on the commercial *purchase* of arms.

As the Ninth Circuit noted, "[t]he most reasonable interpretation of that passage [carving out 'presumptively lawful regulatory measures'] is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *B&L Prods., Inc.*, 104 F.4th at 119. We agree and hold that laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment.[6]

In so holding, we necessarily conclude the district court abused its discretion when it determined that commercial regulations described in *Heller* only pertained to "those who regularly sell firearms." Aplt. App. III at 173 (quoting *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)). As SB 23-169 encompasses both sellers and purchasers, with certain exceptions, it benefits from this presumption.

The thoughtful concurrence concludes that the presumptively lawful analysis applies best at *Bruen* step two. Both approaches – conducting the

---

[6] Our holding is limited to the one type of law or regulation from the *Heller* safe harbor list implicated here – laws imposing conditions and qualifications on the commercial sale of arms. 554 U.S. at 626–27. In other words, other longstanding laws or regulations may be deemed presumptively lawful under *Bruen* step two, not because, as in this case, they fall outside of the Second Amendment's plain text (*Bruen* step one).

presumptive lawful analysis at step one or step two – have their analytical appeal and drawbacks, and it is difficult to forecast how the Supreme Court would decide the issue, given the apparent tension between the *Bruen* two-step framework and the safe harbor list of presumptively lawful regulations. *See, e.g.*, Leo Bernabei, *Bruen As Heller: Text, History, and Tradition in the Lower Courts*, 92 Fordham L. Rev. Online 1, 20 (2024) (discussing the "significant tension between a textual analysis of *Heller*'s 'presumptively lawful' safe harbor provision and the historical inquiry that *Bruen* demands"). However, in our effort to discern the best reading of the quartet of Second Amendment cases, we conclude that the prohibition on conduct contained within SB 23-169 does not require us to proceed beyond *Bruen* step one. Further explanation is warranted for why we do not adopt the concurrence's view.

The concurrence first concludes that *Bruen* step one centers on text, while step two centers on history. Concurrence at 9-10 (citing *Bruen*, 597 U.S. at 17, 24). But *Bruen* is not cabined so neatly. In announcing step one, the *Bruen* court said it is "a test rooted in the Second Amendment's text, *as informed by history*." 597 U.S. at 19 (emphasis added). Meaning, a look at history is required at both steps in the test. *See Rahimi*, 144 S. Ct. at 1912 (Kavanaugh, J., concurring) ("Generally speaking, the historical approach examines the laws, practices, and understandings from before and after

ratification that may help the interpreter discern the meaning of the constitutional text and the principles embodied in that text.")

Second, the concurrence notes that *Heller*'s safe harbor list appears "based in history." Concurrence at 10. It may be right that the Supreme Court expressly created a list of "presumptively lawful regulatory measures" in *Heller*, 544 U.S. at 627, because they are "longstanding," *id.* at 626, and thus necessarily part of our Nation's history and tradition, but none of the Court's quartet of Second Amendment cases states this explicitly. Nor does *Bruen*'s holding require that regulations potentially covered by the presumption be analyzed exclusively under step two. *Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun.").

Moreover, *Bruen* explicitly outlines a two-step process for determining the constitutionality of any law or regulation that burdens a Second Amendment right. Another concern with the concurrence's approach is that it creates a two-tiered analysis within step two. The government must satisfy either a lesser burden by showing its regulation is "longstanding" and covered by the safe harbor or a heavier burden by proving its regulation is "consistent with the principles that underpin our" Nation's historical tradition of firearm regulation. *Rahimi*, 144 S. Ct. at 1898. Again, nothing

in *Bruen* or *Rahimi* suggests that step two can be diluted if the government can "earn a presumption of lawfulness." Concurrence at 13.

There are administrability concerns with the concurrence's approach too, as there is no clarity on what it means for a law or regulation to be "longstanding," Concurrence at 14 (quoting, *Heller*, 544 U.S. at 626), as opposed to "consistent with the principles that underpin our" Nation's historical tradition of firearm regulation. *Rahimi*, 144 S. Ct. at 1898. The concurrence "would require the government to show that the challenged regulation existed or is sufficiently analogous to regulations that existed sometime in the twentieth century."[7] Concurrence at 15. Although "longstanding" does beg for more objective, definitive standards, that pronouncement is hard to square with *Bruen*'s originalist underpinnings. *Bruen* step two is hard enough to apply without introducing more doctrinal opacity to it. *See Rahimi*, 144 S. Ct. at 1930 (Jackson, J., concurring) ("And courts, which are currently at sea when it comes to evaluating firearms

---

[7] We do note that there is some support for setting the benchmark at the twentieth century. Consider Justice Kavanaugh's concurrence providing that the requirement for fingerprinting to obtain a shall-issue concealed carry permit is presumptively lawful. *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). Fingerprinting did not become prevalently utilized for identification purposes in America until the twentieth century. *See* Joshua D. Jones, *Fingerprint Problems: Laden with Historical Misconceptions*, 18 W. Mich. U. Cooley J. Prac. & Clinical L. 199, 204–06 (2016).

44

legislation, need a solid anchor for grounding their constitutional pronouncements.").

Finally, and perhaps most importantly, it seems inconsistent to conclude that step one is a textual analysis and to then take an expansive view of the text to infer concomitant rights that are not present in the language of the Second Amendment. Rather, the best reading is that SB 23-169 is presumptively lawful because the aged-based condition or qualification on the conduct it proscribes falls outside the scope of the plain text of the Second Amendment.

**6**

Before we tie a bow on the scope of "keep and bear," *Bruen* dictates that we have more work to do in considering how the presumption of lawfulness applies to SB 23-169. The Court's discussion in *Bruen* on conditions and qualifications for obtaining a "shall-issue" concealed carry permit is pertinent. 597 U.S. at 38 n.9. The majority's opinion and Justice Kavanaugh's concurrence sanctioned several conditions and qualifications for obtaining a "shall-issue" concealed carry permit, including undergoing fingerprinting, a background check, a mental health records check, passing a firearms safety course, and receiving training in firearms handling and laws regarding the use of force, among other possible requirements. *Id.* (majority opinion); *id.* at 80 (Kavanaugh, J., concurring).

45

The permissibility of these conditions and qualifications on concealed carry permits derives from the fact that they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id.* at 38 n.9 (majority opinion) (quoting *Heller*, 554 U.S. at 635), and "contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,'" *id.* (first quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969); and then quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)). Still, such a condition or qualification could be challenged as unconstitutional if it is "put toward abusive ends . . . ." *Id.* For example, in the "shall-issue" concealed carry permit context, if "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.*

In *Rahimi*, the federal government had tried to cite the use of the term "responsible" as used in *Heller* and *Bruen* to argue that individuals can be disarmed entirely simply because they are not "responsible." *Rahimi*, 144 S. Ct. at 1903. But the Court, in one short paragraph, rejected this argument as reading too much into the use of this term. *Id.* As such, *Rahimi* did not address presumptively lawful regulations in any way that dictates a different course than the one set out in *Bruen*. We read *Bruen*'s "abusive ends" limitation to mean that any condition or qualification on the sale or

purchase of firearms, if found to have such abusive ends, negates the presumption that the law or regulation is lawful. 597 U.S. at 38 n.9.

Governor Polis argues that SB 23-169 is presumptively lawful because it places a condition or qualification on the sale and purchase of firearms. This is, according to Governor Polis, a straightforward regulatory measure aimed to ensure that firearms are sold to law-abiding, responsible individuals, in line with states' long-standing authority to regulate commercial transactions. SB 23-169, Governor Polis emphasizes, neither prohibits anyone from possessing a gun nor prohibits certain non-purchase gun transfers of ownership. It also includes exceptions, such as permitting sales to members of the military and law enforcement, and permits acquiring firearms by means other than purchases, such as inheritance and gifts from family members.

We agree and hold that SB 23-169 does not employ "abusive ends" that would disqualify it from the presumption of lawfulness.[8] *Id*. To start, a minimum age requirement of 21 is a nondiscretionary condition or

---

[8] There remains an open question as to the assignment of burdens: which party must prove that a law or regulation is presumptively lawful, and, if proven, which party must then demonstrate whether a presumptively lawful firearms regulation is or is not being put toward abusive ends. *Bruen*, 597 U.S. at 38 n.9. Because the assignment of the burdens would not affect the outcome here, we decline to address the question of burdens at this time.

qualification on the commercial sale of arms aimed at ensuring guns are held by law-abiding, responsible persons. *Id.* In fact, the federal government, almost all 50 states, and the District of Columbia have each implemented a minimum age requirement for some or all firearm purchases.[9]

---

[9] We recognize that the following statutory schemes are complex and may include various exceptions, but the categories below are designed to provide a *general* overview of each jurisdiction's minimum purchase age(s).

**For example, these jurisdictions currently set the minimum age to purchase a handgun or long gun to 18:** Alabama (Ala. Code §§ 13A-11-57, 13A-11-76); Alaska (Alaska Stat. § 11.61.210(a)(6)); Arizona (Ariz. Rev. Stat. § 13-3109(A)); Arkansas (Ark. Code Ann. § 5-73-109(a)); Georgia (Ga. Code Ann. § 16-11-101.1(a)(1), (b)); Idaho (Idaho Code Ann. § 18-3302A); Indiana (Ind. Code Ann. § 35-47-2-3); Kansas (Kan. Stat. Ann. § 21-6301(a)(14), (k)(l)); Kentucky (Ky. Rev. Stat. Ann. § 527.110(1)(a)); Louisiana (La. Rev. Stat. Ann. § 14:91); Maine (Me. Rev. Stat. tit. 17-A §§ 554-A, 554-B); Minnesota (Minn. Stat. § 609.66); Mississippi (Miss. Code Ann. § 97-37-13); Missouri (Mo. Rev. Stat. §§ 562.016.4, 571.060.1(2), 571.080); Nevada (Nev. Rev. Stat. Ann. §§ 202.300(1)(5)–(9), 202.310); New Hampshire (N.H. Rev. Stat. Ann. § 159:12); North Carolina (N.C. Gen. Stat. § 14-315); North Dakota (N.D. Cent. Code §§ 62.1-02-01(1)(d), 62.1-03-02); Oklahoma (Okla. Stat. Ann. tit. 21, § 1273(A), (E)); Oregon (Or. Rev. Stat. § 166.470(1)(a)); Pennsylvania (18 Pa. Cons. Stat. Ann. §§ 6110.1(c)–(d), 6302); South Carolina (S.C. Code Ann. § 16-23-30(A)(3)); Tennessee (Tenn. Code Ann. §§ 39-17-1303(a)(1), 39-17-1320(a)); Texas (Tex. Penal Code Ann. § 46.06(a)(2), (c)); Utah (Utah Code Ann. § 76-10-509.9); Virginia (Va. Code Ann. §§ 1-207, 18.2-309); and Wisconsin (Wis. Stat. § 948.60(2)(b)).

Such a minimum age requirement for firearm sales and purchases is nondiscretionary because it sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers, eliminating any possibility for subjective interpretation or exceptions. It seems evident that the necessity of *some* minimum age requirement is widely accepted – after

---

**These jurisdictions currently set the minimum age to purchase a handgun or long gun to either 18 or 21, depending on the type of gun:** Federal Government (18 U.S.C. § 922(b)(1), (c)(1)); Connecticut (Conn. Gen. Stat. §§ 29-34(b), 29-37a(b), (c)); District of Columbia (D.C. Code Ann. §§ 7-2507.06(a)(1), 22-4507); Iowa (Iowa Code §§ 724.15(2)(A), 724.22(1)–(2)); Maryland (Md. Code Ann., Pub. Safety § 5-134(b), (d)); Massachusetts (Mass. Gen. Laws ch. 140 §§ 130, 131E(a)); Michigan (Mich. Comp. Laws Ann. §§ 28.422(3)(b), (11), 750.223(2)); Nebraska (Neb. Rev. Stat. §§ 28-1204.01, 69-2403, 69-2404); New Jersey (N.J. Stat. Ann. §§ 2C:39-10e, 2C:58-3(c)(4), 2C:58-3.3(c), 2C:58-6.1(a)); New York (N.Y. Penal Law §§ 265.65, 400.00(1)(a), (2), (12)); Ohio (Ohio Rev. Code Ann. § 2923.21(A)–(B)); Washington (Wash. Rev. Code Ann. § 9.41.240); and Wyoming (Wyo. Stat. § 6-8-404(d)(i)(A)–(B)).

**These jurisdictions currently set the minimum age to purchase a handgun or long gun to 21:** California (Cal. Penal Code § 27505(a); 27510(a)); Delaware (Del. Code Ann. tit. 24, § 903; Del. Code Ann. tit. 11, § 1445); Florida (Fla. Stat. § 790.065(13)); Hawaii (Haw. Rev. Stat. Ann. § 134-2(a), (d)); Illinois (430 Ill. Comp. Stat. 65/3(a), 65/4); Rhode Island (R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-35.2, 11-47-37); and Vermont (Vt. Stat. Ann. tit. 13 § 4020).

**These jurisdictions currently do not restrict the sale or purchase of firearms but do restrict possession for individuals aged 18 or 19 and younger:** New Mexico (N.M. Stat. Ann. § 30-7-2.2); South Dakota (S.D. Codified Laws § 23-7-44); and West Virginia (W. Va. Code § 61-7-8).

**Lastly, this jurisdiction currently has no laws restricting the sale, purchase, sale, or possession of firearms by minors:** Montana.

all, no one is reasonably arguing that 8-year-olds should be allowed to purchase guns.

It is no wonder, then, that Pineda does not contest the constitutionality of imposing a minimum age requirement on firearm purchases as a general matter. Rather, Pineda challenges Colorado's minimum purchase age being adjusted to 21 instead of 18. Thus, the question becomes whether it is a proper exercise of legislative power for Colorado to define 21 as the age at which individuals are deemed "responsible" enough to purchase a firearm or whether SB 23-169 is being "put toward abusive ends . . . ." *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).

Following *Bruen*, the Supreme Court has not explained what constitutes "abusive ends" in the context of firearm regulations, aside from its discussion of "shall issue" licensing regimes. 597 U.S. at 38 n.9. Generally, "abusive" means "characterized by wrongful or improper use." *Abusive*, Black's Law Dictionary (12th ed. 2024). In assessing SB 23-169, we examine whether the age limit it imposes is arbitrary or improper, in order to determine whether the statute serves legitimate purposes or is being put to abusive ends.

First, a significant number of jurisdictions – at least 20 – have established a minimum purchase age of 21, some depending on the type of

firearm. *See supra* at 48 n.9. Thus, a considerable portion of our country has made the normative judgment that setting a minimum purchase age at 21 is appropriate to ensure that firearms are held by responsible, law-abiding persons, in accordance with the Second Amendment.

Second, Justice Alito strongly alluded to the constitutionality of a minimum purchase age of 21 in his concurrence in *Bruen*, stating:

> Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U.S.C. §§ 922(x)(2)–(5), and bars the sale of a handgun to anyone under the age of 21, §§ 922(b)(1), (c)(1).

597 U.S. at 73 (Alito, J., concurring). By positively citing 18 U.S.C. § 922(b)(1), which sets a minimum purchase age of 21, Justice Alito acknowledged the constitutionality of such a condition or qualification on firearm purchases. Notably, the majority opinion in *Bruen* did not challenge this statement or suggest that Justice Alito's concurrence inaccurately stated the Court's majority view on this issue. And as we noted earlier, Pineda does not assert that 18 U.S.C. § 922(b)(1) is unconstitutional.

Third, we reject the notion that the minimum age for purchasing a firearm should automatically mirror the minimum voting age. U.S. Const. amend. XXVI (extending right to vote to 18-year-olds in 1971). By its plain text, the Constitution does not establish a one-age-fits-all standard for all rights.

Equally misguided is the belief that the age at which most states currently set the age of majority (i.e., the point at which one is no longer considered a minor) is the *only* appropriate minimum firearm purchase age. Indeed, at the Founding most states set the age of majority at 21.

"Under English common law, individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents (usually their fathers) or guardians." Aplt. App. I at 164 (Cornell Dec.). This concept followed to the colonies. "Those between the ages of eighteen and twenty (and indeed all under the age of 21) were considered 'minors' or 'infants' from the time of the nation's founding up through the latter half of the twentieth century." *Id.* at 156; *see also* Samuel Johnson, *A Dictionary of the English Language* (1755) (defining "age" as "[m]aturity" and noting that "twenty-one years is the full age"); Thomas Sheridan, *A Complete Dictionary of the English Language* (1789) (defining "age" as "in law, in a man the age of twenty-one years is the full age"); Zephaniah Swift, *A System of the Laws of the State of Connecticut* (1795) ("Per[s]ons within the age of twenty-one, are, in the language of the law denominated infants, but in common [s]peech, minors.").

This is further exemplified by one early American dictionary, which defined "minor" as follows:

A person of either sex under age; one who is under the authority of his parents or guardians, or who is not permitted by law to make contracts and manage his own property. By the laws of Great Britain and of the United States, persons are minors till they are twenty-one years of age.

Noah Webster, *An American Dictionary of the English Language* (1828). Likewise, "age" was defined as "[t]he period when a person is enabled by law to do certain acts for himself, or when he ceases to be controlled by parents or guardians; as, in the United States, both males and females ar[e] of age at twenty-one years old." *Id.*

As noted by Sir William Blackstone, "[i]nfants have various privileges, and various disabilities: but their very disabilities are privileges; in order to secure them from hurting themselves by their own improvident acts." William Blackstone, *Commentaries on the Laws of England* (1765-1769). Blackstone's often-cited treatise explains the legal limitations placed on minors. Those under 21 could not: (1) alienate their lands or execute binding deeds, (2) enter into legally binding contracts, except to make purchases for necessities like food, clothing, and education, or (3) either sue or be sued without a guardian. *Id.*; *see also* Zephaniah Swift, *A System of the Laws of the State of Connecticut* (1795) (noting "by common law an infant can bind himself by his contract for necessaries, for diet, apparel, education and lodging," but little else). Once an individual turns 21, they become "liberated from parental power and become free, which is comple[]ted on the

day proceeding the birth-day." Zephaniah Swift, *A System of the Laws of the State of Connecticut* (1795).

The age of majority, as set by most states, remained at 21 well into the 20th century. Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016). In response to the demands of World War II, the government lowered the conscription age from 21 to 18. *Id.* Because the obligation of military service has long been linked to the right to political participation, this change eventually led in 1971 to the passage of the Twenty-Sixth Amendment, lowering the voting age from 21 to 18 in both state and federal elections. *Id.* at 64–65. Once 18 became the age for conscription and voting, most states eventually adopted it as the standard age of majority. *Id.* at 65.

However, state legislatures have the authority and prerogative, rooted in the Tenth Amendment, to set and adjust the age of majority as they see fit "for the public good . . . ." *Bond v. United States*, 572 U.S. 844, 854 (2014). Meaning, laws imposing age restrictions do not need to correspond with the ages set for conscription, voting, or even general expectations of when one becomes responsible. *See, e.g.*, Ala. Code § 26-1-1 (setting age of majority to 19); Neb. Rev. Stat. § 43-2101 (same); Miss. Code Ann. § 1-3-27 (setting age of majority to 21). What is more, there are many examples where age minimums for other conduct, such as alcohol

consumption, tobacco sales, and gambling, are set higher than a state's age of majority – typically at 21. This is all to say, the minimum age for firearm purchases need not rise or fall entirely with the age at which most states currently set as the age of majority.

Fourth, Governor Polis and Colorado present compelling scientific evidence[10] through the declaration of Dr. Steinberg that setting 21 as the threshold purchase age for a firearm is designed to ensure purchasers are law-abiding and responsible (noting that "responsible" is an amorphous term). Dr. Steinberg's insightful declaration, which stands unrefuted by Pineda, establishes the following:

For much of the 20th century, scientists held the belief that brain maturation concluded during late childhood, a view "based on the observation that the brain reached its adult size and volume by age 10." Aplt. App. II at 166 (Steinberg Dec.). In the late 1990s, this conclusion was undermined by research on the brain's internal anatomy and activity patterns, instead of just its external appearance. *Id.* "The advent of functional Magnetic Resonance Imaging (fMRI) permitted scientists and

---

[10] The concurrence correctly observes that even considering scientific evidence approaches the "means-ends scrutiny" the Supreme Court tossed aside in *Bruen*. However, assessing "abusive ends" is difficult without at least partially considering the evidence supporting the legislation's purpose, to determine whether the ends are either abusive or legitimate. *Bruen*, 597 U.S. at 38 n.9.

researchers to actually observe the brains of living individuals and examine their responses to various stimuli and activities." *Id.* The result of these examinations revealed that "key brain systems and structures, especially those involved in self-regulation (i.e., exercising control over one's emotions, impulses, and actions) and higher-order cognition (e.g., advanced thinking abilities, including thinking ahead, planning, accurately perceiving risk, and making reasoned decisions), continue to mature throughout adolescence until at least the age of 21." *Id.*

Additional studies on brain maturation conducted during the past decade have demonstrated that "several aspects of brain development affecting judgment and decision-making are not only ongoing during early and middle adolescence, but continue at least until age 21." *Id.* By 2015, neuroscientists widely accepted that a child's brain maturation continues into late adolescence. *Id.* at 166–67.

As Dr. Steinberg sets out, psychological studies provide that individuals in their late teens and early 20s are less mature than adults in several significant and relevant ways:

(1) "First, adolescents and people in their early 20s are more likely than older individuals to engage in what psychologists call 'sensation-seeking' . . . ."

(2) "Second, adolescents and individuals in their early 20s are less able than older individuals to control their impulses and

consider the future consequences of their actions and decisions."

(3) "Third, basic cognitive abilities, including memory and logical reasoning, mature before the development of emotional maturity, including the ability to exercise self-control, rein in sensation seeking, properly consider the risks and rewards of alternative courses of action, and resist coercive pressure from others. . . . As a consequence of this gap between intellectual and emotional maturity, the tendencies of adolescents and people in their early 20s, relative to individuals in their mid- or late 20s, to be more focused on rewards, more impulsive, and more myopic are exacerbated when adolescents are making decisions in situations that are emotionally arousing, including those that generate negative emotions, such as fear, threat, anger, or anxiety.

*Id.* at 168–71.

Dr. Steinberg lastly sets out the following four types of risk-taking behaviors that peak in the late teens and early 20s, which are particularly germane to our inquiry:

(1) "First, according to recent data from the United States Federal Bureau of Investigation (FBI) on arrest rates as a function of age, arrests for violent crime increase between 10 and 19 years, peak in the late teens and early 20s, and decline thereafter, most dramatically after 25. FBI data indicate that arrests of individuals between 18 and 20 for homicide, robbery, and weapons possession are more common than is the case for those who are 21 and older." *Id.* at 175–76 (footnotes omitted).

(2) "Second, according to data from the National Institute of Mental Health, as well as epidemiological studies, suicidal ideation and attempted suicide are higher during late adolescence and young adulthood than any other period of

life. Firearms were used in more than half of all suicide attempts." *Id.* at 176 (footnotes omitted).

(3) "Third, numerous studies have documented that rates of deliberate self-injury, which, even if not fatal, may have very serious consequences, also peak in middle and late adolescence." *Id.*

(4) "Finally, binge drinking is more frequent during the late teens and early 20s than at any other age. This is significant because there is a strong association between binge drinking and violence. Intoxication is a particularly significant contributing factor to homicide and physical assault at all ages, especially in incidents involving personal confrontations, and even more so in those involving firearms." *Id.* at 176–77 (footnotes omitted).

In sum, Dr. Steinberg concludes that SB 23-169 is "consistent with [the] current scientific consensus concerning the cognitive, emotional, and social capacities of people [aged 18, 19, and 20] relative to those who are 21 and older." *Id.* at 165. He opines that SB 23-169 "will likely reduce the numbers of firearm homicides, nonhomicide violent crimes, suicides, and accidental firearm injuries in Colorado." *Id.* at 179.

For all the foregoing, we hold that SB 23-169 is designed to ensure only that those who "keep and bear" arms in Colorado are, in fact, law-abiding, responsible persons, that it is objectively applied, and thus is not being "put toward abusive ends . . . ." *Bruen*, 597 U.S. at 38 n.9.

**7**

To recap, Pineda has partially met his burden at step one by demonstrating that (1) 18- to 20-year-olds fall within "the people," and (2) the arms he wishes to purchase constitute protected "arms." However, Pineda fails to prove that SB 23-169 implicates his right to "keep and bear" arms, the third prong of step one. This is because SB 23-169 is presumptively lawful as a law that imposes conditions or qualifications upon the sale and purchase of arms and thus does not fall within the protections of the plain text of the Second Amendment. Laws or regulations imposing conditions or qualifications – such as a minimum purchase age of 21 – on the commercial sale or purchase of arms, when not employed for abusive ends, remain outside the scope of the Amendment's protections under the third prong of *Bruen* step one.

As such, the district court abused its discretion in determining that Pineda met his burden to prove he is substantially likely to succeed on the merits of his lawsuit to merit the issuance of a preliminary injunction.

**B**

"The second preliminary-injunction factor asks whether irreparable injury will befall the movants without an injunction." *Free the Nipple-Fort Collins*, 916 F.3d at 805. "Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable

59

injury." *Id.* Pineda has not established a likelihood of success on his Second Amendment claim, and he likewise cannot establish irreparable injury in the enforcement of SB 23-169. He points to no irreparable injury other than the violation of his Constitutional Second Amendment right, which we resolved against his position. Accordingly, the district court erred by concluding Pineda established an irreparable injury.

## C

"The third preliminary-injunction factor involves balancing the irreparable harms identified [by Pineda] against the harm that the preliminary injunction causes" Governor Polis and the State of Colorado. *Id.* at 806. And the "last preliminary-injunction factor requires that the injunction not be against the public interest." *Id.* at 807. These two factors merge where, as here, the government is the opposing party. *Nken*, 556 U.S. at 435. Balancing Pineda's non-existent harms against the real harms of non-enforcement of SB 23-169 weighs in favor of Governor Polis. And, of course, the public interest strongly favors Colorado's enforcement of SB 23-169, particularly "as guns became the leading cause of death in Colorado among this age group." Aplt. Br. at 70. Accordingly, the district court likewise erred by concluding that these factors weighed in favor of Pineda.

## VI

Pineda failed to meet his burden under all four preliminary injunction factors. Therefore, the district court abused its discretion, and thus erred, in granting Plaintiffs' motion for a preliminary injunction and enjoining enforcement of SB 23-169. We REVERSE the district court's order enjoining enforcement of SB 23-169 and REMAND with instructions to DISSOLVE the injunction and for further proceedings consistent with this opinion.

No. 23-1251, *Rocky Mountain Gun Owners v. Polis*

**McHUGH,** Circuit Judge, concurring:

I agree with the majority that Mr. Pineda failed to carry his burden on all four preliminary injunction factors. I write separately because I am not persuaded that presumptively lawful regulatory measures apply at *Bruen* step one as part of the "keep and bear" analysis. I would instead consider presumptively lawful regulatory measures at *Bruen* step two, after there has been a determination that the Second Amendment's plain text covers the proposed conduct.

I first outline how I would integrate presumptively lawful regulatory measures into the *Bruen* test. I then apply that framework to the Colorado law, concluding that although the plain text covers the proposed conduct, the challenged law is presumptively lawful, and Mr. Pineda has not rebutted the presumption of lawfulness.

## I.    THE *BRUEN* FRAMEWORK

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010) (holding the Second Amendment applies to the states). In *Bruen*, the Supreme Court explained "the standard for applying the Second Amendment":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022) (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)).

As I understand *Bruen*, courts must first determine if the Second Amendment's "plain text" covers the "proposed course of conduct." *Id.* at 24, 32. If the plain text does not cover the proposed conduct, the inquiry ends because the Second Amendment challenge fails. But if the plain text covers the conduct, the regulation is presumptively unconstitutional, and the government bears the burden of demonstrating the regulation is consistent with our Nation's historical tradition of firearm regulation. *Id.* at 24, 70. I now explain my understanding of these steps in greater detail.

## A.     Step One: Text

In *Heller*, the Supreme Court began with a textual analysis of the Second Amendment's operative clause—"the right of the people to keep and bear Arms[] shall not be infringed." U.S. Const. amend. II; *see Heller*, 554 U.S. at 579–95. The Court explained that in this context, "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. "Arms" are weapons "in common use" for self-defense today, "keep Arms" means to "have weapons," and "bear" means to "carry" for purposes of confrontation. *Id.* at 581–84, 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 597 U.S. at 32. Putting "these textual elements together," the Second

Amendment's operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

Applying this textual analysis at *Bruen* step one, courts consider whether (1) the plaintiff is part of "the people," (2) the weapons at issue are "'in common use' today for self-defense," and (3) the plain text covers the "proposed course of conduct." *Bruen*, 597 U.S. at 24, 31–32 (quoting *Heller*, 554 U.S. at 627).

I agree with the majority's holding that if the plain text does not cover the proposed conduct, the inquiry ends because the constitutional challenge fails. Although *Bruen* does not explicitly prescribe this outcome, the focus on text in *Heller* and *Bruen* demonstrates that a Second Amendment challenge fails unless the plain text is implicated.

In *Bruen*, the Supreme Court stated that "*Heller*'s methodology centered on constitutional text" and that "*Heller* relied on text and history" when "suggesting the outer limits of the right." *Bruen*, 597 U.S. at 22; *see also United States v. Rahimi*, 144 S. Ct. 1889, 1910 (2024) (Gorsuch, J., concurring) ("The Court reinforces the focus on text, history, and tradition, following exactly the path we described in *Bruen*."); *id.* at 1924 (Kavanaugh, J., concurring) ("But in Second Amendment cases as in other constitutional cases, text, history, and precedent must remain paramount."); *id.* (Barrett, J., concurring) ("A regulation is constitutional only if the government affirmatively proves that it is 'consistent with the Second Amendment's text and historical understanding.'" (quoting *Bruen*, 597 U.S. at 26)). Given the Supreme

3

Court's repeated emphasis on text—including in the test it described as the "standard for applying the Second Amendment"—I am persuaded that a threshold requirement for Second Amendment challenges is that the Amendment's plain text covers the proposed conduct. *Bruen*, 597 U.S. at 24.

This conclusion is supported by *Bruen*'s discussion of the two-step framework that had emerged in the courts of appeals after *Heller*. *See id.* at 17–24. At the first step, the government could "justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood.'" *Id.* at 18 (alterations in original) (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)). If the government proved "the regulated conduct falls beyond the Amendment's original scope, 'then the analysis [could] stop there; the regulated activity is categorically unprotected.'" *Id.* (quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)). At the second step, courts generally analyzed "how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* (quoting *Kanter*, 919 F.3d at 441). If the challenged law burdened a "core" Second Amendment right, then strict scrutiny applied. *Id.* at 18–19. Intermediate scrutiny applied to lesser impositions. *Id.* at 19.

The parties in *Bruen* largely agreed with this framework, "arguing that intermediate scrutiny is appropriate when text and history are unclear in attempting the delineate the scope of the right." *Id.* The Supreme Court, however, did not adopt this approach. The Court explained that step one of the proposed framework is

4

"broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text." *Id.* But the second step is inconsistent with *Heller*, which does "not support applying means-ends scrutiny in the Second Amendment context." *Id.* Thus, the Supreme Court articulated the correct standard, which begins with assessing whether "the Second Amendment's plain text covers the individual's conduct." *Id.* at 24.

If a court applying *Bruen* concludes the Second Amendment's text does not cover the conduct, but nevertheless permits the constitutional challenge to proceed, the court must have reasoned there was some burden on Second Amendment rights, albeit a lesser burden than if the plain text were implicated. This reasoning necessarily alters the burdens outlined in *Bruen* because the plaintiff's claim would proceed but without a presumption of unconstitutionality. *See id.* ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). Altering the burden depending on the level of infringement veers too closely to the framework the Supreme Court rejected, which required courts to determine whether a "core" Second Amendment right was burdened and adjust the level of scrutiny accordingly. *Id.* at 18–19. Thus, instead of analyzing "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right," courts must begin by determining whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 18 (quoting *Kanter*, 919 F.3d at 441), 24.

5

For these reasons, I agree with the majority's holding that for a Second Amendment challenge to proceed, the Amendment's plain text must cover the proposed conduct. Other circuits have reached this same conclusion. *See Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023) ("*Bruen* instructs that history is relevant only if 'the Second Amendment's plain text covers an individual's conduct,' and this threshold inquiry requires courts to consider three issues . . . ." (quoting *Bruen*, 597 U.S. at 17)) (vacated and remanded for further consideration in light of *Rahimi*), *vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709 (2024); *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc) ("First, we must ask whether the Second Amendment's plain text covers the conduct at issue. If not, that ends the inquiry: the Second Amendment does not apply."); *Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1196 (6th Cir. 2024) (explaining that if a regulation does not "restrict conduct necessary to effectuate [the right to own and bear arms in case of confrontation], the proposed conduct . . . is not protected by the plain text of the Second Amendment and the regulation need not satisfy *Bruen*'s second step, even though it regulates conduct connected to firearms"), *petition for cert. filed*, No. 24-178 (Aug. 24, 2024); *United States v. Scheidt*, 103 F.4th 1281, 1284 (7th Cir. 2024) ("The plain text of the Second Amendment does not cover Scheidt's conduct, so there is no need to conduct a historical analysis of gun registration forms."); *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024) ("As the plain text of the Second

Amendment does not cover B&L's proposed conduct . . . B&L's argument necessarily fails." (footnote omitted)).[1]

Although I largely agree with the majority's explanation of *Bruen* step one, I do not agree that presumptively lawful regulatory measures apply at step one. Instead, as I explain in the following section, I would consider those measures at *Bruen* step two.

---

[1] In *McRorey v. Garland*, the Fifth Circuit evaluated a firearms regulation without applying the two-step *Bruen* framework. 99 F.4th 831, 836–39 (5th Cir. 2024). There, plaintiffs sought to preliminarily enjoin a law requiring expanded background checks for eighteen-to-twenty-year-olds. *Id.* at 834–36. The Fifth Circuit held that the law was not subject to the *Bruen* framework because it is a presumptively lawful regulatory measure and because "'keep and bear' does not include purchase." *Id.* at 836–37, 838. The plaintiffs did not rebut the presumption by showing the law was abusive, so the court affirmed the denial of their request for a preliminary injunction. *Id.* at 839–40.

I am not persuaded by the Fifth Circuit's reasoning for three reasons. First, it does not reckon with the Supreme Court's emphasis on text and history. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022) (stating *Heller* "demands a test rooted in the Second Amendment's text, as informed by history"). Second, the Fifth Circuit did not explain how courts should resolve cases where the plain text covers the proposed conduct and the law at issue is a presumptively lawful regulatory measure. *See McRorey*, 99 F.4th at 836–39. Third, *McRorey* was decided before *United States v. Rahimi*, 144 S. Ct. 1889 (2024), and a Fifth Circuit case decided post-*Rahimi* calls *McRorey*'s methodology into question. In *United States v. Diaz*, the Fifth Circuit considered a Second Amendment challenge to 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms. No. 23-50452, 2024 WL 4223684, at *1 (5th Cir. Sept. 18, 2024). Although *District of Columbia v. Heller* states that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful," 554 U.S. 570, 626, 627 n.26 (2008), the Fifth Circuit nevertheless applied *Bruen*'s two-step framework and stated a "full historical analysis [was] required," *Diaz*, 2024 WL 4223684, at *4 n.2, *5–9. Thus, *Diaz* seems to part ways with *McRorey*, which held a historical analysis was not required because the law was a presumptively lawful regulatory measure. *See McRorey*, 99 F.4th at 836–39.

### B.     *Step Two: History*

If the plain text covers the proposed conduct, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. I believe the government has two paths for making this showing: (1) the government may show that its regulation is a presumptively lawful regulatory measure *or* (2) the government may make the ordinary showing explained in *Bruen* and *Rahimi*. I explain each path in turn.

### 1.     **Presumptively Lawful Regulatory Measures**

In *Heller*, the Supreme Court stated that "the right secured by the Second Amendment is not unlimited" and that its opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. The Court noted that these are "presumptively lawful regulatory measures" and that its list is not exhaustive. *Id.* at 627 n.26. Two years later, the Supreme Court "repeat[ed] [its] assurances" about "longstanding regulatory measures." *McDonald*, 561 U.S. at 786.

*Bruen* did not explicitly overrule *Heller*'s and *McDonald*'s statements about presumptively lawful regulatory measures, and some justices continue to acknowledge their existence. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) (stating the Court had not "disturbed anything that [it] said in *Heller* or *McDonald*");

*id.* at 80–81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*'s discussion of presumptively lawful regulations). And in *Rahimi*, the Court explained that according to *Heller*, "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.6); *see also id.* at 1923 (Kavanaugh, J., concurring) (quoting *Heller*'s discussion of presumptively lawful regulations).

For these reasons, I agree with the majority's holding that presumptively lawful regulatory measures are, at least, Supreme Court dicta we are bound to follow. I also agree that a plaintiff may rebut the presumption of lawfulness by showing the regulation has been "put toward abusive ends," resulting in a denial of Second Amendment rights.[2] Majority Op. at 47 (quoting *Bruen*, 597 U.S. at 39 n.9). However, I diverge from the majority's view of presumptively lawful regulations in three ways.

First, in my judgment, presumptively lawful regulations apply best at *Bruen* step two. As discussed, *Bruen* step one centers on text, while step two centers on

---

[2] The Supreme Court has not explained how a plaintiff could rebut the presumption of lawfulness. *See Heller*, 554 U.S. at 626–27; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). *Bruen* footnote nine seems to offer the best suggestion, as it explains circumstances under which an individual could challenge a law that would normally be constitutional. *See Bruen*, 597 U.S. at 39 n.9. However, I do not rule out other means through which a plaintiff could rebut the presumption.

history.[3] *See Bruen*, 597 U.S. at 17, 24. The majority considers presumptively lawful regulations at step one, but I do not see how those regulations are tethered to the Second Amendment's text. For instance, the majority concludes the law at issue imposes a "condition or qualification on the sale of arms" and thus "falls outside of the scope of the Second Amendment's right to 'keep and bear' arms." Majority Op. at 41. But the majority does not explain why concluding that a law imposes conditions and qualifications on the sale of arms results in a holding that the plaintiff is *not* attempting to exercise the right to possess and carry arms for confrontation. *See id.*; *see also Heller*, 554 U.S. at 592.

Although presumptively lawful regulations are not tied to the Second Amendment's text, they do seem based in history. *Heller* introduced presumptively lawful regulations by describing them as "longstanding." 554 U.S. at 626. The use of "longstanding" demonstrates that, in the Supreme Court's view, these measures deserve a presumption of lawfulness because they have some basis in history and tradition. *See id.* at 626–27. This conclusion is supported by *Bruen*, in which the Court discussed "historical regulations of 'sensitive places'" as permissible analogies

---

[3] The majority cautions that *Bruen* "is not cabined so neatly" because "[i]n announcing step one, the *Bruen* court said it is 'a test rooted in the Second Amendment's text, *as informed by history*.'" Majority Op. at 43 (quoting *Bruen*, 597 U.S. at 19). It is true that history may inform our understanding of the text. *Bruen*, 597 U.S. at 19. But undeniably, the question at *Bruen* step one is whether "the Second Amendment's *plain text* covers an individual's conduct." *Id.* at 24 (emphasis added). So, in my view, history is relevant at step one only to the extent it clarifies the Amendment's text. As the majority recognizes, step one "does not necessitate bringing forth evidence of *historical practice*." Majority Op. at 28.

to "modern regulations." 597 U.S. at 30. And, of course, the right to bear arms, even in sensitive places, falls within the plain text of the Second Amendment.

In my view, the best explanation for *Heller*'s "presumptively lawful regulatory measures" is that the Supreme Court concluded those regulations have a sufficient basis in history and are therefore entitled to a presumption of lawfulness. *See* 554 U.S. at 626–27, 627 n.26; *Bruen*, 597 U.S. at 30. Thus, I would consider presumptively lawful regulatory measures at *Bruen* step two, as that is where courts evaluate the regulation's connection to history.

The majority, however, concludes that some regulatory measures—like conditions and qualification on the sale of arms—are presumptively lawful at step one, while other regulatory measures may be presumptively lawful at step two. Yet the majority offers no guidance for determining where the presumption applies in any given case. And two examples readily illustrate why this split approach is difficult to apply.

First, consider a hypothetical law that prohibits carrying handguns at public playgrounds. Assuming the plaintiff challenging the law is part of "the people," the plaintiff would be entitled to a presumption of unconstitutionality at *Bruen* step one—handguns are "Arms" and "carrying handguns publicly for self-defense" is covered by "keep and bear." *See Bruen*, 597 U.S. at 31–32. But if the court determined that public playgrounds are sensitive places and that the regulation is

11

longstanding, the government would be entitled to a presumption of lawfulness.[4] *See Heller*, 554 U.S. at 626, 627 n.26. If the court applied that presumption at step one—as the majority has done here—both parties would be entitled to presumptions in their favor *within* step one, with no guidance on which presumption takes precedence.

Under the majority's approach, courts could resolve this conflict by reasoning the challenged law is "presumptively lawful under *Bruen* step two." Majority Op. at 42 n.6. Although the majority does not explain how to earn the presumption at step two, the majority would presumably require *Bruen*'s full historical analysis given its disagreement with a "two-tiered analysis within step two." *Id.* at 44. But if the law satisfies *Bruen*'s full historical analysis and there is no alternative analysis for regulations that are merely "longstanding," then the presumption should be unnecessary—the law would be constitutional under *Bruen*. *See* 597 U.S. at 24 (explaining that a law is constitutional if the government shows "it is consistent with the Nation's historical tradition of firearm regulation"). In other words, under the majority's approach, the presumptively lawful classification does no work at *Bruen* step two.

Next, consider felon dispossession laws. Those laws burden the right to "keep and bear," so a plaintiff would ordinarily be entitled to a presumption of lawfulness at step one. But felon dispossession laws are presumptively lawful under *Heller*. 554

---

[4] I use playgrounds as an example but express no opinion as to whether they would, in fact, be longstanding sensitive places.

U.S. at 626, 627 n.26. Again, applying the presumption of lawfulness at step one—as the majority does here—creates conflicting presumptions within step one. The solution, under the majority's approach, would be to apply the presumption at step two. But felon dispossession laws did not exist at the founding or when the Fourteenth Amendment was ratified—they are "creatures of the twentieth" century. *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, J., concurring). So, without the alternative method of rebutting the step one presumption with longstanding restrictions, it is unclear to me how the felon dispossession laws would survive at step two. And if felon dispossession laws are presumptively lawful because they satisfy the traditional *Bruen* step two analysis, they should not need a *presumption* of lawfulness—they would be constitutional.

This confusion is resolved by placing presumptively lawful regulations at step two, thus allowing the presumptions to apply sequentially. Continuing with the playground example, the parties would proceed to step two with a presumption of unconstitutionality. But, at step two, if the government showed that public playgrounds qualify as sensitive places and that the regulation is longstanding, the government would earn a presumption of lawfulness that rebuts the presumption of unconstitutionality. And the government would be entitled to only a presumption of lawfulness because it has shown only that the regulation is longstanding, a lesser showing than the full historical analysis typically required under *Bruen*. So, under this approach, the presumption has a purpose.

13

To be sure, the Supreme Court decisions are not clear as to how presumptively lawful regulatory measures fit into *Bruen*'s two-step framework. But I would hold those measures are best situated within *Bruen* step two as one way to rebut the presumption of unconstitutionality. If such a longstanding regulatory tradition is not applicable, the government must undertake the full historical analysis required at step two.

I next depart from the majority because I believe the government has the burden of showing the regulation at issue is longstanding—not just that the regulation falls into one of the *Heller* categories. In *McDonald*, the Supreme Court "repeat[ed] [its] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'" *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626–27). The inclusion of "such" and the use of a single "or" to separate list items indicates that "longstanding" applies to each list item. *Ortega v. Lujan Grisham*, No. CIV 24-0471 JB/SCY, 2024 WL 3495314, at *32 (D.N.M. July 22, 2024), *appeal filed*, No. 24-2121 (10th Cir. Aug. 22, 2024). Additionally, in *Bruen*, the Supreme Court identified "laws forbidding the carrying of firearms in sensitive places" as "longstanding," further suggesting "longstanding" applies to each list item. 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). I thus conclude that for the presumption of

14

lawfulness to attach, the government must show the regulation at issue is longstanding or is sufficiently analogous to longstanding regulations.

This raises the question of how longstanding a regulation must be to justify a presumption of lawfulness. While the Supreme Court has not addressed this issue, *Heller*'s list indicates that a regulation can be "longstanding" even if it did not exist at the founding era or when the Fourteenth Amendment was ratified. Consider felon dispossession laws, for example. Those laws are presumptively constitutional, yet they are of "mid-20th century vintage." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*; *see also McCane*, 573 F.3d at 1048 (Tymkovich, J., concurring) ("[T]he weight of historical evidence suggests felon dispossession laws are creatures of the twentieth—rather than the eighteenth—century."); *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) (explaining the "dearth of felon-disarmament laws in the eighteenth and nineteenth centuries"); *Ortega*, 2024 WL 3495314, at *32 n.11 (collecting law review articles). Accordingly, I would require the government to show that the challenged regulation existed or is sufficiently analogous to regulations that existed sometime in the twentieth century.[5]

---

[5] It is unclear at what point in the twentieth century a regulation needs to have existed to be longstanding. But as I explain later, *see supra* Section II.B, the Colorado law is sufficiently analogous to laws that existed before the early twentieth century. Accordingly, I do not decide at what point in the twentieth century the longstanding description attaches.

The majority fairly points out that "longstanding" is imprecise and creates "administrability concerns." Majority Op. at 44–45. But as explained, the Court's phrasing in *McDonald* appears to require a showing that the regulation is longstanding. *See McDonald*, 561 U.S. at 786. And although I agree that "longstanding" is imprecise, that is not a sufficient reason to ignore the Court's use of that word in *Heller* and *Bruen*. Until the Supreme Court provides further guidance, the lower courts are tasked with defining the parameters of that term, extracting guidance from the examples available.

Third and finally, while the majority's discussion of scientific evidence is thoughtful, in my view, it approaches the type of "means-ends scrutiny" the Supreme Court eschewed in *Bruen*. *See* 597 U.S. at 19 (stating "*Heller* and *McDonald* do not support applying means-ends scrutiny"); *id.* at 18–19 (explaining the means-ends scrutiny previously employed by the courts of appeals). For this case, I think it is sufficient to explain that the challenged law is "nondiscretionary" and that the federal government, the District of Columbia, and almost all fifty states have "implemented a minimum age requirement for some or all firearm purchases." Majority Op. at 48–49; *see also id.* at 49–50 n.9 (collecting statutes).

To summarize, I would hold that if the plain text covers the proposed conduct, the government may rebut the presumption of unconstitutionality and earn a presumption of lawfulness by demonstrating that the challenged regulation is a longstanding regulatory measure of the type identified in *Heller*.

16

2.      **Ordinary Showing**

If the challenged regulation is not presumptively lawful, the government may still prevail by making the ordinary showing outlined in *Bruen* and *Rahimi*. This requires the government to show that "the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1898 (alteration in original) (quoting *Bruen*, 597 U.S. at 29). Although this analysis is historical, the law is not "trapped in amber." *Id.* at 1897. "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 30). When deciding if a regulation "comport[s] with the principles underlying the Second Amendment," courts must consider "[w]hy and how the regulation burdens the right [to keep and bear arms]." *Id.*

It is unclear how historic regulations must be to matter at *Bruen* step two. The Supreme Court has noted but not resolved the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Bruen*, 597 U.S. at 37; *see also Rahimi*, 144 S. Ct. at 1898 n.1. Answering this question is not necessary to this case, so I leave this issue for another day. But I observe that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment

17

when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66; *see also id.* at 66 n.28 (noting that "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence").

* * *

To summarize, when a plaintiff brings a Second Amendment challenge, the threshold question is whether the Amendment's plain text covers the proposed conduct. If it does not, the constitutional challenge fails. If the plain text covers the proposed conduct, there is a presumption of unconstitutionality and the court proceeds to step two.

At step two, the government may rebut the presumption of unconstitutionality and earn a presumption of lawfulness by showing that its regulation is a presumptively lawful regulatory measure. The government is entitled to only a presumption of lawfulness because it has made a lesser showing than if it met the ordinary *Bruen* standard. Alternatively, instead of relying on a presumption, the government may make the ordinary showing required by *Bruen* and *Rahimi*. If the government makes this showing, it prevails because the "conduct falls outside" the Second Amendment. *Bruen*, 597 U.S. at 17.

I acknowledge this framing is imperfect. But in my judgment, it is the most faithful application of Supreme Court precedent.

## II.    APPLICATION

### A.    *Step One: Text*

Turning to the Colorado law, the threshold question is whether the Second Amendment's plain text covers Mr. Pineda's proposed conduct. I conclude that it does.

The first task is defining Mr. Pineda's proposed conduct. Because Mr. Pineda wants to purchase a firearm but is prevented from doing so by the law, the proposed conduct is purchasing firearms. Governor Polis, however, defines the conduct more narrowly as the "desire to purchase guns before [turning] 21." Appellant's Br. at 18. I disagree with this framing because it conflates *Bruen* step one and step two. The prohibited conduct is purchasing firearms. Whether the government can regulate purchasing firearms based on age is a question for step two, where the court evaluates possible historical analogues.

For example, consider *Bruen*, where the plaintiffs challenged New York's licensing scheme that issued "public-carry licenses only when an applicant demonstrate[d] a special need for self-defense." 597 U.S. at 11. If the Supreme Court had followed Governor Polis's approach, it would have defined the conduct as "carrying handguns publicly for self-defense [without demonstrating a special need]." *See id.* at 32. But instead, the Court defined the conduct more generally as "carrying handguns publicly for self-defense" and, at step two, evaluated whether the

19

special-need requirement was consistent with history. *Id.* at 32–34. So, using *Bruen*

as a model, the proposed conduct is purchasing firearms.

The next question is whether the Second Amendment's plain text covers

purchasing firearms. In *Heller*, the Supreme Court explained that "the most natural

reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at

582. It further explained that "bear" means to "carry" and has "a meaning that refers

to carrying for a particular purpose—confrontation." *Id.* at 584. So, at first blush, it

may appear that "purchase" falls outside the plain text because neither "have" nor

"carry" cover "purchase." Some courts have reached this conclusion. *See McRorey v.

Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("And on its face 'keep and bear' does not

include purchase—let alone without a background check."); *Nat'l Rifle Ass'n v.

Bondi*, 61 F.4th 1317, 1325 (11th Cir. 2023) (stating "the Second Amendment's plain

text includes only a right 'to keep and bear arms,' not a right to buy them," but

declining to "decide this question" and instead assuming the plain text covers buying

firearms), *reh'g en banc granted*, *opinion vacated*, 72 F.4th 1346 (11th Cir. 2023);

*see also B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) (stating

"the right to acquire firearms" is an "ancillary right" that "only implicates the Second

Amendment in limited circumstances").[6]

---

[6] Some courts have held that the Second Amendment's plain text does not cover
purchasing firearms but that limitations on purchasing firearms may be so burdensome
they trigger *Bruen*'s two-step framework. *See, e.g.*, *McRorey*, 99 F.4th at 838 n.18 ("Even
under our reading of *Bruen*, the Second Amendment extends protection to acquisition.

I believe these cases read *Heller* too narrowly. The Supreme Court did not define "keep" and "bear" in isolation and then narrow the Second Amendment right to only possessing and carrying arms. Instead, the Court also considered what rights were implied by "keep and bear Arms."

To illustrate, the Court explained that at the founding, "'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. "When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* Thus, the phrase "bear arms" "*implies* that the carrying of the weapon is for the purpose of 'offensive or defensive action.'" *Id.* (emphasis added). Later in its analysis, the Court reviewed postratification commentary and favorably quoted an antislavery advocate who wrote that "the right to keep and bear arms[] also implies the right to use them if necessary in self defence; without this right to use the guaranty would have hardly

---

There is no question that regulations on purchase so burdensome that they act as *de facto* prohibitions on acquisition would be subject to constitutional challenge under *Bruen*'s rigorous historical requirement."); *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) (explaining that Ninth Circuit precedent holds "that the plain text of the Second Amendment only prohibits meaningful constraints on the right to acquire firearms"); *Ortega v. Lujan Grisham*, No. CIV 24-0471 JB/SCY, 2024 WL 3495314, at *26, *28 (D.N.M. July 22, 2024), *appeal filed*, No. 24-2121 (10th Cir. Aug. 22, 2024) (concluding that "the Second Amendment's plain text does not cover the conduct of purchasing a firearm" but agreeing that the Second Amendment right would be meaningless if the right to acquire firearms did not receive some protection).

    I find this reasoning unpersuasive for two reasons. First, this analysis is too similar to the test rejected by the Supreme Court, which required considering how closely the law came to the core Second Amendment right and the severity of the burden on that right. *See Bruen*, 597 U.S. at 18–19. Second, the question at *Bruen* step one is not how burdened the right to keep and bear arms is but whether the proposed conduct is covered by the Second Amendment's plain text. *See id.* at 17, 24.

been worth the paper it consumed." *Id.* at 609 (quoting Joel Tiffany, A Treatise on the Unconstitutionality of American Slavery 117–18 (Cleveland, J. Calyer 1849)). The Court also quoted an 1880 treatise that stated "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *Id.* at 617–18 (quoting Thomas Cooley, The General Principles of Constitutional Law in the United States of America 271 (Boston, Little, Brown, & Co. 1880)).

I do not mean to imply that by quoting these historical sources, the Court was defining the outer bounds of the Second Amendment right. Rather, these quotations demonstrate that the Court reads the plain text to cover concomitant rights that are necessary to exercising "the individual right to possess and carry weapons in case of confrontation." *See id.* at 592. Justice Alito's dissent in *New York State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336 (2020) (per curiam), confirms this reading.

In *New York State Rifle & Pistol Ass'n*, plaintiffs argued a New York City rule violated the Second Amendment because it prevented them from transporting their firearms to a second home or shooting range outside the city. 590 U.S. at 337–38. After granting certiorari, the Supreme Court vacated the Second Circuit's judgment on mootness grounds and remanded. *Id.* at 339. Justice Alito—joined by Justices Thomas and Gorsuch—dissented, concluding that the case was not moot and that New York City's rule violated the Second Amendment. *Id.* at 340–70 (Alito, J., dissenting).

22

Justice Alito explained that a "necessary concomitant" of "the right to keep a handgun in the home for self-defense" is "the right to take a gun outside the home for certain purposes." *Id.* at 364 (Alito, J., dissenting). One of those purposes is taking "a gun to a range in order to gain and maintain the skill necessary to use it responsibly." *Id.* at 365 (Alito, J., dissenting). To support this proposition, Justice Alito quoted *Heller*: "to bear arms implies something more than the mere keeping [of arms]; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *Id.* at 365 (Alito, J., dissenting) (alteration in original) (quoting *Heller*, 554 U.S. at 617–18). Although there were other ways to train with a handgun—for example, renting a gun from the range—the Second Amendment right was still burdened. *Id.* at 365, 369 (Alito, J., dissenting).

Because the "right at issue [was] a concomitant of the same right recognized in *Heller*," Justice Alito explained that it was the City's burden to justify the rule. *Id.* at 365 (Alito, J., dissenting). The City did not justify the rule, so he would have held it unconstitutional. *Id.* at 365–66 (Alito, J., dissenting) ("[The City] points to no evidence of laws in force around the time of the adoption of the Second Amendment that prevented gun owners from practicing outside city limits."); *id.* at 369–70. Notably, Justice Kavanaugh agreed the case was moot but wrote a concurrence stating he agreed with Justice Alito's "general analysis of *Heller* and *McDonald*." *Id.* at 340 (Kavanaugh, J., concurring). So, after *Heller*, four justices have supported a view that the Second Amendment's plain text protects "necessary concomitants" of

23

the rights defined in *Heller*. *See id.* at 364–65 (Alito, J., dissenting, joined by

Thomas, J., and Gorsuch, J.); *id.* at 340 (Kavanaugh, J., concurring); *see also Luis v.*

*United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in judgment) ("The

right to keep and bear arms, for example, 'implies a corresponding right to obtain the

bullets necessary to use them' and 'to acquire and maintain proficiency in their use.'"

(first quoting *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir.

2014); and then quoting *Ezell v. Chicago*, 651 F.3d 984, 704 (7th Cir. 2011))).[7]

Turning to the case at hand, I would conclude that purchasing firearms is a

necessary concomitant of the right to "keep and bear Arms." Keeping and bearing

arms implies something more than just possessing and carrying weapons—it implies

the right to *acquire* arms in order to use them for self-defense. *See Heller*, 554 U.S. at

617–18; *N.Y. State Rifle & Pistol Ass'n*, 590 U.S. at 365 (Alito, J., dissenting). After

all, acquisition is a prerequisite to possession.[8]

---

[7] The majority argues that "it seems inconsistent to conclude that step one is a textual analysis and to then take an expansive view of the text to infer concomitant rights." Majority Op. at 45. That is a fair critique, but the Supreme Court appears to have adopted this approach. *See Heller*, 554 U.S. at 584, 609, 617–18; *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 364–65 (2020) (Alito, J., dissenting); *id.* at 340 (Kavanaugh, J., concurring); *Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

[8] The majority notes that Justice Alito's dissent and the examples in *Heller* identified conduct that is "much more closely related to the actual text than the conduct at issue here, i.e., sale and purchase." Majority Op. at 37 n.4. But regardless, acquiring a firearm, like the other identified conduct, is protected because it is necessary to exercising the right to "keep and bear Arms." *See N.Y. State Rifle & Pistol Ass'n*, 590 U.S. at 364–65 (Alito, J., dissenting) (stating that a "necessary

24

Of course, the challenged law applies only to purchases, so individuals under twenty-one may still acquire firearms through other means, like inheritance. But I do not see how a person's ability to exercise his or her Second Amendment right can be conditioned on the serendipitous receipt of a firearm from another person. *See Hirschfeld v. Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 417 (4th Cir.) ("[O]ther options are not always readily available to many individuals. Not all young adults have friends or family members who are able or willing to gift them a gun."), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). Moreover, the Supreme Court in *Heller* held that banning handguns burdened the Second Amendment right, even if other firearms were not banned. *See* 554 U.S. at 629 ("It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."). Accordingly, I do not think it is enough to say there are other avenues through which a person under twenty-one *might* acquire a firearm. *Cf. New York State Rifle & Pistol Ass'n*, 590 U.S. at 365 (Alito, J., dissenting) (concluding the Second Amendment right was burdened even if gun owners could "practice at a range using a gun that is owned and rented at the range"

---

concomitant" of the "core Second Amendment right" is the right "to take a gun outside the home in order to transfer ownership lawfully"); *see also id.* at 365 (stating that another concomitant right "is to take a gun to a range in order to gain and maintain the skill *necessary* to use it responsibly" (emphasis added)); *Luis*, 578 U.S. at 27 (Thomas, J., concurring) ("Without protection for these closely related rights, the Second Amendment would be toothless.").

25

because "the same model gun that the person owns might not be available at the range" and because "each individual gun may have its own characteristics").

For these reasons, I would join the courts that have held the Second Amendment's plain text covers purchasing firearms. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (per curiam) (agreeing with the Tennessee Supreme Court that the "right to keep arms[] necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair" (quoting *Andrews v. State*, 50 Tenn. 165, 178 (Tenn. 1871)); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (stating that *Heller* "'implies a corresponding right to acquire and maintain proficiency' with common weapons" (quoting *Ezell*, 651 F.3d at 704)); *cf. B & L Prods.*, 104 F.4th at 118 (holding that "the right to acquire firearms" "only implicates the Second Amendment in limited circumstances" but acknowledging "that unless the right to *acquire* firearms receives some Second Amendment protection, the right to keep and bear arms would be meaningless").

In sum, I would hold that the proposed conduct—purchasing firearms—is covered by the plain text of the Second Amendment, resulting in a presumption of unconstitutionality.

26

## B.    Step Two: History

Because the plain text covers the proposed conduct, the burden shifts to Governor Polis to justify the challenged law either by showing it is presumptively lawful or by satisfying the ordinary *Bruen* step-two analysis. I conclude the Colorado law is a presumptively lawful regulatory measure and that Mr. Pineda has failed to rebut the presumption of lawfulness.

I agree with the majority's holding that the Colorado law is a condition and qualification on the commercial sale of arms. Thus, the question is whether the law is longstanding. *See Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30. I conclude that it is because the law is analogous both to laws that existed before the twentieth century and in the early twentieth century.[9]

First, the Colorado law is analogous to laws that existed before the twentieth century. Before 1900, at least twenty jurisdictions made it unlawful to sell handguns and other deadly weapons to minors[10] under the age of twenty-one.[11] Five of these

---

[9] The text of and citations for the historical laws discussed in this Section are included in an Appendix to this concurrence.

[10] Some jurisdictions defined "minor" as men under the age of twenty-one and women under the age of eighteen. *See, e.g.*, Illinois. That distinction is not material, however, because the point is that jurisdictions set twenty-one as the minimum age for a segment of "the people."

[11] Alabama, Delaware, District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, North Carolina, Territory of Oklahoma, Tennessee, Texas, West Virginia, Wisconsin, Territory of Wyoming.

laws had exceptions[12]—like for hunting or if there was parent consent—but the majority did not include exceptions.[13] Moreover, eighteen of these laws went further than the Colorado law by prohibiting all acquisitions, not just purchases.[14] And although at least thirteen of these laws excepted shotguns, rifles, or other long guns,[15] they all applied to handguns—"the quintessential self-defense weapon." *See Heller*, 554 U.S. at 629. Finally, at least six additional jurisdictions implemented a minimum age for firearm acquisition, although they set the minimum age lower than twenty-one.[16]

The Colorado law is also analogous to laws that existed in the early twentieth century. Between 1900 and 1935, at least thirteen jurisdictions—not including the ones previously discussed—had minimum age requirements for acquiring handguns

---

[12] Illinois (allowing minor's father, guardian, or employer to sell or otherwise transfer firearm to the minor), Kentucky (allowing parent or guardian to sell or otherwise transfer firearm to the minor), Missouri (creating exception for parent or guardian consent), Tennessee (creating exception for a gun for hunting), Texas (creating exception for parent or guardian consent).

[13] Alabama, Delaware, District of Columbia, Georgia, Indiana, Iowa, Kansas, Louisiana, Maryland, Mississippi, North Carolina, Territory of Oklahoma, West Virginia, Wisconsin, Territory of Wyoming.

[14] Alabama, District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Missouri, North Carolina, Territory of Oklahoma, Tennessee, Texas, West Virginia, Wisconsin, Territory of Wyoming.

[15] Alabama, Georgia, Indiana, Iowa, Kentucky, Louisiana, Maryland, North Carolina, Territory of Oklahoma, Tennessee, Texas, Wisconsin, Territory of Wyoming.

[16] Florida (sixteen), Michigan (thirteen), Minnesota (eighteen), New Jersey (fifteen), Pennsylvania (sixteen), Rhode Island (fifteen).

and other deadly weapons.[17] Again, some of these laws had exceptions[18] or applied only to handguns,[19] but all went further than Colorado's law by applying to all acquisitions and not just purchases. And at least one of these laws set a minimum acquisition age at twenty-one.[20]

In sum, Colorado's law is consistent with laws that existed before the early twentieth century—including twenty laws before 1900 that prohibited selling handguns to individuals under twenty-one. This historical evidence is sufficient to demonstrate that laws prohibiting individuals under twenty-one from purchasing firearms are longstanding. *See Heller*, 554 U.S. at 626 (identifying felon dispossession laws as "longstanding"); *McCane*, 573 F.3d at 1048 (Tymkovich, J., concurring) ("[T]he weight of categorical evidence suggests felon dispossession laws

---

[17] Territory of Arizona, California, Connecticut, Territory of Hawaii, Idaho, Massachusetts, New York, North Dakota, Oregon, South Carolina, Utah, Vermont, Virginia.

[18] Idaho (creating exception for parent or guardian consent), Massachusetts (creating exception for instructors who provide "military weapons to pupils for instruction and drill"), Vermont (creating exceptions for acquisition from parent or guardian and instructors who provide "military weapons to pupils for instruction and drill").

[19] California, Connecticut, Hawaii (1927 law), North Dakota, Oregon, South Carolina.

[20] Oregon; *but see* Territory of Arizona (fourteen), California (eighteen), Connecticut (eighteen), Territory of Hawaii (1933 law) (minimum age to acquire rifles, pistols, and revolvers is twenty; minimum age to acquire shotguns is sixteen), Territory of Hawaii (1927 law) (eighteen), Idaho (sixteen), Massachusetts (fifteen), New York (sixteen), North Dakota (eighteen), Utah (fourteen), Vermont (sixteen), Virginia (twelve).

are creatures of the twentieth—rather than the eighteenth—century."); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (explaining the "dearth of felon-disarmament laws in the eighteenth and nineteenth centuries"); *Ortega*, 2024 WL 3495314, at *32 n.11 (collecting law review articles).

Because Colorado's law is a longstanding condition and qualification on the commercial sale of arms, it is a presumptively lawful regulatory measure. *Heller*, 554 U.S. at 626–27, 627 n.26. Mr. Pineda bears the burden of rebutting the presumption, and I agree with the majority that he has not carried that burden. As a result, it is unnecessary to evaluate the Colorado law under the ordinary *Bruen* step-two analysis, and I conclude Mr. Pineda has failed to show a likelihood of success on the merits. I concur with the majority's analysis concerning the remaining preliminary injunction factors.

## III.    CONCLUSION

This case presents a difficult question given the uncertainty in Second Amendment law. But considering the guidance available, I conclude Mr. Pineda's proposed conduct is covered by the Second Amendment's text, but his challenge nonetheless fails because the regulation is presumptively lawful, and he has not rebutted that presumption. For these reasons, I concur.

**APPENDIX**

| Before 1900 | |
|---|---|
| Alabama | Making it unlawful to "sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol." 1856 Ala. Laws 17; *see also Brown v. Beason*, 24 Ala. 466, 466 (1854) (describing the plaintiff's children, "some of whom were over twenty-one years of age, and some minors"); *Saltonstall v. Riley*, 28 Ala. 164, 172 (1856) (describing plaintiff as "a minor under the age of twenty-one years"); *Vincent v. Rogers*, 30 Ala. 471, 473–74 (1857) (explaining that a plaintiff entered a contract when "she was a minor, under twenty-one years of age"). |
| Delaware | Making it unlawful to "knowingly sell a deadly weapon to a minor other than an ordinary pocket knife." 16 Del. Laws 716 (1881); *see also* Revised Statutes of the State of Delaware 608 (The Mercantile Printing Co. ed. 1893) (stating minors may be bound as apprentices or servants until age twenty-one for men and age eighteen for women); Revised Statutes of the State of Delaware 484–85 (James & Webb ed. 1874) (same). |
| District of Columbia | Making it unlawful to "sell, barter, hire, lend or give to any minor under the age of twenty-one" any "deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles." 27 Stat. 116–17 (1892). |
| Florida | Making it unlawful to "sell, hire, barter, lend or give to any minor under sixteen years of age any pistol, dirk or other arm or weapon, other than an ordinary pocket-knife, or a gun or rifle used for hunting, without the permission of the parent of such minor, or the person having charge of such minor." 1881 Fla. Laws 87. |
| | Making it unlawful to sell "pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives . . . to minors." 1895 Fla. Laws 14. |
| Georgia | Making it unlawful "to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane." 1876 Ga. Laws 112; *see also McDowell v. Ga. R.R.*, 60 Ga. 320, 321 (1878) (stating that the "legal majority in this state is twenty-one years; until that age all persons are minors"). |

| Illinois | Making it unlawful for anyone other than the minor's father, guardian, or employer to "sell, give, loan, hire or barter" or to "offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character." 1881 Ill. Laws 73 (Criminal Code); *see also* The Revised Statutes of the State of Illinois 766 (George W. Cothran ed. 1881) (stating that males are minors until age twenty-one and females are minors until age eighteen). |
|---|---|
| Indiana | Making it unlawful "for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person." 1875 Ind. Acts 59. |
| Iowa | Making it "unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor." 1884 Iowa Acts 86; *see also Hoover v. Kinsey Plow Co.*, 8 N.W. 658 (Iowa 1881) (stating that the plaintiff "obtained his majority" at "21 years of age"). |
| Kansas | Making it unlawful to "sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to minors." 1883 Kan. Sess. Laws 159; *see also Burgett v. Barrick*, 25 Kan. 526, 527 (1881) (explaining that when a plaintiff entered a contract he "was an infant, under the age of twenty-one years"). |
| Kentucky | Making unlawful for anyone "other than the parent or guardian" to "sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor." 1860 Ky. Acts 245; *see also Newland v. Gentry*, 57 Ky. (1 B. Mon.) 666, 671 (1857) (referring to twenty-one as the age of majority). |
| Louisiana | Making it unlawful "for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years." 1890 La. Acts 39. |

| | |
|---|---|
| Maryland | Making it unlawful "to sell, barter or give away any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years." 1882 Md. Laws 656. |
| Michigan | Making it unlawful to "sell, give, or furnish to any child under the age of thirteen years, any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same." Additionally, making it unlawful for "any person under the age of thirteen years[] to have in possession" any of the previously listed items. 1883 Mich. Pub. Acts 144. |
| Minnesota | Making it unlawful to, "without the written consent of a magistrate, sell[] or give[] any pistol or firearm to any person under the age of eighteen (18) years." Minn. Stat. § 333 (1885). |
| Mississippi | Making it unlawful "for any person to sell to any minor . . . knowing him to be a minor" "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description." 1878 Miss. Laws 175; *see also Rohrbacher v. City of Jackson*, 51 Miss. 735, 744, 746 (1875) (explaining that allowing "female citizens over eighteen years of age" to vote "authorizes females, some of whom are minors, to have a voice in the election"); *Acker v. Trueland*, 56 Miss. 30, 34 (1878) (identifying twenty-one years as the age of majority). |
| Missouri | Making it unlawful to "sell or deliver, loan or barter to any minor," "without the consent of the parent or guardian of such minor," "any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon." 1 The Revised Statutes of the State of Missouri 224 (John A. Hockaday et al. eds. 1879); *see also id.* at 430 (stating males under twenty-one years are minors and females under eighteen years are minors). |
| New Jersey | Making it unlawful "to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school." 1885 N.J. Laws 52. |

| North Carolina | Making it "unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot." 1893 N.C. Sess. Laws 468; *see also State v. Kittelle*, 15 S.E. 103, 103 (N.C. 1892) (referring to a person under twenty-one years as "a minor"). |
|---|---|
| Territory of Oklahoma | Making it "unlawful for any person within this Territory[] to sell or give to any minor" any "pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles," "loaded cane, [or] billy." 1890 Okla. Sess. Laws 495; *see also* 1890 Okla. Sess. Laws 752 (defining minors as "[m]ales under twenty-one years of age" and "[f]emales [u]nder eighteen years of age"). |
| Pennsylvania | Making it unlawful to "sell or cause to be sold[] to any person under sixteen years of age[] any cannon, revolver, pistol or other such deadly weapon." 1881 Pa. Laws 111–12. |
| Rhode Island | Making it unlawful to "sell to any child under the age of fifteen years, without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate." 1883 R.I. Pub. Laws 157. |
| Tennessee | Making it "unlawful for any person to sell, loan, or give, to any minor a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife," except "that this act shall not be construed so as to prevent the sale, loan, or gift, to any minor of a gun for hunting." 1856 Tenn. Pub. Acts 92; *see also Seay v. Bacon*, 36 Tenn. (1 Sneed) 99, 102 (1856) (referring to twenty-one years as the age of majority). |
| Texas | Making it unlawful to "knowing sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof." 1897 Tex. Gen. Laws 221–22; *see also* 1 Sayles' Annotated Civil Statutes of the State of Texas 1009 (John Sayles & Henry Sales eds. 1898) (stating that "[m]ale persons under twenty-one years of age" and unmarried "females under twenty-one years of age" are minors). |

| | |
|---|---|
| West Virginia | Making it unlawful to "sell or furnish [any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character] to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years." 1882 W. Va. Acts 421. |
| Wisconsin | Making it "unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state." 1883 Wis. Sess. Laws 290 (vol. I); *see also Hepp v. Huefner*, 20 N.W. 923, 924 (1884) (referring to those under twenty-one years as minors). |
| Territory of Wyoming | Making it "unlawful for any person to sell, barter or give to any person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person." 1890 Wyo. Terr. Sess. Laws 140. |
| After 1900 ||
| Territory of Arizona | Making it unlawful to "sell or give to any minor under the age of fourteen years, or to any person for the use of such minor, any firearms, or toy pistols from which dangerous and explosive substances may be discharged." 1901 Ariz. Sess. Laws 1244–45 |
| California | Making it unlawful to "sell, deliver or otherwise transfer any pistol, revolver or other firearm capable of being concealed upon the person to any . . . minor under the age of eighteen years." 1923 Cal. Stat. 701. |
| Connecticut | Making it unlawful to "sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver." 1923 Conn. Pub. Acts 3709. |
| Territory of Hawaii | "No person shall sell, barter, hire, lend, or give any pistol or revolver to any person under the age of eighteen years." 1927 Haw. Sess. Laws 211. |
| | Limiting permits "to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more." Additionally, limiting permits "to acquire shotguns . . . to persons of the age of sixteen years or more, irrespective of citizenship." 1933 Haw. Sess. Laws 37. |

| Idaho | Making it unlawful to "directly or indirectly[] sell or deliver, loan or barter to any minor under the age of sixteen (16) years [any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon] without the consent of the parent or guardian of such minor." 1909 Idaho Sess. Laws 6. |
|---|---|
| Massachusetts | Making it unlawful to "sell[] or furnish[] to a minor under the age of fifteen years any firearms, air guns or other dangerous weapon . . . but instructors and teachers may furnish military weapons to pupils for instruction and drill." 1909 Mass. Acts 148. |
| New York | Making it unlawful to "offer[], sell[], loan[], lease[], or give[] any gun, revolver, pistol or other firearm or any airgun, spring-gun or . . . any instrument or weapon commonly known as a toy pistol . . . to any person under the age of sixteen years." 1911 N.Y. Laws 442. |
| North Dakota | Making it unlawful to "sell, barter, hire, lend or give to any minor under the age of eighteen years any pistol or revolver." 1923 N.D. Laws 381. |
| Oregon | Making it "unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years." 1917 Or. Laws 808. |
| South Carolina | Making it unlawful to "sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot." Additionally, making it unlawful for "[a]ny person being the parent or guardian of, or attending in *loco parentis* to any child under the age of twelve years" to "knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm." 1923 S.C. Acts 221. |
| Utah | Making it unlawful to "sell[], give[], or dispose[] of, or offer[] to sell, give or dispose of, any pistol, gun, target gun or other firearm, to any person under the age of fourteen years." 1905 Utah Laws 60. |

| Vermont | Making it unlawful for "[a] person, other than a parent or guardian," to "sell[] or furnish[] to a minor under the age of sixteen years a firearm or other dangerous weapon" but creating an exception for "an instructor or teacher who furnishes military weapons to pupils for instruction and drill." 1913 Vt. Acts & Resolves 306. |
|---|---|
| Virginia | Making it "unlawful for any person, firm, corporation, or association, to sell, barter, exchange, furnish, or dispose of by purchase, gift, or in any other manner, any toy gun, pistol, rifle, or other toy firearm, if the same shall, by means of powder or other explosives discharge blank or ball charges, to any person under the age of twelve years." 1902–04 Va. Acts 261. |